UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **BRYAN P. SPENCE,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:23-cv-00552-O** |
| | § | |
| **AMERICAN AIRLINES, INC., and** | § | |
| **AMERICAN AIRLINES EMPLOYEE** | § | |
| **BENEFITS COMMITTEE,** | § | |
| | § | |
| **Defendants.** | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are Defendants' Motion for Summary Judgment (ECF No. 99), Brief in

Support (ECF No. 100), and Appendix (ECF No. 101), filed on February 26, 2024; Plaintiff's

Response (ECF No. 110) and Appendix (ECF No. 111), filed on March 18, 2024; and Defendants'

Reply (ECF No. 113) and Appendix (ECF No. 114), filed on April 1, 2024. Having considered the

briefing and applicable law, the Court **DENIES** Defendants' Motion for Summary Judgment.

## I.    BACKGROUND[1]

### A.  Parties and Retirement Plans

American Airlines, Inc. ("AA") and American Airlines Employee Benefits Committee (the

"EBC" and, together with AA, "Defendants") manage the American Airlines 401(k) Plan and the

American Airlines 401(k) Plan for Pilots (collectively, "the Plan"). In so doing, Defendants are

fiduciaries under the Employee Retirement Income Security Act of 1974 ("ERISA"). 29 U.S.C. §

1011, *et seq.* Plaintiff Bryan Spence ("Spence" or "Plaintiff") is a pilot employed by American, as

---

[1] Unless otherwise specified, these undisputed facts are drawn from Plaintiff's Amended Complaint (ECF No. 41), Defendants' Motion for Summary Judgment (ECF Nos. 99, 100), Plaintiff's Response in Opposition (ECF No. 110), and Defendants' Reply (ECF No. 113).

well as an F-16 Instructor Pilot at the Naval Air Station Joint Reserve Base in Fort Worth, who invests in the Plan. Plaintiff brings this lawsuit on behalf of himself and on behalf of the class certified by the Court on May 22, 2024:

> All participants and beneficiaries of the American Airlines, Inc. 401(k) Plan and/or the American Airlines, Inc. 401(k) Plan for Pilots from June 1, 2017 through the date of judgment (the "Class Period"), excluding (i) Plan participants and beneficiaries who invested solely through the Plan's self-directed brokerage account, and (ii) Defendants and any of their directors, officers, or employees with responsibility for the Plans investment or administration (the "Class").[2]

**B.  The Class Action Lawsuit**

This class action lawsuit arises out of Defendants' alleged mismanagement of the Plan due to investing—or allowing others to invest—assets in pursuit of environmental, social, and governance ("ESG") initiatives. ESG interests include environmental sustainability, social justice concerns, and leadership accountability to shareholders. In response to AA's ESG-focused investment practices, the Amended Complaint asserts two causes of action under ERISA: (1) Defendants breached their duties of loyalty and prudence and (2) Defendants breached their duty to monitor. Plaintiff initially argued that these breaches manifested in two ways.

The first theory of liability is that Defendants used the Plan to invest in ESG funds. By including these ESG funds in the Plan that underperformed compared to similar funds in the broader market, Plaintiff contends that Defendants breached their duties of loyalty and prudence by failing to act solely in the Plan participants' financial interests and remove the imprudent ESG funds (the "Challenged Fund Theory"). However, in subsequent briefing, Plaintiff expressly abandoned the Challenged Fund Theory to streamline this case and focus on the primary issue.[3]

---

[2] May 22, 2024 Order 24, ECF No. 122.
[3] Pl.'s Reply in Support of Mot. for Class Cert. 1, ECF No. 76 (stating that Plaintiff is "narrowing . . . the class definition to exclude the self-directed brokerage window [or the Challenged Fund Theory]" because "focusing this case on proxy voting activism will streamline it").

The second—and remaining—theory of liability is that Defendants violated their fiduciary duty by mismanaging the Plan by including funds "that are managed by investment managers that pursue non-financial and nonpecuniary ESG policy goals through proxy voting and shareholder activism" on their investment portal (the "Challenged Manager Theory"). Specifically, Plaintiff contends that the Plan primarily contains funds administered by investment management firms like BlackRock Institutional Trust Company, Inc. ("BlackRock"). According to Plaintiff, certain managers like BlackRock pursue pervasive ESG agendas. That is, BlackRock's "engagement strategy . . . covertly converts the Plan's core index portfolios to ESG funds." As a result, BlackRock's investments harm the financial interests of Plan participants and beneficiaries because BlackRock focuses on socio-political outcomes rather than exclusively on financial returns. BlackRock is just one of the many investment managers Plaintiff references by name. Due to such actions by Plan investment managers, Plaintiff argues that Defendants violated their fiduciary duties to act solely in the Plan's financial interests by investing in funds managed by BlackRock and others who engage in conduct, such as proxy voting, to support ESG policies.

### C.  Administration of the Plan

Plan participants contribute to their individual retirement accounts by choosing from a menu of investment options selected by Defendants, who are responsible for selecting and monitoring the Plan's options.[4] Defendants also delegate proxy voting power to the Plan's investment managers.[5] The largest of those managers is BlackRock.[6] BlackRock votes proxies in

---

[4] Pl.'s App. 0341, ECF No. 111-2 (Pilots Plan Section 4.4(b)); *id.* at 0255, ECF No. 111-1 (Non-Pilots Plan Section 8.6(a)); Defs.' App. 0002–04, ECF No. 101-1; *see also id.* at 0028–29 (authorizing "the power to appoint 'investment managers'"); *id.* at 0043–44 (same); *id.* at 0127 (same).
[5] Defs.' App. 0132, ECF No. 101-1.
[6] *See id.* at 0170 ("BlackRock serves as the investment manager for all of the Tier II (Index Funds), with the exception of the High Yield Index Funds which is managed by SSgA.").

accordance with its own proxy voting policy.[7] This policy incorporates ESG considerations.[8] Pursuant to its agreement with AA, BlackRock must submit quarterly certifications that advise whether any proxies were not voted in accordance with BlackRock's policy.[9] To date, there is no evidence in the record that BlackRock has ever submitted a certification. Notably, BlackRock also enjoys a significant financial stake in AA, owning more than 5% of AA's stock and approximately $400 million of AA's fixed income debt.[10]

Despite delegating proxy voting power, Defendants retain an important oversight role. The EBC, in particular, meets quarterly to review the performance of the Plan's investment options, including the underlying investment managers, and "to assess whether any changes to the Plans' investment lineups [a]re warranted."[11] At each quarterly meeting, the EBC reviews and considers reporting on market developments, as well as reporting on the Plans' investment managers (and potential alternative managers), including fees, overall performance relative to benchmarks and peer groups, and any noteworthy qualitative information.[12] Notwithstanding these regular evaluations, the EBC never discussed or reviewed proxy voting by BlackRock or any other investment managers.[13]

---

[7] *Id.* at 0384–85, ECF No. 101-2.
[8] *See id.* at 0436–0461 (BlackRock proxy voting guidelines); *id.* at 0452–56 (discussing specific ESG voting policies).
[9] *Id.* at 0399.
[10] Pl.'s App. 0481–82, ECF No. 111-2 (Request for Admission No. 10); *see id.* at 0488 (containing internal email communications discussing BlackRock's financial interests in AA in response to an article discussing BlackRock's climate change commitments).
[11] Defs.' App. 0005, ECF No. 101-1; *id.* at 0684–86, ECF No. 101-3 (Kerr Depo. at 23:8–23:12); *id.* at 0736 (Eberwein Depo. at 23:4–23:8).
[12] *Id.* at 0006, ECF No. 101-1; *id.* at 0145–68 (2017 Plan investment review); *id.* at 0177–200 (2018 Plan investment review); *see also id.* at 0302–07 (Aon review of BlackRock).
[13] Pl.'s App. 0006–11, ECF No. 111-1 (Kerr Depo. at 37:15–18; 68:7–11); *id.* at 0023 (Menezes Depo. at 53:1–13; 56:3–6; 53:14–20); *id.* at 0047–49 (Montana Depo. at 32:24-33:9; 33:13–18; 35:3–7; 39:23–40:3; 50:5–11).

Beyond its oversight role, the EBC otherwise delegates the most granular oversight of the Plan to others—specifically, experts. Defendants rely upon the assistance of both external and internal experts to review, monitor, and evaluate the Plans' investment options across numerous dimensions.[14] As its external expert, the EBC engaged Aon Investments USA, Inc. ("Aon"), an investment consulting firm, to act as an outside advisor to the Plan.[15] Aon utilizes specialized manager research teams comprised of hundreds of dedicated research professionals to analyze quantitative data and conduct qualitative reviews.[16] Aon also conducts interviews of managers to assess their business structure, activities, operations, and compliance practices, among other factors.[17]

Defendants' internal experts are a team of investment professionals in AA's Asset Management Group. These AA individuals provided additional expertise on a regular basis and also served as a layer of oversight for Aon's work.[18] The Asset Management Group met with existing and prospective investment managers on a quarterly basis to understand their investment strategies.[19] This internal group also regularly met with Aon and conducted their own independent analyses of the Plan's investments.[20] These internal and external experts identify material issues

---

[14] Defs.' App. 0005–06, ECF No. 101-1; *id.* at 0670–671, ECF No. 101-3 (Montana Depo. at 24:1–25:8); *id.* at 0687–88 (Kerr Depo. at 41:19–42:25).

[15] *Id.* at 0005, ECF No. 101-1.

[16] *Id.* at 0007–08; *id.* at 0015, 0018–20; *id.* at 0302–06; *id.* at 309–14; *id.* at 0743, ECF No. 101-3; *id.* at 0749–50.

[17] *Id.* at 0676 (Montana Depo. at 30:12–30:15) (explaining that investment managers were being "very fulsomely reviewed" by Aon's research team); *id.* 0718–19 (Menezes Depo. at 64:25–65:22) (testifying to awareness that Aon applied an "army of resources" to monitoring and advising on the Plans' investment options).

[18] *Id.* at 0009–10, ECF No. 101-1.

[19] *Id.* at 0010; *id.* at 0670–71, ECF No. 101-3 (Montana Depo. at 24:1–25:8); *id.* at 0696–97 (Menezes Depo. at 20:6–21:9); *id.* at 0698–99 (Menezes Depo. at 25:13–26:15); *id.* at 0702–03 (Menezes Depo. at 36:6–37:18).

[20] *Id.* at 705–06 (Menezes Depo. at 44:20–45:15); *id.* at 0724–25 (Menezes Depo. at 90:14–91:20); *id.* at 0008–10, ECF No. 101-1.

for Defendants to consider in its administration of the Plan.[21] On some occasions, experts have raised issues, concerns, and opportunities for improved risk/return expectations or lower fees to the EBC.[22]

### D. ESG Activism

In 2017, BlackRock started to actively support ESG proposals at major energy companies.[23] By June of 2017, Larry Fink, BlackRock's CEO, publicly disavowed President Trump's decision to leave the Paris Climate agreement.[24] For the next two years, Fink continued to signal ESG commitments, including his desire to use proxy votes to push BlackRock's socio-political agenda onto companies through open letters to CEOs.[25] By early 2020, Fink published an open letter to CEOs that stated "[c]limate change has become a defining factor in companies' long-term prospects."[26] Fink's letter touted BlackRock's climate change initiatives, including its founding role in the Task Force on climate-related financial disclosures and signing the United Nations' Principles for Responsible Investment.[27]

Fink's letter captured the attention of Defendants. The day after its issuance, senior AA executives emailed about the letter.[28] Specifically, AA's Director of Sustainability, Ken Menezes,

---

[21] *Id.* at 0679, ECF No. 101-3 (Montana Depo. at 96:14–96:18); *id.* at 700 (Menezes Depo. at 31:9–18); *id.* at 0717–18 (Menezes Depo. at 63:14–64:2).

[22] *See, e.g., id.* at 0010–11 (describing placement of investment manager on the watch list and later replacing that manager); *id.* (recommending a transition to two new managers to increase performance relative to benchmarks); *id.* (recommending removal of passively managed fund to replace with new actively managed fund due to higher expected risk-adjusted returns); *id.* at 0158, ECF No. 101-1 (describing underperformance of Jackson Square Partners); *id.* at 0091 (listing opportunities for improved returns); *id.* at 0273 (moving TCW's Core Plus Fixed Income strategy from "Buy" to "In Review" due to recent changes" that may impact the Plan); *id.* at 0305 (listing no major developments or key monitoring points for the given review period).

[23] Pl.'s Expert Report of J.B. Heaton 5–7, ECF No. 50-1.

[24] *Id.* at 6.

[25] *Id.* at 6–10.

[26] *Id.* at 10.

[27] *Id.*

[28] Pl.'s App. 0488–49, ECF No. 111-2.

6

acknowledged BlackRock managed "a little over $10 billion" of Plan assets.[29] Shortly thereafter, AA executives emailed an article titled, "How to Make Your 401(k) a Little Less Evil."[30] Around this same time, AA's Asset Management Group prepared a presentation for the EBC about the United States Department of Labor's warning to plan sponsors and fiduciaries that "ESG cannot stand on its own as satisfaction of fiduciary duty."[31] It does not appear that this presentation was ever formally discussed.[32]

By the end of 2020, Engine No. 1—a climate activist firm—published a letter to Exxon's Board of Directors, asking them to explore clean and net-zero emission energy options.[33] That same month, BlackRock publicly signaled its support for shareholder proposals on climate change.[34] Consistent with its public stance, BlackRock proceeded to oppose several management-recommended directors at energy companies because they failed to meet BlackRock's climate goals or failed to adequately diversify their corporate boards.[35] On May 26, 2021, BlackRock voted

---

[29] *Id.* at 0488.

[30] *Id.* at 0600–01.

[31] Defs.' App. 0322, ECF No. 101-2; Pl.'s App. 0487, ECF No. 111-2 (February 28, 2020 email attaching article titled "How to Make Your 401(k) a Little Less Evil"), *id.* at 600–01 (article).

[32] *See* Pl.'s App. at 0003–04, ECF No. 111-1 (Kerr Depo. at 28:25–29:1; 29:15–17, 24) (testifying that Aon never advised the EBC on anything regarding ESG); *id.* at 0006 (Kerr Depo. at 37:15–18) (recalling no discussion of proxy voting at any EBC meeting); *id.* at 0008 (Kerr Depo. at 46:8–20) (recalling no discussion of ESG at any EBC meeting, with AA Managing Director of Asset Management responsible for overseeing the Plan, or with any Aon representative); *id.* at 0011 (Kerr Depo. at 68:7–11) (recalling no discussion about BlackRock's proxy voting policy with any member of the EBC); *id.* at 0012 (Kerr Depo. at 72:7–14) (recalling no discussions about ESG at any EBC meeting ever); *id.* at 0023 (Menezes Depo. at 53:1–20; 56:3–6) (recalling no AA Asset Management staff bringing up ESG during meetings with the Chairs of the EBC); *id.* at 0047–48 (Montana Depo. at 32:24–33:9) (noting that Aon and AA Asset Management Staff never raised proxy voting issues); *id.* at 0048 (Montana Depo. at 33:13–18) (noting that EBC does not monitor investment managers' proxy voting); *id.* at 0048 (Montana Depo. at 35:3–7) (noting that Aon has never raised a proxy voting issue with the EBC); *id.* at 0049, 0052 (Montana Depo. at 39:23–40:3; 50:5–11) (stating that the decision to delegate proxy voting to investment managers was never reviewed by the EBC and the EBC never considered prohibiting investment managers from considering ESG in their proxy voting); *id.* at 0055 (Montana Depo. at 96:10–13, 19–22) (stating that no one ever raised with the EBC that BlackRock was voting proxies that hurt some of the stocks in the Plan's funds).

[33] Pl.'s Expert Report of J.B. Heaton 11–12, ECF No. 50-1.

[34] *Id.* at 13.

[35] *Id.* at 16–18.

in support of Engine No. 1's dissident directors because Exxon failed to meet BlackRock's climate demands.[36] Three of Engine No. 1's dissident-director nominees were ultimately elected to Exxon's board.[37] In response to this election, Exxon's stock prices, along with other energy stocks, fell.[38] Despite the impact of BlackRock's ESG-oriented activism on energy stock prices, Defendants allowed BlackRock continued to manage billions of dollars of Plan assets.

The following year, in August 2022, AA Director of Asset Management, Alex Ruehle, emailed BlackRock about Texas's letter regarding ESG activism.[39] Yet Ruehle—nor any other members of the AA Asset Management Group—raised BlackRock's ESG activism with the EBC even though the EBC was renegotiating the Plan's investment agreement with BlackRock. At that time, a vote on whether to retain BlackRock as the Plan's largest investment manager was set for the following month.[40] Months later, Ruehle again reached out to BlackRock regarding the expansion of its proxy-voting choices for clients.[41] But once again, the EBC did not discuss BlackRock's proxy voting, including its new options, at the December 2022 EBC meeting.[42] And the EBC never discussed BlackRock's proxy voting at subsequent meetings.[43]

Defendants' first review of "ESG . . . factors and influences for each [investment] manager" occurred on June 12, 2023—a mere ten days after Plaintiff initiated this lawsuit.[44] This review requested, for the first time, "a summary of how each manager uses ESG in the management of

---

[36] *Id.* at 18.

[37] *Id.* at 19–20.

[38] *Id.* at 32–34; Decl. & Suppl. Expert Report of J.B. Heaton 2, ECF No. 74-1.

[39] Pl.'s App. 0627–29, ECF No. 111-2.

[40] *Id.* at 0634–38.

[41] *Id.* at 0650; *see also id.* at 0647 (containing BlackRock's email to Menezes notifying him of the expanded proxy-voting choices).

[42] *Id.* at 0639–42.

[43] *E.g.*, *id.* at 0643–46.

[44] *Id.* at 0598 (listing potential question topics as "AA feedback on the lawsuit," "ESG – factors and influences for each manager" and "[g]etting a summary of how each manager uses 'ESG' tin the management of their strategy"); *see also* Pl's Compl. 43, ECF No. 1 (filed on June 2, 2023).

their strategy."[45] As AA's Director of Sustainability, Jill Blickstein,  put it, AA "had never done that before."[46] Three months later, the EBC finally reviewed proxy voting by the Plan's investment managers at the September 27, 2023 EBC meeting.[47]

## II.   LEGAL STANDARD

### A.  Summary Judgment

A party is entitled to summary judgment as a matter of law when the pleadings and evidence before the court show that no genuine issue exists as to any material fact. FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "To determine whether there are any genuine issues of material fact, the court must first consult the applicable substantive law to ascertain what factual issues are material." *Lavespere v. Niagra Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990). Disposing of a case through summary judgment serves to reinforce the purpose of the Federal Rules of Civil Procedure "to achieve the just, speedy, and inexpensive determination of actions, and when appropriate, affords a merciful end to litigation that would otherwise be lengthy and expensive." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1197 (5th Cir. 1986) (footnote omitted).

All of the evidence must be viewed in the light most favorable to the nonmovant, but the movant may not satisfy his or her summary judgment burden with either conclusory allegations or unsubstantiated assertions. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citations omitted); *Calbillo v. Cavender Oldsmobile, Inc.,* 288 F.3d 721, 725 (5th Cir. 2002) (citations omitted). A genuine issue of material fact exists "if the evidence is such that a reasonable factfinder could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  "An issue is 'genuine'

---

[45] Pl.'s App. at 0037, ECF No. 111-1 (Menezes Depo. 129:5–7, 131:16–18, 131:23–132:2).
[46] *Id.* (Menezes Depo. at 132:3-4).
[47] *Id.* at 0651, ECF No. 111-2.

if it is real and substantial, as opposed to merely formal, pretended, or a sham." *Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 489 (5th Cir. 2001) (cleaned up). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. Although the Court is required to consider only the cited materials, it may consider other materials in the record. FED. R. CIV. P. 56(c)(3). Nevertheless, "Rule 56 does not impose on the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n.7 (5th Cir. 1992). Parties should "identify specific evidence in the record, and . . . articulate the 'precise manner' in which that evidence support[s] their claim." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994) (citations omitted).

"If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim." *Norwegian Bulk Transp. A/S v. Int'l Marine Terminals P'ship*, 520 F.3d 409, 412 (5th Cir. 2008) (citing *Celotex*, 477 U.S. at 325). "The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists." *Id.*

### B.  ERISA

The primary purpose of ERISA is to protect participants and beneficiaries of employee retirement plans. *Pilot Life Ins. Co v. Dedeaux*, 481 U.S. 41, 44 (1987). One way in which ERISA achieves this purpose is by imposing fiduciary duties. *Langbecker v. Elec. Data Sys. Corp.*, 476 F.3d 299, 307 (5th Cir. 2007). "An ERISA fiduciary must act with prudence, loyalty and disinterestedness, requirements carefully delineated in the statute." *Id.* (citing 29 U.S.C. § 1104(a)). To state a claim for breach of a fiduciary duty under ERISA, a plaintiff must allege, or

10

set forth facts from which the court could reasonably infer, that: (1) the plan is governed by ERISA, (2) the defendant is a fiduciary of the plan, and (3) the defendant breached its fiduciary duties under ERISA, resulting in losses to the plan's participants. *Seidner v. KimberlyClark Corp.*, No. 3:21-CV-867-L, 2023 WL 2728714, at *6 (N.D. Tex. Mar. 30, 2023); *Blackmon v. Zachary Holdings, Inc.*, No. 5:20-CV-988-DAE, 2021 WL 2190907, at *3 (W.D. Tex. Apr. 22, 2021).

## III.   ANALYSIS

Defendants seek summary judgment on both of Plaintiff's ERISA claims.[48] Specifically, Defendants challenge only the third element—breach of a fiduciary duty—and, even if a breach occurred, no losses resulted.[49] The parties do not dispute that the first two elements are met, because the Plan is governed by ERISA and Defendants are fiduciaries of the Plan.[50] But as explained below, the Court finds that material fact disputes preclude summary judgment in favor of Defendants as to their duties of prudence and loyalty. Prior to this discussion of the merits, the Court first addresses two preliminary issues: (1) whether Plaintiff's theory of liability was actually pleaded and (2) whether Plaintiff may proceed to trial on claims against both Defendants.

### A.   Theory of Liability

The Court begins with Defendants' characterization of Plaintiff's theory of liability as an unpleaded "intervention theory."[51] According to Defendants, Plaintiff has "shifted to a new theory found nowhere in the Amended Complaint" and "not addressed in the Court's Order on

---

[48] Defs.' Br. in Support of Mot. for Summ. J. 14–28, ECF No. 100.
[49] *Id.* at 16, 21.
[50] However, as explained in Section II.B, Defendants argue that AA is not a fiduciary to the same extent as the EBC. But Defendants do not otherwise appear to argue that AA lacks *any* fiduciary role whatsoever—just that the particular mismanagement of the Plan alleged by Plaintiff is too far removed from AA's limited appointment-only fiduciary role.
[51] Defs.' Br. in Support of Mot. for Summ. J. 24, 25, 38, ECF No. 100; Defs.' Reply Br. in Support of Mot. for Summ. J., 14, 14 n.15, 15, 17, 18, ECF No. 113.

Defendants' motion to dismiss."[52] Under Plaintiff's "new theory," as Defendants put it, the "supposed breach was not the selection or retention of any managers or funds but instead [Defendants'] failure to demand that one particular manager—BlackRock—*change* its proxy voting activity."[53] In other words, Defendants characterize Plaintiff's theory as one of "intervention," in which Defendants should have used the Plan's leverage to dictate and influence the proxy votes taken by managers.[54] This would entail, according to Defendants, "maintain[ing] their investments in managers with misguided proxy votes and capitaliz[ing] on the Plans' continuing investment . . . to change . . . proxy vote[s]."[55] Because Defendants believe this theory is different than merely alleging a fiduciary breach resulted from "the selection or retention of any managers or funds," Defendants take issue with Plaintiff "pivot[ing] . . . to an unpleaded theory."[56] Defendants' overly narrow characterization misunderstands the theory consistently alleged by Plaintiff throughout the case.

In the Amended Complaint, Plaintiff articulated a general theory underlying the alleged breaches of loyalty and prudence: that Defendants failed to act exclusively in the Plan participants' financial interests because they utilized ESG-oriented managers and allowed ESG corporate goals to infiltrate and influence the administration of the Plan.[57] Put simply, Plaintiff's theory is one of mismanagement due to ESG activism. Various actions could fall under this mismanagement umbrella. For instance, Plaintiff regularly mentions the acts of selecting, including, and retaining ESG-oriented managers.[58] But these are not the only possible acts of mismanagement. And these

---

[52] Defs.' Br. in Support of Mot. for Summ. J. 15, ECF No. 100.
[53] *Id.* (emphasis in original).
[54] *Id.*
[55] *Id.* at 2 (emphasis omitted).
[56] *Id.*
[57] Pl.'s Am. Compl. ¶¶ 3, 6, 117–124, 131, ECF No. 41.
[58] *Id.* ¶¶ 117–124.

are certainly not the only acts identified in the Amended Complaint. Other explicitly mentioned examples include the acts of "evaluating," "monitoring," "eliminating," and otherwise not "taking all necessary steps to ensure that the Plan's assets are invested properly."[59] So, too, are the acts of "fail[ing] to investigate the proxy voting and shareholder activism of the investment managers"[60] and "fail[ing] to make any reasonable and timely effort under the circumstances to remedy the breaches."[61] Whether "Defendants should have maintained their investments in managers with misguided proxy votes and capitalized on the Plan's continuing investment with one such manager—BlackRock Inc.—in order to change a single BlackRock proxy vote"[62] is simply *one* possible application of Plaintiff's general theory. It is possible to envision many other acts that would similarly operate as an application of this general theory.

At bottom, Plaintiff's theory of liability is broad and straightforward. Plaintiff asserts that Defendants violated their fiduciary duties by knowingly permitting "investment managers that pursue non-financial and nonpecuniary ESG policy goals through proxy voting and shareholder activism" to administer the Plan.[63] In the process, Defendants' mismanagement harmed Plan participants' financial interests by focusing on socio-political outcomes instead of exclusively seeking financial returns.[64] Having reviewed all of the acts alleged by Plaintiff in the Amended Complaint, along with the responses to Defendants' motion to dismiss and motion for summary judgment, the Court finds no inconsistencies between Plaintiff's initial articulation of the theory and later applications of that pleaded theory.

---

[59] *Id.* ¶ 117.
[60] *Id.* ¶ 118
[61] *Id.* ¶ 123.
[62] Defs.' Br. in Support of Mot. for Summ. J. 2, ECF No. 100 (emphasis omitted).
[63] Pl.'s Am. Compl ¶ 68, ECF No. 41; Feb. 21, 2024 Order 2, ECF No. 98.
[64] Pl.'s Am. Compl ¶ 68, ECF No. 41; Feb. 21, 2024 Order 2, ECF No. 98.

### B. Proper Fiduciaries

Next, the Court evaluates whether Plaintiff may proceed to trial on claims against both Defendants. Defendants argue in a footnote that no triable issue exists as to AA's liability.[65] According to Defendants, the Plan's governing documents empower only the EBC—not AA— with the authority to select and retain investment managers.[66] Plaintiff does not dispute this designation of authority.[67] Because it is uncontroverted that the EBC is the only authorized entity in the governing documents, Defendants argue that Plaintiff cannot hold AA liable for any of the alleged fiduciary breaches committed by the EBC.[68] The Court disagrees.

A "fiduciary" under ERISA is anyone or any entity who exercises discretionary control over plan administration. 29 U.S.C. § 1002(21)(A)(iii). This definition encompasses anyone who appoints, retains, or removes a fiduciary. *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 284 F. Supp. 2d 511, 660–61 (S.D. Tex. 2003). There are three ways to assume fiduciary status under ERISA: (1) serving "as a named fiduciary in the instrument establishing the employee benefit plan," (2) "becoming a fiduciary pursuant to a procedure specified in the plan instrument," and (3) acting "as a 'functional fiduciary' under the broad, authority, control, or advice provisions of ERISA." *Perez v. Bruister*, 823 F.3d 250, 260 (5th Cir. 2016) (Jones, J.) (citations omitted).

As it relates to the third catchall way to qualify as an ERISA fiduciary, Defendants argue that the Fifth Circuit has not recognized that the power to appoint fiduciaries carries with it

---

[65] Defs.' Br. in Support of Mot. for Summ. J. 15 n. 17, ECF No. 100.

[66] *Id.*

[67] *See generally* Pl.'s Resp. in Opp. to Defs.' Mot. for Summ. J. 22–23, ECF No. 110; *see also* Defs.' Reply Br. in Support of Mot. for Summ. J. 19, ECF No. 113 ("The . . . governing documents . . . assign fiduciary authority for the selection and monitoring . . . to the EBC, not American. . . . Plaintiff does not contend otherwise.").

[68] Defs.' Reply Br. in Support of Mot. for Summ. J. 19–20, ECF No. 113.

additional monitoring obligations.[69] *See Fentress v. Exxon Mobil Corp.*, 304 F. Supp. 3d 569, 586 (5th Cir. 2018) ("The Fifth Circuit has never recognized a theory of ERISA fiduciary liability that holds corporate directors personally liable for failing to monitor fiduciaries appointed by the directors." (cleaned up)); *Perez,* 823 F. Supp. 3d at 260 n.10 (rejecting "failure to monitor" theory of liability for individual who appointed plan administrators). Rather, "if an employer and its board of directors have no power with respect to a plan other than to appoint the plan administrator and the trustees, then their fiduciary duty extends only to those functions." *Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan Enterprises, Inc.,* 793 F.2d 1456, 1459–60 (5th Cir. 1986). That is why "when courts evaluate whether a party is an ERISA fiduciary, they must focus on the specific role the purported fiduciary played as relevant to the claim at hand." *Humana Health Plan Inc. v. Nguyen*, 785 F.3d 1023, 1027 (5th Cir. 2015).

Focusing on AA's specific role here, the record supports a finding that it exercises certain responsibilities despite the Plan's governing documents naming just the EBC as the responsible entity. Undoubtedly, AA appoints, retains, and removes the EBC members since "it's in the purview of the HR department and . . . the executive team . . . is responsible for . . . the entire company."[70] But this is not the extent of AA's responsibility. Additionally, AA executives and its Asset Management Group are also responsible for overseeing both the EBC and the Plan's investment managers, along with communicating with the Plans' advisors, preparing materials for

---

[69] *Id.* The cases cited by Defendants only reveal the Fifth Circuit's hesitance to recognize broader monitoring liability for those who "have no power with respect to a plan other than to appoint the plan administrator." *Sommers,* 793 F.2d at 1459–60. Moreover, the hesitation also appears designed to protect *individuals* rather than the larger corporate entity that oversees the lesser entity. *See, e.g.*, *Fentress*, 304 F. Supp. 3d at 586 (5th Cir. 2018) (corporate directors); *Perez,* 823 F. Supp. 3d at 260 n.10 (individual).

[70] Pl.'s App. 0008, ECF No. 111-1 (Kerr Depo. at 47:10-17) (American Airlines' HR department and executive team are responsible for supervising the EBC).

EBC meetings, and raising any concerns or issues concerning the Plans with the EBC members.[71] As AA's Director of Sustainability put it, it is really the AA staff who runs the Plan.[72] In fact, even Defendants appear to describe these AA responsibilities in their summary judgment motion.[73]

Based on these appointment and removal powers, combined with the additional oversight and advisory responsibilities, a reasonable factfinder could conclude that AA functionally serves as an ERISA fiduciary. This finding is premised on what matters for determining fiduciary status: the discretionary control actually exercised rather than how governing documents empower. *In re Enron Corp.*, 284 F. Supp. 2d at 661 n.159. Therefore, based on the record before it, the Court finds that AA is a fiduciary alongside the EBC. Plaintiff may proceed to trial on claims against both Defendants; however, the Court will entertain further evidence at trial to continue assessing AA's fiduciary status.

### C. Duty of Prudence[74]

Defendants argue that Plaintiff "failed to develop any evidence that Defendants' selection and monitoring efforts fall short of prevailing fiduciary practice."[75] Specifically, Defendants contend that (1) they maintained a robust, state-of-the-art process to administer the Plan, (2) they properly relied on experts, and (3) Plaintiff does not identify any alternative funds Defendants could have selected consistent with their fiduciary duties.[76] As a result, Defendants argue that summary judgment is warranted because Plaintiff cannot establish a breach of prudence.[77] The

---

[71] *Id.* at 0047 (Montana Depo. at 30:24–31:7) (explaining that the Asset Management Group "support[s] the administration of the pension and 401(k) and the company's investments).

[72] *Id.* (Montana Depo. at 31:9–16).

[73] *See generally* Defs.' Br. in Support of Mot. for Summ. J. 5–6, ECF No. 100.

[74] Because the duty of prudence includes the duty to monitor, Count II is subsumed within Count I. Therefore, the Court addresses the two duties together, just as it did in the order denying Defendants' motion to dismiss. Feb. 21, 2024 Order 5 n.3, ECF No. 98.

[75] Defs.' Br. in Support of Mot. for Summ. J. 14, ECF No. 100.

[76] *Id.* at 14–15.

[77] *Id.* at 14.

Court disagrees, finding genuine disputes of material fact on the record before it that preclude summary judgment in favor of Defendants.

Under ERISA, a fiduciary must act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use." 29 U.S.C. § 1104(a)(1)(B). This includes "exercis[ing] prudence in selecting investments," along with "a continuing duty of some kind to monitor investments and remove imprudent ones." *Tibble v. Edison Int'l*, 575 U.S. 523, 529–30 (2015). The prudence standard normally focuses on the fiduciary's conduct in making investment decisions—not on the results. *Pension Benefits Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 716 (2d Cir. 2013).

In acting prudently, the fiduciary's conduct must "give[] appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment." 29 C.F.R. § 2550.404a-1(b)(1)(i). One such factor is proxy voting, 29 C.F.R. § 2550.404a-1(d)(1), and ERISA's fiduciary duties still apply when voting (or not voting) proxies, *id.* § 2550.404a-1(d)(2). If a fiduciary delegates proxy voting, it must prudently and diligently select and monitor the entity voting proxies. *Id.* §§ 2550.404a-1(d)(2)(ii)(E), (4)(ii). The fiduciary's process must also "take[] into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action compared to the opportunity for gain (or other return) associated with reasonably available alternatives with similar risks." *Id.* § 2550.404a-1(b)(2)(i). At its core, ERISA's "prudence standard normally focuses on the fiduciary's conduct in making investment decisions, and not on the results." *Main v. Am. Airlines, Inc.*, 248 F. Supp. 3d 786, 793 (N.D. Tex. 2017) (O'Connor, J.).

To survive summary judgment, Plaintiff must provide evidence from which a factfinder could conclude that Defendants breached their duty of prudence. Here, the summary judgment record makes clear that a factfinder could find Defendants breached their duty of prudence by failing to monitor investment managers and failing to address the facts and circumstances of ESG proxy voting and shareholder activism present within the Plan.

### 1. Monitoring and Evaluating Investment Managers

At the outset, Plaintiff points to evidence that Defendants never reviewed or monitored proxy voting by any of the Plan's investment managers.[78] This lack of review and monitoring even appears to have taken place after Defendants learned that the largest investment manager of Plan assets, BlackRock, voted proxies in support of ESG objectives rather than exclusively in the financial best interests of the Plan.[79] Evidence also suggests that Defendants knew of other managers taking ESG factors into consideration.[80] Despite this evidence, the topics of ESG and proxy voting were never discussed at any EBC meeting or with any EBC member prior to this lawsuit being filed.[81] And Defendants never brought up ESG or proxy voting at any of the quarterly

---

[78] Pl.'s Resp. in Opp. to Defs.' Mot. for Summ. J. 3, 9–11, 13–14, ECF No. 110.

[79] Pl.'s App. 0011, ECF No. 111-1 (Kerr Depo. at 65:13–21; 66:20–68:3); *id.* at 0024 (Menezes Depo. at 59:14–22); *id.* at 0051, 0053 (Montana Depo. at 47:5–12; 57:20–25).

[80] *See id.* at 0597, ECF No. 111-2 ("Most of our underlying managers take ESG factors into consideration.").

[81] *See id.* at 0003–4, ECF No. 111-1 (Kerr Depo. at 28:25–29:1; 29:15–17, 24) (testifying that Aon never advised the EBC on anything regarding ESG); *id.* at 0006 (Kerr Depo. at 37:15–18) (recalling no discussion of proxy voting at any EBC meeting); *id.* at 0008 (Kerr Depo. at 46:8–20) (recalling no discussion of ESG at any EBC meeting, with AA Managing Director of Asset Management responsible for overseeing the Plan, or with any Aon representative); *id.* at 0011 (Kerr Depo. at 68:7–11) (recalling no discussion about BlackRock's proxy voting policy with any member of the EBC); *id.* at 0012 (Kerr Depo. at 72:7–14) (recalling no discussions about ESG at any EBC meeting ever); *id.* at 0023 (Menezes Depo. at 53:1–20; 56:3–6) (recalling no AA Asset Management staff bringing up ESG during meetings with the Chairs of the EBC); *id.* at 0047–48 (Montana Depo. at 32:24–33:9) (noting that Aon and AA Asset Management Staff never raised proxy voting issues); *id.* at 0048 (Montana Depo. at 33:13–18) (noting that EBC does not monitor investment managers' proxy voting); *id.* at 0048 (Montana Depo. at 35:3–7) (noting that Aon has never raised a proxy voting issue with the EBC); *id.* at 0049, 0052 (Montana Depo. at 39:23–40:3; 50:5–11) (stating that the decision to delegate proxy voting to investment managers was never reviewed by the EBC and the EBC never considered prohibiting investment managers from considering ESG in their proxy

meetings with BlackRock at AA headquarters or BlackRock's headquarters.[82] The lack of discussion raises a material fact dispute as to whether Defendants properly considered the facts and circumstances that a reasonable fiduciary should consider when selecting and monitoring investment managers.

Evidence reveals that Defendants were aware of these ESG facts and circumstances for quite some time without engaging in any discussion about the consequences. The EBC knew as early as 2019—and no later than January 2020—that BlackRock pursued ESG objectives through proxy voting and shareholder activism.[83] Similarly, the AA Asset Management Group knew in February 2020 that "[m]ost of [the Plan's] underlying managers take ESG factors into consideration."[84] In fact, officials knew that "12 of [its] 15 current managers and 14 of 16 proposed managers are Principals for Responsible Investment signatories."[85] Despite this knowledge, every AA witness testified during depositions that ESG and proxy voting were never discussed at any EBC meeting or with any EBC member prior to this lawsuit being filed.[86] Likewise, Defendants

---

voting); *id.* at 0055 (Montana Depo. at 96:10–13, 19–22) (stating that no one ever raised with the EBC that BlackRock was voting proxies that hurt some of the stocks in the Plan's funds).

[82] *Id.* at 0019–20 (Menezes Depo. at 36:9–11; 36:24–37:12; 39:19–24; 40:9–24) (confirming that ESG or proxy voting was not brought up with BlackRock).

[83] *Id.* at 0011 (Kerr Depo. at 65:13–21; 66:20–68:3) (indicating general awareness by January 2020); *id.* at 0024 (Menezes Depo. at 59:14–22) (indicating genera awareness as early as 2019); *id.* at 0051, 0053 (Montana Depo. at 47:5–12; 57:20–25) (indicating general awareness as early as 2019).

[84] *Id.* at 0597, ECF No. 111-2.

[85] *Id.*

[86] *See id.* at 0003–04, ECF No. 111-1 (Kerr Depo. at 28:25–29:1; 29:15–17, 24) (testifying that Aon never advised the EBC on anything regarding ESG); *id.* at 0006 (Kerr Depo. at 37:15–18) (recalling no discussion of proxy voting at any EBC meeting); *id.* at 0008 (Kerr Depo. at 46:8–20) (recalling no discussion of ESG at any EBC meeting, with AA Managing Director of Asset Management responsible for overseeing the Plan, or with any Aon representative); *id.* at 0011 (Kerr Depo. at 68:7–11) (recalling no discussion about BlackRock's proxy voting policy with any member of the EBC); *id.* at 0012 (Kerr Depo. at 72:7–14) (recalling no discussions about ESG at any EBC meeting ever); *id.* at 0023 (Menezes Depo. at 53:1–20; 56:3–6) (recalling no AA Asset Management staff bringing up ESG during meetings with the Chairs of the EBC); *id.* at 0047–48 (Montana Depo. at 32:24–33:9) (noting that Aon and AA Asset Management Staff never raised proxy voting issues); *id.* at 0048 (Montana Depo. at 33:13–18) (noting that EBC does not monitor investment managers' proxy voting); *id.* at 0048 (Montana Depo. at 35:3–7) (noting that Aon has never raised a proxy voting issue with the EBC); *id.* at 0049, 0052 (Montana Depo. at 39:23–40:3; 50:5–

never brought up ESG or proxy voting at any of their quarterly meetings with BlackRock.[87] The first time Defendants ever discussed proxy voting was on September 27, 2023 *after* Plaintiff filed this lawsuit.[88] And only after the filing of this lawsuit did Defendants finally review "ESG . . . factors and influences for each manager" and seek "a summary of how each manager uses 'ESG' in the management of their strategy."[89]

A reasonable fact finder could conclude from this evidence that a prudent fiduciary would have discussed these developments during internal meetings and with investment managers. Moreover, a fact finder could also conclude that these are facts and circumstances that a reasonable fiduciary would consider when selecting and monitoring investment managers as a general matter, particularly given that they are responsible for billions of dollars of their employee's retirement funds. As such, the Court finds genuine issues of material fact exist regarding whether Defendants acted reasonably or unreasonably under ERISA's fiduciary duties of prudence and monitoring.

Defendants attempt to minimize these factual disputes. According to Defendants, their "process for selecting and monitoring investment options was at all times state of the art" and "there is no evidence or expert testimony that [Defendants'] process in selecting or monitoring the Plans' investment options fell short of prevailing fiduciary behavior or any other established

---

11) (stating that the decision to delegate proxy voting to investment managers was never reviewed by the EBC and the EBC never considered prohibiting investment managers from considering ESG in their proxy voting); *id.* at 0055 (Montana Depo. at 96:10–13, 19–22) (stating that no one ever raised with the EBC that BlackRock was voting proxies that hurt some of the stocks in the Plan's funds).

[87] *Id.* at 0019–20 (Menezes Depo. at 36:9–11; 36:24–37:12; 39:19–24; 40:9–24).

[88] *Id.* at 00567, ECF No. 111-2 (containing September 14, 2023 email from AA Asset Management staff requesting that proxy voting overview be included in the materials for the September EBC Meeting); *id.* at 0052, ECF No. 111-1 (Montana Depo. at 49:21–50:4) (testifying that EBC never hired any expert to review ESG or proxy voting issues prior to this lawsuit); *id.* at 0054 (Montana Depo. at 84:23–25) (recalling no mention of proxy voting at any EBC meeting before September 27, 2023); *see also* Defs.' Br. in Support of Mot. for Summ. J. 15, ECF No. 100 ("In September 2023, Aon made a presentation to the EBC regarding its due diligence efforts regarding investment managers' proxy voting.").

[89] Pl.'s App. 0598, ECF No. 111-2; *see also id.* at 0037, ECF No. 111-1 (Menezes Depo. 129:5–7; 131:16–18, 131:23–132:4) (noting that seeking out summaries of how each manager uses ESG had not been done before).

standard."[90] In support of this contention, Defendants point to evidence that investment managers were required to certify that their voting practices complied with investment management agreements and proxy voting policies.[91] But Defendants do not point to any certification from BlackRock and the Court is unable to locate any BlackRock certifications in the record. And even if such certifications exist, it is unclear how this alone satisfies Defendants' fiduciary obligation to prudently monitor the Plan given that "[m]ost of [the Plan's] underlying managers take ESG factors into consideration."[92] Without any evaluation, analysis, or other review action regarding proxy voting practices, a reasonable fact finder could find that Defendants failed to ensure that BlackRock (or any other investment manager) voted in the best financial interests of the Plan.

Rather than affirmatively act, Defendants instead trusted investment managers to self-regulate and self-report violations of proxy voting policies.[93] As Plaintiff puts it, this is the equivalent of "trusting the fox to guard the henhouse."[94] The record bears this out. For instance, the Court was unable to find any evidence in the voluminous record of even a single investment manager self-reporting a violation to AA. This is unsurprising, given that self-reporting a violation could lead to the investment manager losing control over the billions of dollars of assets under management. Furthermore, AA staff in the Asset Management Group remarkably assumed that investment managers would be voting proxies in the economic interests of the Plan based on contractual commitments alone.[95] But this is especially irresponsible given that Asset Management Group staff knew in February 2020 that "[m]ost of [the] underlying managers take ESG factors

---

[90] Defs.' Br. in Support of Mot. for Summ. J. 5, 16, ECF No. 100.

[91] *Id.* at 14.

[92] Pl.'s App. at 0597, ECF No. 111-2.

[93] *Id.* at 0026, ECF No. 111-1 (Menezes Depo. at 66:8–14; 66:25–67:4).

[94] Pl.'s Resp. in Opp. to Defs.' Mot. for Summ. J. 12, ECF No. 110.

[95] *See* Pl.'s App. 0026, ECF No. 111-1 (Menezes Depo. at 66:15–17) (explaining the expectation the investment managers would voting appropriately).

into consideration" and that many of the "underlying managers and . . . proposed managers are Principals for Responsible Investment signatories."[96] This trusting assumption continued even after learning that BlackRock—the largest investment manager of Plan assets—voted proxies in support of non-economic ESG objectives rather than exclusively in the financial best interests of the Plan.[97] From this evidence, the Court finds that a trial is necessary to evaluate facts as to Defendants' process for monitoring and evaluating investment managers.

### 2.   Reliance on Expert Advice

Defendants also argue that summary judgment on this claim is appropriate because they "followed a robust process by meeting regularly and reviewing extensive information with the assistance of both Aon, an outside investment advisor, and [Defendants'] internal asset management group."[98] In particular, Defendants heavily relied on Aon to employ the standard manager evaluation process when assessing mangers. Along with the internal Asset Management Group, these experts existed to identify any concerns or issues in need of attention.[99]

ERISA fiduciaries may rely on independent experts. *Donovan v. Cunningham*, 716 F.2d 1455, 1467 (5th Cir. 1983). But those fiduciaries may not "rely blindly on that advice." *Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 300–01 (5th Cir. 2000). "An independent appraisal is not a magic wand that fiduciaries may simply waive over a transaction to ensure that their responsibilities are fulfilled. It is a tool and, like other tools, is useful only if used properly." *Cunningham*, 716 F.2d

---

[96] *Id.* at 0597, ECF No. 111-2.

[97] *See* Pl.'s App. 0482–83, ECF No. 111-2 (Request for Admission No. 11) (admitting knowledge that "BlackRock voted proxy shares in favor of a dissident slate of director candidates in the May 2021 election").

[98] Defs.' Br. in Support of Mot. for Summ. J. 16 (citing Defs.' App. 0670–71, ECF No. 101-3 (Montana Depo. at 24:1–25:8).

[99] *Id.* at 17 (citing Defs.' App. 0717–18, ECF No. 101-3 (first citing Menezes Depo. at 63:14–64:2); then citing *id.* at 0718–19 (Menezes Depo. at 64:25–65:22); then citing *id.* at 0670 (Montana Depo. at 24:7–24:21); *id.* at 0676 (Montana Depo. at 30:12–30:15); then citing *id.* at 0679 (Montana Depo. at 96:14–96:18); and then citing *id.* 0005, ECF No. 101-1).

at 1467. Critically, "[c]onflicted fiduciaries do not fulfill ERISA's investigative requirements by merely hiring an expert." *Howard v. Shay*, 100 F.3d 1484, 1490 (9th Cir. 1996). In order to rely on independent expert advice, a "fiduciary must (1) investigate the expert's qualifications, (2) provide the expert with complete and accurate information, and (3) make certain that reliance on the expert's advice is reasonably justified under the circumstances." *Id.* at 1489 (citing *Cunningham*, 716 F.2d at 1467, 1474; *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 435–36 (3d Cir. 1996) (emphasizing that "ERISA's duty to investigate requires fiduciaries to review the data a consultant gathers, to assess its significance and to supplement it where necessary").

Whether Defendants prudently relied on external and internal experts presents various fact issues to be decided at trial. Defendants represent that they "picked Aon through a formal request for proposal process, in which the merits of Aon's advisory services were vetted and compared to those of other investment advisory firms."[100] Furthermore, Defendants continue, it was through that process and subsequent interactions that the EBC and supporting AA Asset Management Group became familiar with Aon's experience and resources, as well as the robustness of Aon's manager evaluation process.[101] While Defendants' choice of Aon as a reputable outside advisor may demonstrate sufficient investigation of the expert's qualifications prior to engagement, this alone does not demonstrate that Defendants' use of and reliance on Aon after engagement was appropriate. For instance, a reasonable fact finder could find that Defendants blindly followed Aon's advice, hired them in an attempt to mask conflicts of interest, did not provide complete and accurate information to them, or otherwise failed to ensure that reliance on their advice was reasonably justified under the circumstances. Among other evidence, the lack of discussion with

---

[100] *Id.* (citing Defs.' App. 0006–07, ECF No. 101-1).
[101] Defs.' App. 0008, ECF No. 101-1.

or evaluation by Aon regarding concerning ESG activity in the Plan, in particular, gives rise to these concerns.

Defendants also rely on their internal experts in the Asset Management Group.[102] These internal experts conducted their own ongoing review of the Plan and its managers.[103] The internal team met with the managers on a quarterly basis and reviewed Aon's quarterly investment reviews, providing input and raising questions on those reviews prior to delivering them to EBC members.[104] As evidence of prudence and sufficient monitoring of the Plan, Defendants represent that their internal experts secured contractual commitments from investment managers that proxy votes would be cast in the best long-term financial interests of the Plan.[105] Although these contractual commitments are an example of prudent behavior, they do not, on their own, satisfy Defendants' duty of prudence. That is because the record is unclear as to whether Defendants sufficiently monitored for contractual compliance as it relates to ESG proxy voting. And the Court cannot locate any evidence in the record that Defendants took remedial action in instances of actual or potential *noncompliance* with these contractual commitments. For instance, there is no evidence that Defendants asked any of its experts to review ESG or proxy voting issues but did so after Plaintiff filed this lawsuit.[106] Therefore, a reasonable factfinder could still find that Defendants acted imprudently despite the presence of experts to help monitor and assess the Plan.

---

[102] *Id.* at 0005.

[103] *Id.* at 0006.

[104] *Id.* at 0009–10.

[105] *See, e.g.*, *id.* at 0378–79, ECF No. 101-2 ("The Investment Manager shall . . . vote all proxies and respond to all tender offers with respect to the Account . . . and have responsibility for ensuring that proxies are voted in the best interests of the Plans' participants and beneficiaries."); *id.* at 0399 (containing contractual commitments regarding proxy voting and regular attestations); *id.* at 0438 (containing BlackRock's commitment "to vote proxies in the best long-term economic interests of their assets"); *id.* at 0014, ECF No. 101-1 (describing investment management agreements).

[106] Pl.'s App. 0052, ECF No. 111-1 (Montana Depo. at 49:21–50:4).

### 3. Alternative Funds

Finally, Defendants also fault Plaintiff for not identifying alternative funds that could have been selected consistent with ERISA's fiduciary obligations.[107] According to Defendants, it is unreasonable to criticize the selection and retention of certain funds without identifying some other funds that could have been chosen instead.[108] And given that there are "more than 72,000 defined contribution plans" that "use BlackRock's investment services," it would be difficult for Plaintiff to identify alternative funds.[109] It may ultimately prove accurate that there are no investment managers who would invest and vote differently than BlackRock. But this alone does not automatically insulate Defendants from breach of prudence claims at this stage.

The Court previously deferred evaluation of any such alternative-fund comparators for future stages of litigation because of the inherent fact questions involved.[110] Once again, the Court finds it proper to defer until trial this evaluation of comparators, in part because of the factual nature of engaging in such a comparison and in part because the Fifth Circuit has not imposed a performance-benchmark requirement. *Blackmon v. Zachary Holdings, Inc.*, 2021 WL 2190907, at *5 (W.D. Tex. 2021) (declining to dismiss the complaint when the plaintiff did not provide a performance benchmark); *see also Seidner v. Kimberly-Clark Corp.*, 2023 WL 2728714, at *7 (N.D. Tex. 2023) ("The Fifth Circuit has yet to adopt or express an opinion regarding application of the Eighth Circuit's 'meaningful benchmark' standard in ERISA fiduciary duty cases."). The Court will determine based on the evidence produced at trial whether alternative funds and benchmark evidence are necessary for Plaintiff succeed on the breach of prudence claim, or if the

---

[107] Defs.' Br. in Support of Mot. for Summ. J. 18, ECF No. 100.
[108] *Id.* at 18–19.
[109] *Id.* at 19 (noting that "60% of Fortune 100 companies, . . . the largest retirement plan in Texas[,] . . . and . . . the largest retirement plan in the United States" rely on BlackRock).
[110] Feb. 21, 2024 Order 9, ECF No. 98.

mere demonstration that Defendants disregarded, or otherwise failed to act regarding, the established record of ESG underperformance is sufficient on its own without comparators.[111]

### 4. Summary of Fact Issues

Contrary to Defendants' assertion that there is "no evidence that [Defendants'] conduct was out of line with normal fiduciary practice," Plaintiff provides evidence upon which a factfinder could disagree with Defendants.[112] Taking all of the evidence together regarding Defendants' conduct when making decisions related to the Plan, a factfinder could conclude that Defendants acted imprudently due to a flawed fiduciary process and imprudent actions regarding ESG investing. As such, the Court determines that this matter should proceed to trial to permit fact finding and to fully weigh all evidence in order to determine if a breach of prudence occurred. Whether Defendants maintained a "state of the art . . . process for selecting and monitoring investment options" by properly utilizing experts and considering the facts and circumstances of ESG proxy voting and shareholder activism necessitate the weighing of evidence at trial.

From the evidence in the record, the Court finds material fact disputes that preclude summary judgment. Those factual disputes include: (1) whether Defendants' failed to sufficiently consider the facts and circumstances of ESG proxy voting and shareholder activism, (2) whether Defendants sufficiently reviewed or monitored proxy voting delegated to, and subsequently taken by, investment managers, (3) whether Defendants took sufficient steps after learning about any ESG-oriented proxy voting by investment managers, (4) whether Defendants sufficiently raised, if at all, the proxy voting problems and accompanying harms to stocks in the Plan with investment

---

[111] Plaintiff points out that various fiduciaries of state retirement funds took action when they learned about BlackRock and other investment managers pursuing ESG objectives through proxy voting and shareholder activism, but it is unclear. Pl.'s Resp. in Opp. to Defs.' Mot. for Summ. J. 21, ECF No. 110. And there is additional evidence of the harms caused by BlackRock's particular ESG activism. Pl.'s Expert Report of J.B. Heaton 4–23, ECF No. 51-1.

[112] Defs.' Br. in Support of Mot. for Summ. J. 15, ECF No. 100.

managers, (5) whether Defendants considered prohibiting, and subsequently attempting to persuade, investment managers from pursuing ESG goals in their proxy voting, (6) whether Defendants maintained a sufficient process for overseeing and monitoring the Plan, (7) whether Defendants took appropriate steps to protect Plan assets from ESG activism, (8) whether Defendants properly relied on the advice of internal and external experts under the circumstances, and (9) whether, and to what degree, the Court should compare the facts of this case with benchmarks and industry norms. Each of these fact disputes speaks to the fundamental question of whether Defendants acted reasonably or unreasonably with respect to their fiduciary duties of prudence and monitoring. Taken together, the Court finds that Defendants failed to carry their burden at the summary judgment stage to show that no reasonable factfinder could find in their favor as to the breach of prudence.

*       *       *       *       *

Thus, having considered the applicable legal standard, the parties' briefing and evidence, and drawing all reasonable inferences in Plaintiff's favor, the Court finds that there remain genuine disputes over whether Defendants acted prudently in managing the Plan, such that these fact issues are properly reserved for trial. Therefore, the Court **DENIES** Defendant's motion for summary judgment as to the duty of prudence.

### D.  Duty of Loyalty

Defendants primarily move for summary judgment on whether a breach of their duty of prudence occurred, allocating only minimal attention to the duty of loyalty. In fact, most of Defendants' arguments regarding disloyalty are found in a single paragraph in their motion.[113] Even so, Defendants' arguments can essentially be summarized as follows: (1) no evidence exists

---

[113] Defs.' Br. in Support of Mot. for Summ. J. 24–25, ECF No. 100.

that [Defendants] refrained from interfering in proxy voting for a disloyal reason and (2) "it is not only speculative but illogical to assume disloyalty from conduct that was consistent with that of every large private or public investor in BlackRock funds at the time."[114] The reply somewhat fleshes out the latter argument, contending that Plaintiff cannot establish a breach of loyalty simply by alleging incorporation in the Plan of corporate ESG goals or speculating about BlackRock's ESG influence on the Plan as a large AA shareholder.[115] As a result, Defendants argue that Plaintiff cannot prevail on the breach of loyalty claim.[116] The Court disagrees. Once again, there are genuine disputes of material fact as to breach of loyalty that warrant proceeding to trial.

"ERISA's duty of loyalty is 'the highest known to the law.'" *Bussian*, 223 F.3d at 294 (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982)). As part of the duty of loyalty, an ERISA plan fiduciary must "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries." 29 U.S.C. § 1104(a). These benefits are "*financial* benefits . . . that trustees who manage investments typically seek to secure for the trust's beneficiaries." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 421 (2014) (emphasis in original). This understanding of loyalty requires the fiduciary to "not subordinate the interests of the participants and beneficiaries in their retirement income or financial benefits under the plan to other objectives, and may not sacrifice investment return or take on additional investment risk to promote benefits or goals unrelated to interests of the participants." 29 C.F.R. § 2550.404a-1(c)(1). Neither may the fiduciary "accept expected reduced returns or greater risks to secure [collateral] benefits [other than investment returns]." *Id.* § 2550.404a-1(c)(2). In other words, a fiduciary must not "act[] for

---

[114] *Id.* at 24.
[115] Defs.' Reply Br. in Support of Mot. for Summ. J. 11–12, ECF No. 113.
[116] *Id.* at 14.

the purpose of providing benefits to itself or someone else." *Patterson v. Morgan Stanley*, No. 16-cv-6568 (RJS), 2019 WL 4934834, at *12 (S.D.N.Y. Oct. 7, 2019); *see also Reetz v. Aon Hewitt Inv. Consulting, Inc.*, 74 F.4th 171, 181 (4th Cir. 2023) (holding that, to establish breach of loyalty, a plaintiff must prove that the fiduciary "failed to act as if it were free of any conflict"). But, as the Fifth Circuit has declared, "the potential for a conflict, without more, is not synonymous with a plausible claim of fiduciary disloyalty." *Kopp v. Klein*, 894 F.3d 214, 222 (5th Cir. 2018). Instead, disloyalty is established only where the "operative motive" behind the fiduciary's action is "to further its own interests." *Brotherston v. Putnam Invs., LLC*, 907 F.3d 17, 40 (1st Cir. 2018).

## 1.  Influence of Corporate ESG Goals

To survive summary judgment, Plaintiff must "point to evidence" that Defendants "acted for the purpose of" benefitting themselves or third parties when selecting managers on behalf of the Plan. *Sacerdote v. NYU*, 2017 WL 3701482, at *5 (S.D.N.Y. Aug. 25, 2017). Defendants argue that "Plaintiff has no evidence that [Defendants] selected and retained BlackRock funds for disloyal reasons."[117] To the contrary, Plaintiff highlights evidence that Defendants knew at least one of the investment managers, BlackRock, pursued ESG objectives through delegated proxy voting authority.[118] Additionally, other evidence suggests that the EBC approved of this ESG activity. As Chair of the EBC, Elise Eberwein communicated with AA's Director of Sustainability, Jill Blickstein, to express support for BlackRock's ESG objectives.[119] This evidence is not mere speculation based on corporate goals. Rather, this is a conversation between an official responsible

---

[117] *Id.* at 11.

[118] Pl.'s App. 0482–83, ECF No. 111-2 (Request for Admission No. 11).

[119] *Id.* at 0592 (January 14, 2020 email from Chair of the EBC); *id.* at 0065 (Eberwein Depo. at 35:20–36:14) (discussing via email BlackRock CEO's letter titled "BlackRock is Making Sustainability a Core Element of Its Investment Framework," and commenting that "both have one theme . . . climate change, sustainability" and "[i]t's good huh"); *id.* at 0487 (February 28, 2020 email attaching article titled "How to Make Your 401(k) a Little Less Evil"), *id.* at 600–01 (article).

for the Plan and an official responsible for ESG goals. A reasonable fact finder could view these conversations as evidence of corporate ESG goals influencing the administration of the Plan.

Certainly, Defendants ERISA plan does not prohibit the pursuit of corporate ESG goals, provided they remain separate from their fiduciary role. But this reality does not relieve Defendants of their fiduciary duties under ERISA. *See* 29 C.F.R. § 2550.404a-1(c)(1) (instructing a fiduciary "not subordinate the interests of the participants and beneficiaries in their retirement income or financial benefits under the plan to other objectives, and may not sacrifice investment return or take on additional investment risk to promote benefits or goals unrelated to interests of the participants"). To be sure, Defendants are correct that the publishing of sustainability of ESG reports alone fails to show disloyalty.[120] Indeed, the majority of companies listed on the S&P 500 publish such reports.[121] If this were the extent of Plaintiff's evidence, Defendants would succeed at summary judgment on this claim because "it is not only speculative but illogical to assume disloyalty from conduct that was consistent with that of every large private or public investor in BlackRock funds at the time."[122]

But Plaintiff does more than simply point to corporate ESG reports. Plaintiff produces evidence—such as conversations evincing the failure to keep AA's corporate and fiduciary hates separate—that Defendants allowed their corporate goals to influence their fiduciary obligations in some way. It is this evidentiary combination—Defendants' undeniable corporate commitment to ESG *plus* the endorsement of ESG goals by those responsible for overseeing the Plan—that could convince a factfinder of disloyalty from the lack of separation between corporate goals and the fiduciary role. Therefore, the Court finds that Defendants have failed to provide evidence

---

[120] Defs.' Reply Br. in Support of Mot. for Summ. J. 11, n.11, ECF No. 113.
[121] *Id.*
[122] Defs.' Br. in Support of Mot. for Summ. J. 29, ECF No. 100.

eliminating all fact questions surrounding the potential cross-pollination of corporate ESG goals with their fiduciary role. As a result, material fact disputes exist regarding whether Defendants acted as if free of any conflict or ulterior operative motive to further its own interests.

### 2. Influence of BlackRock

Furthermore, there are additional fact disputes surrounding Defendants' incestuous relationship with BlackRock and whether that relationship disloyally influenced administration of the Plan. For instance, the person responsible for monitoring investment managers also managed the corporate financial relationship with BlackRock—an entity that administers the Plan while simultaneously holding a significant equity stake in AA.[123] Indeed, even AA's Director of Sustainability described the relationship in a particularly alarming manner, calling "this whole ESG thing circular" because of AA's "significant relationship[] at BlackRock," which owns a substantial amount of AA stock and fixed income debt at the same time it pursues ESG objectives as an investment manager with "$35 billion in assets" under control.[124] At the same time, the record shows that Defendants never confronted BlackRock about ESG proxy voting or other activism.[125] Nor are there assessments to confirm whether BlackRock acted exclusively in the Plan's financial interests after the discovery of these activities.[126] Such evidence could lead a reasonable factfinder to conclude that AA endorsed BlackRock's ESG-oriented conduct

---

[123] Pl.'s App. 0044-45, ECF No. 111-1 (Montana Depo. at 16:18–17:2); *id.* at 0488, ECF No. 111-2 (January 15, 2020 email chain with AA Treasurer, EBC members, and AA Managing Director of Asset Management stating that "BlackRock holds ~$400M of our fixed income debt," "[t]hey are also our 4th largest equity holder," and "[w]e also invest a little over $10 billion with them between the 401(k) and pension plan").

[124] *Id.* at 0491 (February 4, 2020 email chain).

[125] *Id.* at 0019–20, ECF No. 111-1 (Menezes Depo. at 36:9–11; 36:24–37:12; 39:19–24; 40:9–24) (confirming that ESG or proxy voting was not brought up with BlackRock).

[126] *See id.* at 0011, ECF No. 111-1 (Kerr Depo. at 65:13–21; 66:20–68:3) (indicating general awareness of BlackRock's ESG proxy voting and activism but not discussion this new policy with anyone); *id.* at 0024 (Menezes Depo. at 59:14–22) (same); *id.* at 0051, 0053 (Montana Depo. at 47:5–12; 57:20–25) (same); *see also id.* at 0482–83, ECF No. 111-2 (Request for Admission No. 11) (admitting knowledge that "BlackRock voted proxy shares in favor of a dissident slate of director candidates in the May 2021 election").

Therefore, the Court finds that Defendants have failed to provide evidence eliminating fact questions surrounding the intertwined relationship with BlackRock. As a result, material fact disputes exist regarding whether Defendants acted as if free of any conflict or ulterior operative motive to further the interests of BlackRock—an entity with a significant financial stake in AA.

### 3. Summary of Fact Issues

From this evidence, a reasonable factfinder could conclude that Defendants allowed their corporate ESG goals and/or the goals of a large shareholder to influence the Plan by allowing assets to pursue ESG objectives through proxy voting and shareholder activism. This reveals potential conflicts of interest. And, when combined with evidence that "Defendants did virtually nothing to protect Plan assets from potentially loss-causing ESG activism," a factfinder could conclude that Defendants acted in a manner that breached their duty of loyalty to the Plan.[127] Indeed, it is unclear from the record whether Defendants "acted for the purpose of providing benefits to itself or someone else" rather than furthering the interests of Plan participants. *Patterson*, 2019 WL 4934834, at *12.

It is precisely for this reason the Court cannot grant summary judgment in favor of Defendants. The remaining factual disputes include: (1) whether Defendants' corporate goals influenced their fiduciary role, (2) whether Defendants took steps to keep corporate goals separate from their fiduciary role to avoid a conflict of interest, (3) whether Defendants' intertwined relationship with BlackRock disloyally influenced management of the Plan, (4) whether

---

[127] Pl.'s Resp. in Opp. to Defs.' Mot. for Summ. J. 12–13, ECF No. 110 (first citing Pl.'s App. 0013, ECF No. 111-1 (Kerr Depo. at 74:14-23; 75:8-9, 12-13, 15-20); then citing *id.* at 0022 (Menezes Depo. at 51:23–52:6); then citing *id.* at 0043 (Montana Depo. at 28:3–15; 28:16–29:5; then citing *id.* at 0047–48 (Montana Depo. at 32:12–14; 33:22–34:2; 34:24–35:2); then citing *id.* at 0025–26 (Menezes Depo. at 63:4–13; 61:13–24; 68:13–16; 68:21–69:5); then citing *id.* at 0060–61 (Eberwein Depo. at 18:5–11, 15–20); then citing *id.* at 0061–62 (Eberwein Depo. at 20:14–21:4; 21:5–9); then citing *id.* at 0063 (Eberwein Depo. at 26:2–3, 12–14, 22–24; 26:25–27:3); then citing *id.* at 0066 (Eberwein Depo. at 41:17–42:14); and then citing *id.* at 0069 (Eberwein Depo. at 82:16–19; 82:23–83:4; 83:6–11).

Defendants failed to faithfully investigate the availability of other investment managers whose exclusive focus would maximize financial benefits for Plan participants, and (5) whether Defendants acted exclusively in the interest of the participants and beneficiaries. At bottom, these fact issues center on the proper focus for a breach-of-loyalty claim: "what the defendant fiduciary considered when acting (or not acting)."[128] Taken together, the Court finds that Defendants failed to carry their burden to show that no reasonable factfinder could find in their favor as to the breach of loyalty.

*     *     *     *     *

Thus, having considered the applicable legal standard, the briefing and evidence, and drawing all reasonable inferences in Plaintiff's favor, the Court finds that there remain genuine disputes as to whether Defendants breached their fiduciary duty of loyalty to the Plan, requiring submission of these issues to the factfinder. Therefore, Defendant's motion for summary judgment as to the duty of loyalty is **DENIED**.

### E. Losses

As the final basis for summary judgment, Defendants argue that Plaintiff "does not even purport to make out a 'prima facie case of loss to the plan' caused by Defendants' retention of BlackRock (or, for that matter, any other manager)."[129] However, the Court finds that Plaintiff offers sufficient prima facie evidence of such losses to create a material fact issue for resolution at trial. Additionally, the Court finds that Defendants have not otherwise demonstrated that any losses were *not* caused by their fiduciary breaches. Therefore, genuine material fact disputes remain as to the losses the Plan suffered.

---

[128] Defendants agree that this is the proper focus. Defs.' Reply Br. in Support of Mot. for Summ. J. 18, ECF No. 113.

[129] *Id.* at 13 (quoting *McDonald v. Provident Indem. Life Ins. Co.*, 60 F.3d 234, 237 (5th Cir. 1995)).

### 1. Prima Facie Loss

Plaintiff bears the burden of proving "a prima facie case of loss to the [P]lan." *McDonald*, 60 F.3d at 237. Measuring losses in ERISA fiduciary duty cases is context specific. *Perez v. Bruister*, 54 F. Supp. 3d 629, 674 (S.D. Miss. 2014). Courts resolve doubts about measuring losses in the plaintiff's favor. *Id.* at 675. "The basic remedy under trust law for such a breach of [fiduciary] duty is to restore plan participants to the position in which they would have occupied but for the breach of trust." *Martin v. Feilen*, 965 F.2d 660, 671 (8th Cir. 1992). Losses in ERISA cases are "of such a nature as to preclude the ascertainment of the amount of damages with certainty." *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931). "In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence shows the extent of the damages as a matter of just and reasonable inference although the result be only approximate." *Id.*

Having reviewed the summary judgment record, the Court finds sufficient evidence of losses to the Plan. Plaintiff's expert, J.B. Heaton, has shown one way to measure these losses.[130] In the form of an event study, Heaton's report finds that BlackRock's May 2021 ESG-oriented proxy vote at ExxonMobil hurt the Plan by devaluing its energy stocks.[131] Heaton estimates losses of over $8.8 million following the Exxon vote.[132] The price drop also prevented the Plan from building additional value.[133] Combined, Heaton estimates that the Plan lost approximately $15 million.[134] And this is before consideration of any losses emanating from Heaton's finding that ESG funds have an established record of underperformance.[135]

---

[130] *See generally* Pl.'s Expert Report of J.B. Heaton, ECF No. 51-1.
[131] Pl.'s Decl. & Suppl. Expert Report of J.B. Heaton 5–8, ECF No. 74-1.
[132] *Id.* at 6–7.
[133] Pl.'s Expert Report of J.B. Heaton 56–58, ECF No. 51-1.
[134] Pl.'s Decl. & Suppl. Expert Report of J.B. Heaton 7, ECF No. 74-1.
[135] Pl.'s Expert Report of J.B. Heaton 2, ECF No. 50-1.

Although Defendants argue that Heaton is unable to determine the long-term effects of BlackRock's proxy vote with certainty—challenging both his methodology and loss calculations—damages of this sort are quintessential triable issues of fact that are best resolved by the factfinder after hearing expert testimony from both sides.[136] That is because ERISA losses are often difficult to ascertain with certainty. *Story Parchment Co.*, 282 U.S. at 563. Even though speculative losses are insufficient under this looser conception of loss, Heaton's loss estimates are not mere speculation. Rather, Heaton used the "widely accepted" and "conventional approach" to determine the economic effect of BlackRock's proxy vote on energy stocks within the Plan.[137] Heaton's chosen method, an event study, is a widely accepted form of evidence to show the impact of a particular event on a stock price. *See, e.g.*, *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 280 (2014) (explaining that a party can "introduce evidence of the existence of price impact in connection with 'event studies'—regression analyses that seek to show that the market price of the defendant's stock tends to respond to pertinent publicly reported events") (citation omitted)); *Ludlow v. BP, P.L.C.*, 800 F.3d 674, 683 (5th Cir. 2015) (reviewing expert's use of an event study, "that examine[d] the effect of an event on a dependent variable, such as a corporation's stock price").

A reasonable factfinder could also find Defendants' other arguments regarding loss unavailing. First, Defendants argue that Heaton relies too heavily on temporary movements in stock value such that there is no long-term harm to the Plan.[138] According to Defendants,

---

[136] Defs.' Br. in Support. of Mot. for Summ. J. 13–14, ECF No. 100. Additionally, there is a pending motion to partially exclude Plaintiff's expert witness. Defs.' Mot. to Exclude in Part Expert Testimony, ECF No. 120. The Court **DEFERS** ruling on this motion and will take up the expert issue following the full presentation of all evidence.

[137] Pl.'s Expert Report of J.B. Heaton 23, ECF No. 50-1; Pl.'s Decl. & Suppl. Expert Report of J.B. Heaton 4, 7, ECF No. 74-1.

[138] Defs.' Br. in Support. of Mot. for Summ. J. 25, ECF No. 100

"transitory dips in stock prices do not establish losses" for investors who hold securities for the long term.[139] Defendants argue that "it matters when you sell."[140] Be that as it may, Heaton's report nonetheless offers a calculation of the effect at a point in the life of the Plan. Even if "the market would correct those temporary effects as any such fears dissipated,"[141] those fears have to disappear. And Defendants offer no evidence that, without an injunction, that such fears will resolve. Likewise, market effects do not overcome the fact that harm occurred and impacted Plan participants and beneficiaries at or near a particular proxy vote.[142] At bottom, Defendants' arguments are nothing more than a dispute as to the *amount* of loss rather than successfully showing *no* loss to obtain summary judgment. Expert testimony at trial will assist the factfinder with adducing the particular amount of these long-term losses.

Second, Defendants' overly narrow characterization of Plaintiff's theory of liability—only selection and retention of certain investment managers—contaminates their view of Heaton's loss calculations.[143] Although Heaton did not specifically offer an opinion as to whether Defendants improperly selected or retained BlackRock funds, he nonetheless opined that the loss was caused by BlackRock's proxy voting and general ESG activism, along with Defendants' "failure to object to BlackRock's conduct."[144] And that opinion suffices to show loss and, thus, create a triable fact issue.

---

[139] *Id.*

[140] *Id.*

[141] *Id.* at 25–26.

[142] Defendants rely on a securities-fraud case, *Dura Pharms., Inc. v. Broudo*, 554 U.S. 336 (2005), to support their contention that a loss cannot be transitory or tethered to the point when the harm originated (*i.e.*, a misrepresentation that artificially inflates a stock price). *Id.* at 27. The Court is not convinced that this case is applicable in an ERISA breach-of-fiduciary duty context. In the present case, the loss stems from a fiduciary breach rather than a misrepresentation. This is significant given that, among other reasons, the fiduciary breach can immediately cause the loss whereas a loss from a misrepresentation that artificially inflates a stock's price, as in *Dura*, could take many months to manifest. For this reason, the Court finds that *Dura* does not preclude loss temporary or transitory loss calculations.

[143] *Id.* at 19–20.

[144] Pl.'s Expert Report of J.B. Heaton 34, 42, 53–56, ECF No. 50-1.

Accordingly, the Court concludes that a reasonable factfinder could find the Plan suffered at least some loss. The amount of loss may be up for debate, but Defendants must show *no loss* to obtain summary judgment because Plaintiff has carried its prima facie burden. Thus, resolving doubts about measuring losses in Plaintiff's favor, the Court finds that the amount of loss is a material fact issue for trial, *Perez*, 54 F. Supp. at 675, and now turns to the final question of Defendants' loss–causation burden.

### 2.   Loss–Causation Burden

Defendants fail to carry their burden that any losses were not caused by any breaches of their fiduciary duties. Once a plaintiff establishes a breach of a fiduciary duty and a loss suffered by the ERISA plan, it is the *defendant* who must prove that the loss was not caused by their conduct. *McDonald*, 60 F.3d at 237. Notably, "[c]ourts do not take kindly to arguments by fiduciaries who have breached their obligations that, if they had not done this, everything would have been the same." *In re Beck Indus., Inc.*, 605 F.2d 624, 636 (2d Cir. 1979). Because Defendants bear the burden on this issue, they must establish "beyond peradventure" that their conduct did not cause the losses to the Plan in order to obtain summary judgment. *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).

Defendants incorrectly attempt to place this causation burden on Plaintiff.[145] Redirecting that burden back to Defendants, as the Fifth Circuit requires, the Court finds that evidence in the record demonstrates this burden is not satisfied. Previous sections discussed the specific types of acts that Defendants failed to take to protect the Plan from the harms of ESG activism. But Plaintiff also points to examples of other fiduciaries who acted to stop ESG activism. And Plaintiff's expert

---

[145] Defs.' Br. in Support of Mot. for Summ. J. 23, ECF No. 100.

opines that "[t]here is strong economic evidence that an intervention by the [EBC] . . . on behalf of Plan participants would have been successful in deterring BlackRock from its vote at Exxon."[146]

For example, when Texas and other states learned about BlackRock's ESG objectives, they took action to stop ESG activism in the retirement plans they oversee.[147] In response to the actions taken by these fiduciaries, even BlackRock substantially scaled back its ESG activism after facing "an onslaught of pressure from . . . Republican states over their environmental social and governance (ESG) priorities."[148] By 2024, BlackRock announced that it was leaving "Climate Action 100+" because it "conflicted with US laws requiring money managers to act solely in clients' long-term economic interests."[149] Even BlackRock's CEO Larry Fink—once a strong proponent of ESG activism—recently "sought to build rapport with Republican officials at an energy investment summit in Houston . . . after Texas blacklisted the asset manager over moves to transition away from fossil fuels."[150] BlackRock even published full page advertisements in Texas newspapers claiming it is "proud to invest $125.1 billion in Texas public energy companies on behalf of our clients."[151] And, recently, BlackRock launched a new program to "let individual investors have a say in how their proxy votes are cast."[152] This evidence comports with Plaintiff's expert's opinion that BlackRock's "admitted sensitivity. . . to its reputation" shows that "it needed

---

[146] Pl.'s Expert Report of J.B. Heaton 50, ECF No. 50-1.
[147] *See* Letter from State Attorneys General to Larry Fink, CEO of BlackRock (Aug. 4, 2020), https://www.texasattorneygeneral.gov/sites/default/files/images/executive-management/BlackRock%20Letter.pdf; *see also* Pl.'s Resp. in Opp. to Defs.' Mot. for Summ. J. 21, ECF No. 110 (discussing August 4, 2020 letter to Larry Fink as evidence of an effort to influence BlackRock).
[148] Pl.'s App. 0607–23, ECF No. 111-2.
[149] *Id.* at 0617.
[150] *Id.* at 0624–25.
[151] *Id.* at 0627 (advertisement).
[152] *Id.* at 0626.

only mild criticism to back . . . off its ESG agenda."[153] This is one way in which Defendants could have acted to prevent harm to the Plan from ESG activism.

As this comparative evidence shows, a reasonable factfinder could conclude that Defendants failed to avoid financial losses to the Plan. Indeed, by comparison to other fiduciaries administering plans featuring BlackRock funds, Defendants here took no action whatsoever. Had Defendants appropriately monitored and evaluated investment managers, they could have taken swift remedial action as other fiduciaries did. Specifically, Defendants could have insisted that BlackRock pursue only financial benefits through its administrative efforts and proxy voting activities. And if BlackRock refused or failed to comply, Defendants could have made decisions regarding the continued retention of BlackRock as a manager, including possible elimination. A reasonable factfinder could find that Defendants did not take all necessary and timely steps to ensure that the Plan's assets remained protected. Therefore, at a minimum, there is a factual dispute as to whether Defendants could have taken steps to prevent losses to the Plan. Taken together, the Court finds that Defendants failed to carry their burden to show that no reasonable factfinder could find in their favor regarding the absence of losses to the Plan caused by their fiduciary breaches.

*     *     *     *     *

Having considered the applicable legal standard, the parties' briefing and evidence in the record, and drawing all reasonable inferences in Plaintiff's favor, the Court finds that there remain genuine disputes over the amount of losses suffered by the Plan. As a result, the amount of loss and the loss–causation burden are issues properly reserved for trial. Therefore, Defendant's motion for summary judgment as to losses caused by their breaches of fiduciary duties is **DENIED**.

---

[153] Pl.'s Expert Report of J.B. Heaton 51, ECF No. 50-1.

## IV.    CONCLUSION

For these reasons, the Court determines that genuine material fact disputes remain as to Plaintiff's claims. Therefore, the Court **DENIES** Defendants' Motion to for Summary Judgment in its entirety. This case **SHALL** proceed to the bench trial scheduled to begin on **June 24, 2024**.

**SO ORDERED** this **20th** day of **June, 2024**.