UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| BRYAN P. SPENCE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:23-cv-00552-O |
| | § | |
| AMERICAN AIRLINES, INC., and | § | |
| AMERICAN AIRLINES EMPLOYEE | § | |
| BENEFITS COMMITTEE, | § | |
| | § | |
| Defendants. | § | |

## <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

Every year millions of workers set aside their hard-earned dollars to save for retirement. To protect the interests of these workers, Congress passed the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.*, to remedy "the great personal tragedy" caused by mismanagement of retirement plans that left workers with little to no savings. *Nachman Corp. v. Pension Ben. Guaranty Corp.*, 446 U.S. 359, 374 & n.21 (1980) (internal quotation marks and citation omitted). ERISA establishes the minimum requirements for the fiduciaries who manage retirement investments and imposes accountability should those fiduciaries fail to act in the best financial interests of the retirement plan.

This class action lawsuit is about whether American Airlines ("American") and the American Airlines Employee Benefits Committee ("EBC" and, together with American, "Defendants") breached certain fiduciary duties under ERISA when investing—or relying on others to invest—their employees' retirement assets towards environmental, social, and governance ("ESG") objectives. In response to Defendants' ESG-focused investment practices, Plaintiff Bryan Spence ("Plaintiff"), on behalf of the class members, asserts two causes of action under ERISA: (1) Defendants breached their duties of loyalty and prudence and (2) Defendants

1

breached their duty to monitor.[1] Plaintiff argues that Defendants violated these fiduciary duties by mismanaging the retirement plan when they utilized "investment managers pursuing non-financial and nonpecuniary ESG policy goals through proxy voting and shareholder activism"[2]— specifically, BlackRock Institutional Trust Company, Inc. ("BlackRock"). According to Plaintiff, BlackRock pursues a pervasive ESG agenda that "covertly converts the [retirement] [p]lan's core index portfolios to ESG funds."[3] As a result, Plaintiff contends that BlackRock's inclusion as an investment manager harmed the financial interests of retirement plan participants and their beneficiaries due to pursuing socio-political outcomes rather than exclusively financial returns.

The Court conducted a four-day bench trial on this matter.[4] During the trial, the Court heard testimony from multiple witnesses and examined numerous exhibits. The Court has reviewed the record in its entirety and has observed the witnesses to assess their credibility and weigh their testimony. After reviewing the pleadings, testimony, and evidence admitted at trial, the Court now sets out its findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52. *See* FED. R. CIV. P. 52(a) (requiring a district court to "find the facts specially and state its conclusions of law separately"). In doing so, the Court provides a "clear understanding of the basis for [its] decision" in accordance with the level of detail required in this circuit. *Century Marine Inc. v. United States*, 153 F.3d 225, 231 (5th Cir. 1998).

---

[1] Pl.'s Am. Compl. 47–53, ECF No. 41. As explained in previous decisions, there is no independent fiduciary duty of monitoring. June 20, 2024 Mem. Op. & Order 16 n.74, ECF No. 143; Feb. 21, 2024 Order 5 n.3, ECF No. 98. As a result, Count II is subsumed within Count I. The Court therefore addresses the duty to monitor alongside the other fiduciary duties, just as it did at the motion to dismiss and summary judgment stages.

[2] As discussed in the Court's summary judgment decision, Plaintiff dropped his second theory of liability regarding challenged funds, leaving just the theory challenging the use of investment managers. June 20, 2024 Mem. Op. & Order 2, ECF No. 143.

[3] Pl.'s Am. Compl. 34, ECF No. 41.

[4] Elec. Minute Entries, ECF Nos. 146–49.

For the reasons explained below, the Court concludes that the facts compellingly demonstrated that Defendants breached their fiduciary duty by failing to loyally act solely in the retirement plan's best financial interests by allowing their corporate interests, as well as BlackRock's ESG interests, to influence management of the plan. However, the facts do not compel the same result for the duty of prudence. Defendants acted according to prevailing industry practices, even if leaders in the fiduciary industry contrived to set the standard. This is fatal to Plaintiff's breach of prudence claim. Accordingly, Plaintiff prevails on the merits of his breach of loyalty claim but not on the breach of prudence claim.

# I. DEFERRED ISSUES[5]

Before detailing the findings of fact and conclusions of law, the Court first addresses the outstanding issues on which it has not yet ruled.

## A. Objections

The parties raised various objections over the course of the four-day proceedings. While the majority of these objections were resolved during the trial, the Court deferred ruling on certain objections. First, there was an objection from Plaintiff regarding the quantity of Defendants' exhibits.[6] The Court **OVERRULES** this objection due to finding the quantity of exhibits appropriate given the complexity of the issues in this lawsuit and the quantity of sophisticated third parties involved.

There was also an objection from Plaintiff to Defendants' witness, Russell Ivinjack ("Ivinjack"), because his name was not disclosed during the discovery period.[7] The Court allowed Ivinjack to testify and promised to rule after the trial concluded. Having reviewed the applicable

---

[5] Any objections not expressly addressed in this opinion are otherwise **OVERRULED**.
[6] This objection was first raised in Plaintiff's objections to Defendants' pretrial disclosures, Pl.'s Objections to Defs.' Pretrial Disclosures 2, ECF No. 126, and reasserted at trial.
[7] Pl.'s Objections to Defs.' Pretrial Disclosures 2, ECF No. 126.

law, the Court **OVERRULES** Plaintiff's objection. Defendants disclosed in their Rule 26 disclosures that they anticipated calling a corporate representative from Aon Investments, USA ("Aon"). But because Defendants did not know did not know who within Aon—a third party outside of Defendants' control—would be well-positioned and available to testify about Aon's corporate processes, they ultimately designed as witnesses the two individuals Aon confirmed would be willing to testify as corporate representatives, one of whom was Ivinjack. Defendants subsequently disclosed more than two months before trial their intent to call one of these two Aon representatives. Upon subsequently learning that the other individual would be out of the country during the trial, Ivinjack was the only remaining option. This was sufficient to put Plaintiff on notice as to the source of the testimony Defendants intended to elicit and the subject matter of that testimony. It is well-established that, "[w]here the subjects of information are disclosed, and the information is corporate in nature and could be elicited from any number of corporate representatives, then a generic designation of 'corporate representatives' is sufficient" disclosure for purposes of Rule 26. *Garth v. RAC Acceptance E., LLC*, No. 1:19cv192-DMB-RP, 2021 WL 4432829, at *3 (N.D. Miss. Sept. 27, 2021). This is because "[t]he opposing party in that instance is on notice of the topics about which it may wish to conduct further corporate discovery."[8] *Id.* It

---

[8] Courts within the Fifth Circuit, and outside of it, have repeatedly held the same. *See, e.g.*, *Mercury Luggage Mfg. Co. v. Domain Prot., LLC*, No. 3:19-cv-01939-M, 2020 WL 7122859, at *5 (N.D. Tex. Dec. 4, 2020) (explaining that a generic designation of corporate representative sufficient when "[t]he content of the testimony of the witnesses is entirely within the bounds of the topics and documents to which Plaintiff alerted Defendant in the initial disclosures, and about which Defendant made no effort to follow up"); *Jones v. RealPage, Inc.*, No. 3:19-cv-2087-B, 2020 WL 6149969, at *4 (N.D. Tex. Oct. 19, 2020) ("[T]he disclosure of the names of the specific corporate witnesses of Marietta and GDS was not required by Rule 26(a)."); *see also Equity Recovery Specialists LLC v. Select Portfolio Servicing Inc.*, No. CV-21-01889-PHX-DWL, 2023 WL 5278675, at *7 (D. Ariz. Aug. 16, 2023) ("[M]any courts and commentators have concluded that when, as here, a party seeks to disclose a corporate representative who will testify about corporate policies, it is not necessary to identify that individual by name."); *Pai v. Carnival Corp.*, No. 21-CV-23511-WILLIAMS/REID, 2023 WL 2866380, at *4 (S.D. Fla. Mar. 7, 2023) (denying request to strike corporate representative from witness disclosure); *Paldo Sign & Display Co. v. Unified Mktg., LLC*, No. 13 C 1896, 2017 WL 951313, at *3 (N.D. Ill. Mar. 10, 2017) ("The Court further notes that despite having been on notice through the j2 Defendants' Rule 26(a)(1) disclosures that defendants would rely on unnamed

is only when a disclosing party "makes no reference to the subjects of [the testimony that] such a disclosure" of a corporate representative "is insufficient" for Rule 26 purposes. *Id.* That is not what Defendants did here.

Even if it was, exclusion of Ivinjack would not be the proper remedy. The Fifth Circuit considers four factors in determining whether to exclude the testimony of a late-disclosed witness: "(1) the explanation for the failure to identify the witness; (2) the importance of the testimony; (3) potential prejudice in allowing the testimony; and (4) the availability of a continuance to cure such prejudice." *Betzel v. State Farm Lloyds*, 480 F.3d 704, 707 (5th Cir. 2007). Applied here, Defendants had a legitimate reason for not disclosing Ivinjack—they did not know who would be suitably positioned to describe Aon's corporate processes until May 2024 when they disclosed that information to Plaintiff. The testimony is also important to this case and can only be given by a corporate representative from Aon. *Id.* at 708. There was also no prejudice to Plaintiff because he could have pursued discovery as to Aon by seeking enforcement of his subpoenas. *Mercury Luggage Mfg. Co.*, 2020 WL 7122859, at *5. And without prejudice, there is no need to consider a continuance. *See id.*

## B. Motion to Exclude in Part Expert Testimony

Prior to trial, Defendants filed a motion to partially exclude Plaintiff's expert witness, J.B. Heaton ("Heaton").[9] Defendants' motion largely challenges Heaton's methodology for calculating

---

corporate representatives and employees who had knowledge of defendants' relevant business practices and policies and extent of involvement in the transmission of faxes, plaintiffs never sought a Rule 30(b)(6) deposition of a j2 representative. Consequently, plaintiffs' claims of prejudice ring hollow."); *Krawczyk v. Centurion Cap. Corp.*, No. 06-C-6273, 2009 WL 395458, at *6 (N.D. Ill. Feb. 18, 2009) ("Any prejudice to Plaintiff resulted from not conducting his own discovery with respect to Defendants' witnesses, not from Defendants' bad faith or willfulness in failing to specify the names of the representatives whom they intended to use.").

[9] Defs.' Mot. to Exclude in Part Expert Testimony, ECF No. 120.

losses to the Plan as well as the economic value of a potential injunction.[10] As explained below,
neither of these issues is addressed in this opinion. Defendants also seek exclusion of any testimony
from Heaton about whether Defendants met their fiduciary obligations in accordance with
then-prevailing standards and practices, as well as how BlackRock would have responded to a
hypothetical proxy voting intervention.[11] Because the standards for admitting expert testimony in
a bench trial are lower than a jury trial, *Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000), the
Court allowed Heaton to testify and deferred ruling on the motion.[12] Having reviewed the
applicable law and the challenged portions of Heaton's testimony, the Court **DENIES** the motion.
Plaintiff has established Heaton possesses adequate expert qualifications and has demonstrated
Heaton's opinions and methods are both relevant and reliable. Ultimately, Defendants' arguments
go to the weight assigned to Heaton's testimony rather than its admissibility.

Trial courts act as gatekeepers for expert testimony, determining admissibility based on
Federal Rule of Evidence 702:

> A witness who is qualified as an expert by knowledge, skill, experience, training,
> or education may testify in the form of an opinion or otherwise if the proponent
> demonstrates to the court that it is more likely than not that: (a) the expert's
> scientific, technical, or other specialized knowledge will help the trier of fact to
> understand the evidence or to determine a fact in issue; (b) the testimony is based
> on sufficient facts or data; (c) the testimony is the product of reliable principles and
> methods; and (d) the expert's opinion reflects a reliable application of the principles
> and methods to the facts of the case.

FED. R. EVID. 702. Expert testimony is admissible if the proponent can prove "by a preponderance
of the evidence" that "(1) the expert is qualified, (2) the evidence is relevant to the suit, and (3) the
evidence is reliable." *DeWolff, Boberg & Assocs., Inc. v. Pethick*, No. No. 3:20-CV-3649-L, 2024

---

[10] *Id.* at 1–2; Defs.' Reply in Supp. of Mot.to Exclude in Part Expert Testimony 1, ECF No. 141.
[11] Defs.' Mot. to Exclude in Part Expert Testimony 2, ECF No. 120; Defs.' Reply in Supp. of Mot. to
Exclude in Part Expert Testimony 1, ECF No. 141.
[12] The Court reiterated at trial that Heaton's examination would also serve as a *Daubert* hearing.

WL 1396267, at *3 (N.D. Tex. Mar. 31, 2024) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 n.10 (1993)). When reviewing a motion to exclude expert testimony, "rejection of expert testimony is the exception rather than the rule." *Irving v. Meridian Sec. Ins. Co.*, No. 4:21-CV-01341-O, 2023 WL 2068472, at *3 (N.D. Tex. Jan. 4, 2023) (quoting advisory committee notes to Federal Rule of Evidence 702). This is because the "trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 562 (5th Cir. 2004) (quoting *United States v. 14.38 Acres of Land Situated in Leflore Cty., Miss.*, 80 F.3d 1074, 1078 (5th Cir. 1996)). *Daubert*'s binary standard—admit or exclude—is relaxed in a bench trial to ensure the judge has "discretion to admit questionable technical evidence" provided he does "not give it more weight than it deserves." *Harding v. Cty. of Dallas*, No. 3:15-CV-0131-D, 2018 WL 1156561, at *1 (N.D. Tex. Mar. 5, 2018) (citation omitted); *see also Gibbs*, 210 F.3d at 500. That is why courts frequently deny motions to exclude expert testimony because "such a motion is mostly inapplicable in the context of a trial to the court." *E.g.*, *Shafer v. LG Elecs. U.S.A., Inc.*, No. 09-CV-105-Y, 2010 WL 8757823, at *3 (N.D. Tex. Sept. 30, 2010).

Start with Heaton's qualifications. His research and background fit squarely with Plaintiff's theory of the case and his expert testimony is precisely what the Federal Rules of Evidence contemplate by requiring an "expert by knowledge, skill, experience, training, or education" who will apply that "specialized knowledge" to "help the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702. Heaton received Ph.D. and MBA degrees from respected programs at the University of Chicago Booth School of Business. He likewise graduated from the University of Chicago School of Law. His professional experience includes publishing extensively in several peer-reviewed journals on finance topics, including key issues in this case:

asset management, index investing, shareholder activism, hedge fund activism, event studies and price impact in securities litigation, corporate finance, corporate governance, and ESG investing. Given his expertise in these subject areas, Heaton has also taught law and finance courses at law schools and business schools across the nation. Beyond his academic experience, Heaton practiced law at the litigation boutique Bartlit Beck LLP for nearly two decades and even served as a fiduciary member of Bartlit Beck's 401(k) plan committee. During his fiduciary tenure, he monitored the 401(k) plan's investment options and performance.

Due to his extensive education, research, and overall experience, Heaton has developed particular skills and specialized knowledge to help the Court—the trier of fact in this case— understand the evidence and determine facts in issue. Any "[d]ifferences in [Heaton's] expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility." *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009). The same is true for any "lack of specialization," which "does not affect the admissibility of the opinion, but only its weight." *United States v. Wen Chyu Liu*, 716 F.3d 159, 168–69 (5th Cir. 2013) (cleaned up). Heaton is thus imminently qualified as an expert, and the Court will assign the appropriate weight to Heaton's testimony.

Heaton's opinions and methods are also sufficiently relevant. To be relevant, "expert testimony [must] 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 245 (5th Cir. 2002) (quoting *Daubert*, 509 U.S. at 591). "Relevance depends upon 'whether [the expert's] reasoning or methodology properly can be applied to the facts in issue.'" *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007) (quoting *Daubert*, 509 U.S. at 593); *see also* FED. R. EVID. 702(d) (requiring that an "expert's opinion reflects a reliable application of the principles and methods to the facts of the

case"). In other words, "relevance . . . of expert testimony turn[s] upon the nature of the testimony and the purpose for which the proponent offers the testimony." *DeWolff*, 2024 WL 1396267, at *5.

Plaintiff has shown by a preponderance of the evidence that both the nature of Heaton's testimony and purpose for which he offers it are relevant to key issues in this case, including whether BlackRock engaged in ESG activism through proxy voting and whether any losses occurred as a result. Such testimony can properly be applied to the facts at issue and will assist the Court with understanding the evidence. To the extent Heaton's testimony could be viewed in any way as attempting to opine on whether Defendants qualified as ERISA fiduciaries or whether they breached their fiduciaries duties, those are questions of law for the Court to determine—not Heaton. *See Goodman v. Harris Cnty.*, 571 F.3d 388, 399 (5th Cir. 2009) ("[A]n expert may never render conclusions of law."); *Roton v. Peveto Fin. Grp., LLC*, 649 F. Supp. 3d 300, 312–13 (N.D. Tex. 2022) (excluding expert testimony that "offer[ed] conclusions of law and opinions on ultimate legal issues," including whether defendants qualified as fiduciaries under ERISA and whether they breached their fiduciary duties). The closest any expert testimony may permissibly get to these legal questions is by offering an opinion as to whether a particular party's conduct fell short of prevailing fiduciary practices. Because Heaton's reports offered no such opinions and his testimony at trial focused on (1) "whether and how BlackRock engaged in ESG-driven proxy voting and shareholder activism, and (2) "whether that ESG-driven proxy voting and shareholder activism injured [P]lan participants," there is no reason to exclude Heaton's nonexistent testimony regarding prevailing fiduciary standards.

Finally, Heaton's opinions and methods are sufficiently reliable. Reliability is determined by assessing "whether the reasoning or methodology underlying the testimony is scientifically valid." *Knight*, 482 F.3d at 352 (quoting *Daubert*, 509 U.S. at 592–93); *see also* FED. R. EVID.

702(c) (requiring that "testimony [be] the product of reliable principles and methods"). "The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, *et alia*." *Knight*, 482 F.3d at 355 (cleaned up). Moreover, the party seeking admission of an expert's testimony "need not prove to the judge that the expert's testimony is correct, but []he must prove by a preponderance of the evidence that the testimony is reliable." *Am. Airlines, Inc. v. Delta Air Lines, Inc.*, No. 4:19-CV-1053-O, 2021 WL 3629735, at *4 (N.D. Tex. May 18, 2021) (quoting *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012)).

Plaintiff has proved by a preponderance of the evidence that Heaton's testimony is reliable. Many of Heaton's opinions are based on, among other things, his clear experience in asset management and research on shareholder activism. His opinions regarding BlackRock's ESG activism do not require specific scientific support because Heaton relies on his personal observations, professional experience, training, and education. Given Heaton's qualifications, he is sufficiently positioned to opine on this topic. As to his opinions regarding the economic effects of BlackRock's ESG activism on the Plan, the event studies used by Heaton are widely accepted. Even Defendants' own expert uses the event study methodology. Courts across the country have also cited Heaton's article regarding statistical power. *E.g.*, *In re Petrobras Sec.*, 862 F.3d 250, 278–79 (2d Cir. 2017) (citing and discussing Alon Brav & J.B. Heaton, *Event Studies in Securities Litigation: Low Power, Confounding Effects, and Bias*, 93 WASH. U. L. REV. 583–614 (2015)). Although Defendants challenge the statistical significance of Heaton's results and argue his methodology diverges from standard scientific practices, these arguments are more properly applied to the weight of Heaton's testimony rather than its admissibility.

While the Court takes note of Defendants' arguments—particularly those regarding the reliability and relevance of Heaton's expert testimony—these are not grounds for exclusion. Heaton's testimony is unquestionably relevant to this case and sufficiently reliable to permit admission. Instead, Defendants' arguments (and any counter-expert testimony) bear on the weight assigned to Heaton's testimony, which will matter when the Court addresses in a subsequent ruling the deferred issues of any losses suffered by the Plan and the appropriateness of an injunction. Because Plaintiff demonstrates that Heaton satisfies all of Federal Rule of Evidence 702's requirements, the Court therefore **DENIES** Defendants' motion and admits Heaton as an expert.

### C.  Motion for Directed Verdict

Finally, the Court deferred ruling on Defendants' motion for directed verdict at trial. Rule 52(c) of the Federal Rules of Civil Procedure provides that a court may enter judgment after a party has been "fully heard" on an issue during a nonjury proceeding. FED. R. CIV. P. 52(c). In considering such a motion, the court's task is to evaluate all the evidence, resolve any conflicts, assess the witnesses' credibility, and decide the case on the basis of the preponderance of the evidence. 9C CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FED. PRAC. & PROC. CIV. § 2573.1 (3d ed. 2021). Having first considered the evidence presented by Plaintiff during his case-in-chief, and then the totality of all the evidence following Defendants' defense, the Court determines that at both decisional junctures Plaintiff provided legally and factually sufficient evidence to make out a prima facie case for his claims. Accordingly, the Court **DENIES** Defendants' motion for directed verdict and proceeds with issuing its decision on the merits of Plaintiff's claims.

## II.    FINDINGS OF FACT[13]

### A.  Parties

---

[13] For purposes of this section, any finding of fact that also constitutes a conclusion of law is adopted as such, and any conclusion of law that constitutes a finding of fact is likewise adopted as such.

American is a commercial air carrier headquartered in Fort Worth, Texas. It is a subsidiary of American Airlines Group Inc. ("AAG"), a Fortune 100 company whose securities are traded on the Nasdaq marketplace under the ticker AAL. AAG's common stock is included in several indices, including the S&P 500, the Russell 1000, and the Russell 3000. Plaintiff is a pilot employed by American, as well as an F-16 Instructor Pilot at the Naval Air Station Joint Reserve Base in Fort Worth, who invests in the retirement plan offered by American. Plaintiff filed this lawsuit on behalf of himself and members of the class certified by the Court on May 22, 2024:

> All participants and beneficiaries of the American Airlines, Inc. 401(k) Plan and/or the American Airlines, Inc. 401(k) Plan for Pilots from June 1, 2017 through the date of judgment (the "Class Period"), excluding (i) Plan participants and beneficiaries who invested solely through the Plan's self-directed brokerage account, and (ii) Defendants and any of their directors, officers, or employees with responsibility for the Plans investment or administration (the "Class").[14]

### B.  Overview of the Plan

American sponsors two defined contribution plans for the benefit of its employees: (1) the American Airlines, Inc. 401(k) Plan ("401(k) Plan") and (2) the American Airlines, Inc. 401(k) Plan for Pilots ("Pilots Plan" and, together with the 401(k) Plan, the "Plan"). A defined

---

[14] Order on Mot. for Class Certification 24, ECF No. 122. Defendants have argued that "the Court has only certified a class with respect to Plaintiff's theory that Defendants breached their fiduciary duties by allowing [investment] managers controlling the Plan's Target Date Funds and Index Funds to engage in ESG activism through proxy votes," Defs.' Am. Ex. List 2, ECF No. 142, rather than Plaintiff's unpleaded "intervention theory," Defs. Br. in Supp. of Mot. for Summ. J. 24, 25, 38, ECF No. 100; Defs.' Reply Br. in Supp. of Mot. for Summ. J., 14, 14 n.15, 15, 17, 18, ECF No. 113. But as explained in the Court's summary judgment decision, intervention falls within the Class definition. June 20, 2024 Mem. Op. & Order 11–13, ECF No. 143. Plaintiff articulated a general theory of fiduciary mismanagement based on Defendants' failure to act exclusively in the Plan's financial interests by utilizing ESG-oriented investment managers and allowing ESG corporate goals to infiltrate and influence administration of the Plan. *Id.* at 12 (citing Pl.'s Am. Compl. ¶¶ 3, 6, 117–24, 131, ECF No. 41). Various actions fall under this mismanagement umbrella, such as the selection and retention of ESG-oriented investment managers as well as not taking all necessary steps to ensure that the Plan's assets are invested properly, including but not limited to, intervention in proxy voting. *See id.* at 13. Whether termed the "Challenged Manager Theory" or the "Proxy Voting Theory," both labels capture Plaintiff's theory that Defendants failed to take all necessary steps to loyally and prudently manage the Plan.

contribution plan promises the participant at retirement the value of an individual account reflecting the investment performance of any pre-tax contributions by the participant (and sometimes the employer), less any fees. American established the Plan through written documents, which have been in effect from June 1, 2017 to the present (the "Class Period"). As fiduciaries, American and the EBC manage the 401(k) Plan and the Pilots Plan. At the end of 2021, the Plan had approximately $26 billion under management.

The 401(k) Plan was made available to eligible American employees, including management support staff, members of certain unions, and flight attendants. As of 2022, the 401(k) Plan had 99,540 participants—over 87% of eligible employees. From 2017 to 2022, the 401(k) Plan's total invested assets increased from $10.6 billion to $12.4 billion, and the average account balance over that period grew from $102,302 to $142,994. The Pilots Plan was established on October 27, 2017 following the merger between American and US Airways. After completing a one-year service requirement, most American pilots received an employer contribution of up to 16% of their annual compensation. As of 2022, the Pilots Plan had 17,272 participants—over 97% of eligible employees. From 2017 to 2022, the Pilots Plan's total invested assets increased from $7 billion to $9.1 billion, and the average account balance increased from $426,206 to $679,123. Plaintiff is a participant in the Pilots Plan.

### C. Investment Options

During the Class Period, Plan participants were able to contribute to their individual retirement accounts by choosing from a wide range of investment options selected by the EBC. The Plan's core investment lineup contained three general tiers: (1) target date funds (tier one), (2) passively managed index funds (tier two), and (3) actively managed funds (tier three). Active funds are those in which the managers construct portfolios with the aim of exceeding the returns of a

specific benchmark index, such as the S&P 500 or Russell 1000. For the active funds, investment managers freely buy and sell stock according to their own analyses. In contrast, managers of passive funds construct portfolios with the aim of tracking the performance of a specific index. Passive fund managers thus purchase and sell stocks based on the relative proportion that those stocks represent in the relevant index, with the goal of approximating the capitalization-weighted total return of the underlying index funds as closely as practicable. Beyond these general tiers of active and passive funds, the Plan also contained an additional tier that allowed participants to open up a self-directed brokerage account with access to thousands of additional investment funds available in the industry (tier four).

For funds in tiers one through three, the EBC curates, selects, and monitors the investment options available to participants. The tier one options consist of custom target date funds, which are a series of diversified investment vehicles that correspond to different target retirement years, with asset allocations to multiple asset classes that automatically rebalance over time to reduce risk and become more conservative as the participant's target retirement date approaches. Funds underlying the tier one funds are a mix of the passively and actively managed investment options available in tiers two and three.

The tier two options consist of approximately ten passively managed index funds, each of which invests exclusively in a collective investment trust primarily managed by BlackRock.[15]

The tier three options consist of (1) an option that makes deposits in the American Airlines Federal Credit Union, (2) a stable value fund managed by Galliard Capital Management, (3) an Inflation Protect Fund that has invested exclusively in a BlackRock TIPS Index Fund, and (4) between five and six actively managed custom white label multi-manager funds designed

---

[15] At certain times during the Class Period, State Street also managed Plan funds.

exclusively for Plan participants. To create these custom multi-manager funds, fiduciaries of the Plan select and package investment products from various managers and competing fund complexes into a single option exclusively for Plan participants. A fund's assets are allocated across multiple investment managers, each with its own distinct investment strategy and objective of outperforming a benchmark or market index. The EBC then determines how to allocate custom fund's assets among the underlying investment managers.

The self-directed brokerage accounts in the tier four category give Plan participants the choice to freely reject the core menu of options selected by the EBC and to open their own self-directed brokerage accounts to obtain access to a broad array of stocks, bonds, and mutual funds. The Plan's brokerage window includes thousands of investment options designed to reflect the broader securities market, including mutual funds, exchange traded funds, real estate investment trusts, certificates of deposits, and direct investments in individual companies.

From June 1, 2017 through March 14, 2023, Plaintiff invested his entire account in the American Pilot Target Date Fund 2045, which is one of the custom target date funds constructed by the EBC. Plaintiff also diversified his retirement account by allocating portions of his account to roughly five of the tier two index funds. Plaintiff did not have a tier four self-directed brokerage account during the Class Period.

### D.  Investment Managers

The Plan features investment managers who invest funds on behalf of participants and beneficiaries. The largest of the Plan's investment managers, BlackRock, is an industry leader in investment management, risk management, and investment advisory services for institutional and retail clients, including defined contribution plans like the one at issue in this case. As of early 2023, BlackRock had approximately $9.1 trillion in assets under management. Defined

15

contribution plans—including those for 60% of Fortune 100 companies—widely feature BlackRock funds. Even the federal government's Thrift Savings Plan enlists BlackRock to manage nearly $480 billion in assets. While serving as the investment manager for the Plan, BlackRock is one of the largest shareholders in AAG.

### E. Governance and Administration

At all times during the Class Period, the EBC served as the administrator and named ERISA fiduciary of the Plan. Pursuant to the Plan's governing documents, the EBC has final decision-making responsibility for selecting and monitoring the Plan's investment options. These governing documents also empower American—specifically, American's Chief People Officer— with the authority to appoint EBC members. During the Class Period, the EBC was comprised of American officers, including senior executives from different business units: (1) Treasurer, (2) Chief Financial Officer, and (3) Chief People Officer. The officers most relevant during the Class Period were Treasurer Meghan Montana ("Montana"), Chief Financial Officer Derek Kerr ("Kerr"), and Chief People Officer Elise Eberwein ("Eberwein"). During the Class Period, both Kerr and Eberwein served as Chair of the EBC in addition to their corporate roles.

The EBC also maintained an Investment Policy Statement ("IPS"), which established guidelines and criteria for the selection and monitoring of the investment options. Under the IPS in effect during the Class Period, the EBC was authorized to consider both quantitative and qualitative factors in evaluating the Plan's investment options, including historical risk-and-return measures in a market cycle, as well as a fund's overall strategy and changes to its process, philosophy, or personnel. When evaluating the Plan, the EBC must holistically consider both short-term and long-term performance given the different retirement dates across beneficiaries,

because focusing too heavily on one side of the spectrum would fail to adequately adjust the risk parameters based on the retirement age of certain participants.

Consistent with the practices of other 401(k) plans, the EBC met at least quarterly to review the performance of the Plan's investment options. At these quarterly meetings, the EBC reviewed and considered detailed reporting regarding market developments, as well as qualitative and quantitative information regarding the aggregate performance of the Plan's investment funds and the underlying investment managers. The EBC prepared minutes summarizing the discussions and decisions that occurred in these quarterly meetings.

Beyond this oversight role, the EBC otherwise delegates oversight of the Plan to others—specifically, experts. The EBC engaged both internal and external experts to review, monitor, and evaluate the Plan's investment options and investment managers across numerous dimensions. Internally, the EBC relied on the Asset Management Group to provide advice regarding the Plan. The Asset Management Group consults and supports the EBC's fiduciary function, including with the selection and monitoring of the Plan's investment options. One of the ways these internal experts do so is by regularly reviewing detailed qualitative and quantitative information regarding the Plan's investment options—specifically, performance data for investment options and their underlying managers relative to benchmarks and peer groups. The Asset Management Group also reviews the financial press to stay abreast of market developments and news regarding investment managers.

The professionals who comprise the Asset Management Group offer their own expertise to provide an additional oversight of external experts. Members of the Asset Management Group are financial analysts with experience in investments and asset management. During the Class Period, Ken Menezes served as the Managing Director of the Asset Management Group, alongside his

17

direct report, Alex Ruehle.[16] The standard protocol is for the Asset Management Group to independently meet with current and prospective investment managers on at least a quarterly basis to discuss any developments, changes in investment philosophy or the key personnel managing the fund, and to better understand the factors driving an investment manager's quarterly performance. Separate and apart from these meetings, the Asset Management Group's practice is to communicate with investment managers when questions or concerns arose regarding the Plan. While members of the Asset Management Group met with BlackRock on some occasions, at no point was there specific discussion concerning BlackRock's proxy voting activities or ESG investing.

Externally, the EBC relied on an established outside consultant, Aon, that was hired to provide additional investment advice and monitoring. Aon has received top industry rankings and has extensive experience with large defined contribution plan and maintains significant assets under management—$2 trillion in the United States and $4.6 trillion worldwide. During the competitive request for proposal process, Aon received high marks in multiple categories due to having the largest assets under management and the most experience with large retirement plans. Given these attributes, along with Aon's extensive resources, reputation, and ability to negotiate reduced fees, Defendants' internal committee tasked with overseeing the request for proposal process recommended hiring Aon. The EBC ultimately hired Aon as an outside consultant to the Plan in 2014. Once selected, Aon agreed to serve as a co-fiduciary.

Aon works directly with the Asset Management Group to regularly review the Plan's investment options and to make recommendations to the EBC regarding management of these investments. As part of this collaborative relationship, Aon and the Asset Management Group

---

[16] Ruehle was later replaced by Carlos Chujoy.

would meet quarterly. At these meetings, Aon would discuss the quarterly investment reviews it prepared in advance of upcoming EBC meetings. These reviews typically contain input regarding the Plan and raise any questions. The Asset Management Group would provide feedback on these reviews, along with any other presentations Aon prepared for the EBC meetings, such as those related to replacing managers. Menezes would also meet with Aon annually to better understand Aon's processes. During these visits, Menezes would meet with the particular Aon research team assigned to review specific investment managers.

Both experts assist with monitoring the Plan and are responsible for elevating to the EBC any issues that they believe are material to the Plan's financial interests. Despite working together, the Asset Management Group provides an oversight role by conducting periodic assessments of Aon against other leading investment consulting firms. As part of this process, the Asset Management Group evaluates a number of metrics, including fees, services, and resources devoted to manager research. Aon has consistently served as the Plan's investment consultant since 2014, during which time the Asset Management Group engaged in periodic assessments of Aon.

The Asset Management Group also regularly consults Milliman, U.S., which serves as the investment advisor to the pilots' union, Allied Pilots Associated. The purpose of these consultations—on roughly a quarterly basis—is to collect additional feedback on the Plan to share with Aon and Defendants. During these meetings, the Asset Management Group discusses performance of the Plan's investment options and possible changes to the investment managers. Members of the Allied Pilots Association and Milliman would often attend EBC meetings and are routinely included in discussions with current and prospective investment managers. Throughout the Class Period, the EBC occasionally made changes to the Plan's investment options when an

input source identified concerns, opportunities for improved risk-and-return expectations, or strategies for negotiating lower fees.

### F. Monitoring

To monitor the Plan, Defendants largely outsource most of this responsibility. Aon conducts thorough, ongoing evaluations utilizing its specialized manager research team comprised of more than 600 professionals, including a team of 38 individuals focused on defined contribution assets. When evaluating third-party managers, such as BlackRock, Aon applies a system of rating criteria and rankings, which considers both quantitative and qualitative factors. This blended approach is the investment consulting industry's standard methodology, as there are only a small number of consultants who utilize a quantitative-only approach (known as "quants"). To assess qualitative factors, Aon conducts ongoing due diligence, such as meeting directly with an investment manager to assess its business structure, activities, operations, stability of the management team, and compliance practices. Aon also monitors the financial press for news regarding emerging issues relevant to an investment manager's relative risk level. Additionally, Aon inquires into an investment manager's proxy voting guidelines, reviews formal proxy voting guidelines, and periodically evaluates a manger's adherence to those stated guidelines. As to quantitative factors, Aon uses proprietary and third-party databases to gauge risk and performance. This includes evaluation of fees, performance against various benchmarks and peer groups, and myriad risk measures.

Combined, Aon's evaluative processes functions to confirm that a given investment manager follows protocols that are focused exclusively on the best long-term financial interests of the Plan. The result of this process is to score each investment product or strategy across different dimensions that assigns a rating of "buy," "qualified," or "sell." Aon summarizes these ratings,

along with its supporting observations, in periodic manager research reports, which were made available to the EBC on a regular and as-needed basis. Aon also occasionally negotiates with investment managers for lower fees.

In addition to quarterly reporting, Aon also regularly attends EBC meetings and provides additional performance analyses of investment managers to both the EBC and Asset Management Gorup. The purpose of these additional analyses is to address issues that arise in the evaluative process and making suggestions based on market developments. Prior to each EBC meeting, Aon would provide reports memorializing the highlights of its analyses. These EBC reports also made recommendations regarding investment managers, including proposals for alternative managers, based on fees, overall performance relative to benchmarks and peer groups, and any noteworthy qualitative information.

### G. Proxy Voting

Publicly traded companies in the United States are generally required—by incorporation laws or stock exchange rules—to hold annual meetings. During these meetings, shareholders are asked to vote on a slate of proposals. Investors who own the company's shares on a set record date are eligible to submit votes on pending proposals, which are known as "proxy votes." For most companies, shareholders have one vote for each share they hold. Investors who directly hold shares can submit their own proxy votes. Shares held indirectly through an investment fund, however, are often voted by an investment manager. Most of these proxy votes take place between April and June of each year—known as "proxy season." When it comes to proxy voting, most defined contribution plans delegate proxy voting authority to investment managers given the sheer quantity of securities held on behalf of a plan. To handle this volume of proxy voting during the short proxy

season would require a significant expenditure of plan assets and would often be impracticable given the research and analysis required to make well-informed decisions on thousands of votes.

The United States Securities and Exchange Commission ("SEC") requires investment managers voting proxies on behalf of others to maintain "policies and procedures . . . reasonably designed to ensure that the advisor votes its proxies in the best interests of clients." Proxy Voting by Investment Advisers, 68 Fed. Reg. 6,585, 6,593 (Feb. 7, 2003). For an investment manager to exercise proxy voting power, the fund it manages needs to invest in securities that allow proxy voting. Many securities do not carry such voting rights, as some companies issue non-voting shares. Some of the funds in the Plan do not invest in securities with voting rights. For those that do carry proxy-voting power, shareholder proposals are typically non-binding and advisory in nature. Shareholder proposals are limited from interfering with or inappropriately intruding on the discretion of the company's management, so proxy votes typically do not compel a company's officers or directors to take specific actions.

Consistent with industry practice, the Plan's investment management agreements ("IMA" or "IMAs") assign responsibility for proxy voting to investment managers. Section VIII of the IPS confirms the EBC typically delegates proxy voting to investment managers unless specifically reserved to the EBC in a specific IMA. Even so, the Plan's IMAs consistently assign this responsibility to the managers. For those managers responsible for separate accounts consisting of Plan assets only, the IMAs expressly require voting proxies consistent with the financial interests of the Plan's participants. And for the collective investment trusts consisting of pooled assets— that include Plan assets as well as assets from other plans—the IMAs require the investment managers to comply with their proxy voting guidelines disclosed to the EBC. The investment managers also must provide any revised proxy voting guidelines to the Asset Management Group

22

when updated, as well as supply the EBC with materials regarding their proxy voting practices, including an annual summary report of how proxies were voted in a given fund.

BlackRock's IMA requires that it attest all proxies were voted in compliance with the proxy-voting guidelines, which in turn specifies that BlackRock must vote proxies in the best long-term economic interests of the assets it manages. Despite the consistency of this financial-benefit specification across all revisions, later versions of BlackRock's proxy voting guidelines also expressly incorporated ESG considerations. Coinciding with these changes to the guidelines, BlackRock also did not regularly submit the required attestations each quarter despite Menezes initially testifying that these certifications were received. Menezes later returned to the stand to admit that his testimony was false, and that BlackRock did not submit the required quarterly attestations. And it became clear that Defendants did not question BlackRock about failing to submit these attestations as required by the IMA.

In addition to Defendants either failing to check or willfully ignoring that BlackRock did not submit the required quarterly attestations, Defendants also did not meaningfully discuss proxy voting until after the filing of this lawsuit during the September 2023 EBC meeting. At this meeting, Aon made a presentation regarding its efforts to monitor the proxy-voting activities of the investment managers it rates. Aon confirmed that, as part of its regular due diligence in evaluating investment strategies, it had an established process for monitoring proxy voting. This process included, among other things, reviewing the proxy voting decision-making process and noting whether and why votes deviated from the "default position" or conflicted with the company's management. But prior to this lawsuit, Aon reports prepared for the EBC rarely contained information on proxy voting and it appears that those reports were ultimately not

discussed at that EBC meetings. Furthermore, Defendants never reviewed at these meetings, or tasked any expert to specifically review, BlackRock's proxy voting and ESG investing.

Nevertheless, the EBC's processes for addressing the voting of proxies during the Class Period were consistent with and, in many respects exceeded, the processes of other fiduciaries. That is because fiduciary committees for defined contribution plans rarely, if ever, devote committee time or focus on independently reviewing an investment manager's overall proxy voting practices. Instead, these fiduciaries focus their time and attention on the factors that most directly impact the Plan and rely on investment advisors to conduct the more granular evaluations of investment managers. While these advisors are expected to raise material information when appropriate, historically proxy voting issues have infrequently been judged by advisors as material to the evaluation of performance or expected performance. Only recently has ESG investing complicated this default understanding of proxy voting as typically an immaterial consideration.

### H. ESG Investing

Because ESG investing plays a prominent role in this case, it is important to be clear about what ESG investing actually is. The evidence and expert testimony revealed that an investment strategy assumes an ESG label when it is aimed at, in whole or in part, bringing about certain types of societal change. Generally, three criteria inform ESG investing. First, environmental factors examine a company's carbon footprint, and whether any toxic chemicals are involved in its manufacturing processes and sustainability efforts that make up the supply chain. Second, social factors capture how a company addresses LGBTQ+ interests, promotes racial and gender diversity, equity, and inclusion ("DEI") programs and hiring practices, and engages in other forms of social advocacy. Third, governance factors capture issues surrounding executive pay, diversity in senior leadership, and how well leadership responds to and interacts with shareholders' socio-political

concerns. By focusing on non-pecuniary interests, ESG investments often underperform traditional investments by approximately 10%. For instance, when compared to the S&P 500 and the Russell 1000 indices in 2023, ESG funds dramatically underperformed non-ESG funds, with ESG-related funds returning about 8% compared to about 14% for both indices.[17]

Investing that aims to reduce material risks or increase return for the exclusive purpose of obtaining a financial benefit is *not* ESG investing. Consideration of material risk-and-return factors is no different than the standard investing process when both are focused on financial ends. A few examples help tease out the differences. Consider a company that does not meet certain diversity metrics because its executive leadership has too few female or diverse members. When selecting its executives, the company selected the most qualified individuals from the applicant pool without considering ascriptive characteristics like race or gender. This lack of diversity in leadership positions notwithstanding, the company performs well and even generates record-level returns for its shareholders. In response, an investment manager decides to divest shares in the company despite the financial benefits of continuing to invest. If the reason for divesting is due to the lack of diversity, this is a social and/or governance factor that is not grounded in an assessment of the best financial interest, making this strategy a form of ESG investing. But if the reason is because the investment manager reasonably believes the company's lack of diversity materially risks financial harm to shareholders based on sound analysis, this is not ESG investing given the sole focus on this ESG factor's economic relevance.

---

[17] In terms of satisfying fiduciary obligations, underperformance can also occur as *relative* underperformance compared to how the index fund *should* have performed had the fiduciary focused exclusively on financial interests. In other words, even if the index fund remains on par with (or even outperforms) a benchmark, such as the S&P 500, that fund could in theory still underperform in the sense that it is not obtaining the level of returns it *could* have achieved had it focused strictly on financial considerations.

Take another example. An energy company spends significant amounts of money on infrastructure, social programs, and education initiatives in a third-world country that houses some of its oil fields. These social expenditures are seemingly unrelated to the oil and gas industry. In response, an investment manager chooses to start investing in the company shortly after these social expenditures. If the reason for investing in the company is because these social expenditures are viewed as reasonably reducing, for example, the material risk of government expropriation of the oil fields or mitigating against other types of impactful labor strife, this is not ESG investing because the focus is fundamentally fixed on maximizing a financial benefit. But if the reason is due to the belief that the company has a responsibility to improve the society in which it operates notwithstanding the lack of or reduced economic benefit to the company, such a non-pecuniary consideration would qualify investments based on these social expenditures as a form of ESG investing.

Now consider a more nuanced example. An energy company receives a credible projection that the demand for fossil fuels will rapidly increase in the coming years—it will be off the charts. To maximize shareholder value, the company plans to dramatically ramp up its oil and gas production to make as much money as possible. However, because this plan will do the opposite of reducing greenhouse gas emissions, a large investment manager tactically states in response that it will wield its delegated proxy authority to vote against the company's present path (or against current management). The investment manager's stated reason for doing so is to prevent the increased production of fossil fuels despite the depression of the company's stock that is sure to follow, which will cause shareholders to lose out on significant financial value. If the investment manager's negative response is based on its non-pecuniary climate change agenda, this is a form of ESG investing. The investment manager's response still qualifies as ESG investing even if it

26

believes there are simultaneously some financial benefits to reducing fossil fuel production (essentially, a mix of both ESG and financial benefits) should the company choose to forego the more lucrative financial strategy of increasing fossil fuel production. That is because the investment manager in this hypothetical is acting in a manner inconsistent with the company deriving the greatest profit but instead acting in favor of the mixed benefits which contains some non-pecuniary goals. So even with mixed benefits, the presence of a non-pecuniary consideration reveals that the investment manager is not acting *exclusively* in an economic manner.

As these examples demonstrate, ESG investing is a strategy that considers or pursues a non-pecuniary interest as *an end* itself rather than as a means to some financial end. This distinction is especially key in this case. Simply describing an ESG consideration as a material financial consideration is not enough. There must be a sound basis for characterizing something as a financial benefit. Otherwise, anything could qualify as a financial interest and can serve as pretext for non-pecuniary interests. For example, an investment manager who negatively evaluates 7-Eleven because its stores sell sugary Big Gulp drinks that "could be damaging" or lead to "customers being injured" from the increased potential for diabetes is not actually a financial consideration just by labeling it as such.[18] ERISA suggests an objective, analytically rigorous standard when it comes to a fiduciary exclusively pursuing the best financial interests of the Plan. Deferring to what an entity labels a financial interest would create an entirely different standard— a subjective one—that will infinitely vary based on who is asked. Case in point: Defendants' expert, Charles "Duke" Meythaler ("Meythaler"), testified that voting proxies against a company without diverse directors is not necessarily a non-pecuniary goal when "[i]t depends on one's

---

[18] This example is drawn from a shocking back-and-forth between the Court and Ivinjack. The Court's impression of Ivinjack's testimony in this regard was that the witness was wholly unwilling to concede that ESG factors should *not* be considered by certain businesses when they do not actually serve a financial purpose.

perspective," because those "in Boston, Massachusetts . . . would think it's completely pecuniary." But bastardizing language to such a degree that "pecuniary" no longer conveys any fixed meaning whatsoever would render ERISA's financial-interest standard devoid of any utility. A clear factual understanding of what ESG investing is helps to establish a baseline from which to comparatively evaluate strategies and whether the basis for claiming a consideration is financial in nature rests on a solid premise.

## I.   BlackRock's ESG Activism[19]

BlackRock is a leading publicly traded investment management firm. As of December 31, 2020, BlackRock had approximately $8.7 trillion in assets under management. And by the end of the following year, BlackRock had approximately $1.45 trillion in defined contribution plan assets under management. Most relevant to this lawsuit, BlackRock managed approximately $11 billion in Plan assets as of the end of 2022. Of these assets, a number of investment funds tracked indices like the S&P 500, the Russell 1000, and the Russell 2000, along with investing in the securities within those indices.

BlackRock is the investment manager for all of the passively managed funds in the Plan.[20] When agreeing to serve as an investment manager, BlackRock committed to discharging its duties solely in the best interest of the Plan's participants and beneficiaries, as well as for the exclusive purpose of providing financial benefits of the Plan's managed assets. While serving as an

---

[19] Under Federal Rule of Evidence 703, an expert is allowed to rely on hearsay, and such information based on hearsay may be introduced into evidence to support the basis for the expert's opinion, provided that the factfinder does not substantively rely on it. FED. R. EVID. 703. Various exhibits were admitted at trial for the limited purpose of supporting the basis for Hearton's opinion so that the Court could evaluate the strength of that opinion. All references to that information herein serves this limited purpose only and is not substantively relied on by the Court.
[20] Prior to 2020, BlackRock was the investment manager for all of the passively managed funds in the 401(k) Plan and all but one of the passively managed funds in the Pilots Plan.

investment manager, BlackRock also owned more than 5% of American stock and approximately $400 million of American's fixed income debt.

BlackRock's ESG activism got off to a fast start by actively supporting ESG proposals at major energy companies. Despite its proxy voting guidelines stating that it did *not* see its role as making social, ethical, or political judgments on behalf of clients, BlackRock nonetheless told its staff in February 2016 that it wanted to position itself as a leader of ESG investing. This goal was quickly realized. By January 2017, BlackRock voted against climate-related proposals (and was criticized for doing so) at nearly all of its portfolio companies. And by May 2017, BlackRock changed its proxy voting guidelines and ramped up its support of climate change related proposals at major fossil fuel companies. That same month, it was reported that BlackRock would cast its first vote against management to support a climate change related proposal initiated at Occidental Petroleum by a group including the California Public Employees Retirement Systems. Although Occidental Petroleum was an oil and gas company whose stock was held in the Plan's index and target date funds, Defendants took no affirmative steps to address BlackRock's proxy-voting position. This was not an isolated vote. A few weeks after the Occidental Petroleum vote, BlackRock voted for a shareholder proposal regarding a climate stress test during an ExxonMobil ("Exxon") proxy vote.

Consistent with BlackRock's increasing ESG activism, BlackRock's CEO, Larry Fink, led the charge—especially with respect to climate change. Fink's outspoken activism started when he publicly disavowed President Trump's decision to leave the Paris Climate agreement. Desiring to have a greater socio-political impact, in December 2017 Fink sent letters to approximately 120 companies urging them to report climate change dangers in line with the recommendations of the Financial Stability Board's Task Force on Climate-Related Financial Disclosures.

Over the next two years, Fink continued to signal robust ESG commitments, including his desire to use proxy voting to push BlackRock's agenda onto companies through open letters to CEOs that BlackRock subsequently publicized. In January 2018, BlackRock published Fink's annual letter to CEOs under the title, "A Sense of Purpose." Fink stated that, as an index provider, BlackRock could not sell shares in companies whose policies it did not approve of that were within its index fund. Instead, Fink explained that BlackRock would use its votes to drive social change:

> Globally, investors' increasing use of index funds is driving a transformation in BlackRock's fiduciary responsibility and the wider landscape of corporate governance. In the $1.7 trillion in active funds we manage, BlackRock can choose to sell the securities of a company if we are doubtful about its strategic direction or long-term growth. In managing our index funds, however, BlackRock cannot express its disapproval by selling the company's securities as long as that company remains in the relevant index. As a result, our responsibility to engage and vote is more important than ever.

Fink's letter generated considerable reaction, including the remark that the content upended a half-century of business thought. Nevertheless, in January 2019, BlackRock published another letter from Fink. Doubling down on ESG activism through proxy voting, Fink put CEOs—including American's CEO—on notice that BlackRock's investment priorities had changed dramatically:

> BlackRock's Investment Stewardship engagement priorities for 2019 are: governance, including your company's approach to board diversity; corporate strategy and capital allocation; compensation that promotes long-termism; environmental risks and opportunities; and human capital management.

Delivering financial performance was no longer enough, according to Fink. And to underscore how strongly he felt about this, he threatened that companies must also "contribute to society . . . or risk losing the support of the world's largest asset manager."

In early 2020, BlackRock joined the Climate Action 100+ because the impact of climate risk on investment portfolios was, in BlackRock's view, building rapidly and it planned to

accelerate its engagement with companies on this particular issue. Climate Action 100+ is a group of investors focused on pressing the world's biggest emitters of greenhouse gases to change their ways. BlackRock joining the Climate Action 100+ coincided with yet another open letter from Fink to CEOs, "A Fundamental Reshaping of Finance," which outlined BlackRock's view that a wholesale shift away from managing assets solely for the financial benefit of a plan is essential. Fink's letter touted BlackRock's climate change initiatives, including its founding role in a task force on climate-related financial disclosures and signing the United Nations' Principles for Responsible Investment. It also affirmed BlackRock's socio-political agenda by "fundamental[ly] reshaping . . . finance" based on its belief that "[e]very government, company, and shareholder must confront climate change."

The letter captured Defendants' attention. One day after its issuance, senior American executives traded emails discussing the contents of the letter. In this same email chain, Menezes acknowledged that BlackRock managed "a little over $10 billion" of Plan assets. Shortly thereafter, other American executives discussed via email an article titled, "How to Make Your 401(k) a Little Less Evil." According to the article, just 2.9% of 401(k) plans have even a single fund dedicated to ESG issues, so failing to invest in one of these ESG funds means investing in— or, essentially, endorsing—companies that extract or refine pollutants, mow down rainforests, or mistreat people or animals. The article proceeded to encourage retirement plan administrators to include ESG investments. Then-EBC Chair Eberwein stated in response to the article that ESG investment was a "worthy consideration" despite acknowledging that ESG investments are known to have low performance. This statement coincided with the Asset Management Group's knowledge that most of the Plan's investment managers, especially BlackRock, take ESG factors into consideration. In fact, one member of the Asset Management Group admitted that most of the

current investment managers and proposed managers are Principles for Responsible Investment signatories.

Around this same time, the Asset Management Group prepared a presentation for the EBC about the United States Department of Labor's warning to plan sponsors and fiduciaries that "ESG cannot stand on its own as satisfaction of fiduciary duty." Despite this warning, it does not appear that this presentation was meaningfully discussed by the EBC until *after* this lawsuit was filed. And most shockingly, no member of Aon or the Asset Management Group brought up concerns about ESG-focused investing or proxy voting directly at a meeting with BlackRock.

By the end of 2020, BlackRock published its latest proxy voting guidelines and stewardship expectations, which outlined the expectation that companies must disclose a plan for how their business models will be compatible with a low-carbon economy—that is, an economy where global warming is limited to well below two degrees Celsius and consistent with a worldwide aspiration of net zero GHG emissions by 2050. Consistent with its new proxy-voting guidelines, BlackRock publicly vowed to support more shareholder proposals on climate change, even at major energy companies that make money from the production of fossil fuels. This was one way in which BlackRock would "play their part in reducing global warming."

Opportunities soon followed. Shortly after BlackRock published its new proxy-voting guidelines, BlackRock's ESG activism went parabolic. BlackRock proceeded to oppose several management-recommended directors at energy companies because they failed to meet specified climate goals or secure adequately diverse corporate boards. For example, BlackRock voted against Exxon directors on May 27, 2020 "for lack of progress in driving greater action on climate risk." The most notable example occurred in 2021 in the wake of a climate activist firm, Engine No. 1, publishing a letter to Exxon's Board of Directors asking them to explore clean and net-zero

32

emission energy options. Consistent with its revised standards, BlackRock voted in support of Engine No. 1's dissident directors on May 26, 2021 because Exxon failed to meet BlackRock's climate demands. Three of Engine No. 1's dissident-director nominees were ultimately elected to Exxon's board. BlackRock's proxy votes were outcome determinative in this election. As of the date of the vote, BlackRock held approximately 283.3 million shares. And according to Exxon's Form 8K for June 2021, none of the three dissident directors would have been elected to Exxon's board without BlackRock's proxy votes. In response to this election, Exxon's stock prices, along with other energy stocks, fell.

BlackRock's proxy voting activism did not end there. In April and May 2021, BlackRock opposed management-recommended directors at a dozen or so additional oil and gas companies because they failed to meet the desired climate goals and failed to adequately diversify their boards. Despite the impact of BlackRock's ESG-oriented investing and proxy voting activism in the energy space repeatedly making the news, American allowed BlackRock to continue managing billions of dollars of Plan assets in pursuit of non-economic ESG interests. BlackRock was never asked to provide any financial or empirical analysis justifying its ESG investing—including its vote at Exxon or elsewhere—as in the best financial interest of shareholders. Instead, it appears that Defendants accepted without question the notion that a future energy transition to a green, low-carbon world will occur. But Defendants demanded no support for this premise. Nor did they conduct any independent assessment on their own. They also did not conduct or solicit from Aon or the Asset Management Group an analysis of ESG investing generally or BlackRock's particular form ESG investing. Defendants took no affirmative steps whatsoever to question, let alone prevent, BlackRock's ESG-driven proxy voting using Plan assets. All the while, BlackRock was by far the Plan's largest investment manager simultaneous to its robust ESG activism.

Defendants turned a blind eye to BlackRock's ESG activism. Kerr never sufficiently reviewed or discussed BlackRock's proxy voting guidelines despite receiving Fink's letter describing BlackRock's ESG agenda and concomitant activism. Montana dismissively stated that the amount of Plan assets managed by BlackRock "doesn't really matter" because proxy voting was outsourced. Despite her role as a member of the EBC, Montana did not know what process was used to determine whether proxy voting serves the best financial interests of the Plan. Nor was she aware if Aon had such a process for monitoring proxy voting. Eberwein did not even recall that she served on the EBC in 2019 and 2020. Making matters worse, Eberwein signed off on BlackRock using its own proxy-voting guidelines despite stating she did not know BlackRock was an investment manager of Plan assets.[21] At the same time, she stressed the benefits of participating in the Plan to employees and retirees despite admitting that the EBC never provided information with those participants about ESG, proxy voting, and BlackRock's activist investment strategies.

Most egregiously, Menezes, who was in charge of the corporate relationship with BlackRock, knew that the EBC delegated proxy voting to BlackRock and that BlackRock pursued ESG investing, including through proxy voting. Despite this knowledge, Menezes never raised the concern to anyone on the EBC that BlackRock was pursuing a non-pecuniary ESG investment strategy. Menezes also appears to have either hid or willfully turned a blind eye to the fact that BlackRock did not fulfill its obligation to submit quarterly attestations on proxy voting. While the Court found Menezes wholly unreliable and not credible as a witness, his testimony nonetheless made clear his bias in favor of BlackRock—potentially as far-reaching as attempting to cover up BlackRock's investment practices. And at no point was Menezes able to identify specific actions

---

[21] Eberwein also failed to recall various aspects of her work as an EBC member, which raises the question of her performance in a fiduciary versus corporate role.

taken by the EBC to address potential conflicts of interests or potential financial harm associated with BlackRock and its ESG investing.

Even one of Menezes' direct reports, Ruehle, was aligned with this light treatment of BlackRock. In August 2022, Ruehle emailed BlackRock after a Texas state official sent a letter expressing concern about ESG activism. But, once again, neither Ruehle nor any other member of the Asset Management Group raised BlackRock's ESG activism to the EBC despite the ongoing renegotiations of the Plan's investment agreement with BlackRock and voting slated for the next month to decide whether to retain BlackRock as the Plan's largest investment manager. A few months later, BlackRock emailed Menezes about expanding proxy-voting choices for its clients. Ruehle followed up with BlackRock about these options. Yet the EBC again did not discuss BlackRock's proxy voting, including its new options, at the December 2022 EBC meeting (or at any meetings in the aftermath of the Exxon proxy vote). Defendants finally reviewed starting "ESG factors and influences for each manager" in 2023—a mere ten days after Plaintiff initiated this lawsuit—when responding to concerns raised by Milliman about the lawsuit. This review discussed, for the first time, "a summary of how each manager uses ESG in the management of their strategy." But, as Menezes put it, American "had never done that before." The EBC for the first time engaged in meaningful discussion of proxy voting by the Plan's investment managers during the September 27, 2023 EBC meeting.

Unlike Defendants, when Texas and other states learned about BlackRock's ESG objectives, they acted on behalf of state employee retirement funds in an effort to stop the ESG activism pursued by investment managers, namely BlackRock, by threatening to divest from them.[22] This threat appeared to work. Even before the filing of Plaintiff's lawsuit, BlackRock had

---

[22] Recently, these states—led by Texas—increased this pressure by filing a lawsuit against BlackRock and two other leading institutional investors. Compl., *Texas, et al. v. BlackRock, Inc., et al.*, No. 6:24-cv-00437

scaled back its ESG activism in response to the onslaught of pressure from these states and consumer advocates. Specifically, BlackRock suddenly stressed that it "cannot be the climate police" and disclosed in its February 2022 Form 10-K that disagreement with its ESG agenda is a material risk given the "negative publicity" and potential to "adversely impact BlackRock's reputation and business." And by February 2024, BlackRock announced that it was leaving Climate Action 100+ because it conflicts with United States law requiring money managers to act solely in their clients' long-term economic interests—essentially a confession that its involvement in that particular initiative and related pursuits did the opposite. Even Fink recently attempted to build rapport with state officials (particularly those in Texas) at an energy investment summit in Houston, Texas after BlackRock was blacklisted because of its efforts to force a transition away from fossil fuels. Since then, BlackRock has published full-page advertisements in Texas newspapers claiming that BlackRock is proud to invest billions in Texas public energy companies on behalf of clients. Alongside these actions, BlackRock has once again reformed its proxy-voting practices by launching a program to let individual investors have a voice in how their proxy votes are cast. Whether this change is genuine in the long run remains to be seen and is not for this Court to decide. But what is relevant for purposes of this lawsuit is that pushback against BlackRock occurred and BlackRock promptly adjusted its behavior in response.

Often times, BlackRock couched its ESG investing in language that superficially pledged allegiance to an economic interest. But BlackRock never gave more than lip service to show *how*

---

(E.D. Tex. Nov. 27, 2024) (ECF No. 1). This lawsuit alleged similar patterns as those revealed by the evidence in this case: large institutional investment managers "acquir[ing] substantial stockholdings" to concomitantly "acquire[] the power to influence the policies of these competing companies" and "us[ing] [their] power to . . . pressure the management of all the portfolio companies in which they held assets to align with net-zero goals." *Id.* at 1–2. Of the three named defendants, the complaint alleged that BlackRock is the worst because "it would use [its] shareholdings to advance climate goals" without informing investors. *Id.* at 3. At the same time, BlackRock would "consistently and uniformly represent[] its non-ESG funds would be dedicated solely to enhancing shareholder value." *Id.*

its actions were actually economically advantageous to its clients. Absent a cognizable basis for claiming that certain ESG considerations capture material financial risks, slapping the label "financial interest" serves as mere pretext. BlackRock regularly employed rhetorical devices—such as the "long-term" modifier[23]—to discuss some amorphous and unsupported financial benefit of an ESG factor in order to shift attention away from its non-pecuniary goals. The most emblematic example of this pretext is found in BlackRock's defense of its climate change investment activism based on nothing more than ipse dixit. Just because BlackRock says it is "financial" or "material" does not automatically mean that it is. Using such labels is clever pretext, particularly when dealing with an unproven and nebulous issue like climate change.

At a minimum, BlackRock's own statements made clear that financial interests did not exclusively drive their aims:

> [E]very company must not only deliver financial performance, but also show how it makes a positive contribution to society. Companies must benefit all of their stakeholders, including shareholders, employees, customers, and the communities in which they operate. Without a sense of purpose, no company, either public or private, can achieve its full potential.

While these may be important aims for BlackRock, making a positive contribution to society and benefiting the communities in which they operate are not on their face financial benefits absent some showing to the contrary. That is why, in response to backlash in 2022, BlackRock tellingly backed away from this ESG activism, which reveals its ESG-focused intentions and apparent recognition of the problems with its ESG investing under ERISA.

### J.  American's Corporate ESG Goals

Like BlackRock, American as a company is committed to ESG. According to its annual ESG Report, American views its ESG efforts as a key part of its success and an important part of

---

[23] For example, Fink's 2018 letter repeatedly emphasized that "BlackRock engages with companies to drive the sustainable, *long-term growth* that our clients need to meet their [retirement] goals." (emphasis added).

its long-term strategy. American sets DEI goals and is actively striving to achieve net zero emissions by 2050. In 2021, American was the only passenger airline included in the Dow Jones Sustainability North America Index. Unsurprisingly, American also supports the United Nation's Global Compact's Ten Principles and considers its ESG efforts as integral to meeting that commitment. American is a climate change leader among its peers, just as BlackRock is among its peers.

Like the company, American officials with fiduciary responsibilities expressed a positive view of ESG investing. For example, while serving as Chair of the EBC, Eberwein communicated with an executive on the corporate side, American's Director of Sustainability Jill Blickstein, to express support for BlackRock's ESG objectives. Referencing BlackRock's efforts to make sustainability a core element of its investment framework, Eberwein favorably commented that both share a theme of climate change and sustainability. She also remarked that this alignment was "good." The email also attached the article titled "How to Make Your 401(k) a Little Less Evil," indicating at least some reflection about non-pecuniary interests. Eberwein acknowledged, in her corporate capacity, that Fink's letters would create a public relations "crisis" for American due to the airline's use of fossil fuels.

In addition to its corporate ESG goals, American also entrusted certain individuals with conflicting responsibilities. For instance, one of the main American officials responsible for the day-to-day oversight of the Plan's investment managers, Menezes, also managed the corporate financial relationship between American and BlackRock. Menezes himself appreciated the extensive relationship when he proactively stated that "BlackRock holds $400M of our fixed income debt," serves as "our 4th largest equity holder," and "[w]e also invest a little over $10 billion with them between the 401(k) and the pension plan." Menezes's management of the

BlackRock corporate relationship coincided with American's incorporation of ESG into its corporate strategy, which specifically focused on sustainability aviation fuel ("SAF") initiatives, and aligned with BlackRock's own ESG desires: that "companies disclose a plan for how their business model will be compatible with a low-carbon economy." Menezes described the ESG relationship between Blackrock and American as "circular" given that BlackRock owns a substantial amount of American stock and fixed income debt, while also pursuing ESG objectives as an investment manager.

## III.    CONCLUSIONS OF LAW[24]

### A.  Jurisdiction and Venue

This Court has subject matter jurisdiction over this action under 29 U.S.C. §§ 1132(e) and (f), which provide that participants in a qualifying ERISA retirement plan may pursue a civil action on behalf of the qualifying plan to remedy breaches of fiduciary duties and other prohibited conduct, along with obtaining monetary and equitable relief as set forth in 29 U.S.C. §§ 1132(a)(1) and 1132(a)(3). This Court also has jurisdiction pursuant to 28 U.S.C. § 1331 because this lawsuit presents a federal question under ERISA.

Venue is proper in the Northern District of Texas pursuant to 29 U.S.C. § 1132(e) and 28 U.S.C. § 1391 because Defendants' principal place of business is in this judicial district, the Plan is administered in this judicial district, and a substantial part of the alleged acts and omissions giving rise to Plaintiff's claims occurred in this judicial district.

### B.  Applicable Law

ERISA exists to protect participants and beneficiaries of employee retirement plans. *Pilot Life Ins. Co v. Dedeaux*, 481 U.S. 41, 44 (1987). One way in which ERISA achieves this purpose

---

[24] For purposes of this section, any conclusion of law that constitutes a finding of fact is adopted as such, and any finding of fact that constitutes a conclusion of law is likewise adopted as such.

is by imposing fiduciary duties. *Langbecker v. Elec. Data Sys. Corp.*, 476 F.3d 299, 307 (5th Cir. 2007). "An ERISA fiduciary must act with prudence, loyalty and disinterestedness," which are the "requirements carefully delineated in the statute." *Id.* (citing 29 U.S.C. § 1104(a)). To state a claim for breach of a fiduciary duty under ERISA, a plaintiff must establish three elements: (1) the plan is governed by ERISA, (2) the defendant is a fiduciary of the plan, and (3) the defendant breached its fiduciary duties under ERISA, resulting in losses to the plan's participants.[25] *Seidner v. KimberlyClark Corp.*, No. 3:21-CV-867-L, 2023 WL 2728714, at *6 (N.D. Tex. Mar. 30, 2023).

The Plan at issue here is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A) and a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34). Additionally, the Plan is a qualified plan under 26 U.S.C. § 401 and is of the type commonly referred to as a 401(k) plan. In a defined contribution plan, fiduciaries are obligated to assemble a diversified menu of designated investment alternatives. 29 U.S.C. § 1104(a)(1)(C); 29 C.F.R. § 2550.404c-1(b)(1)(ii). A "designated investment alternative" is defined as "any investment alternative designated by the plan into which participants and beneficiaries may direct the investment of assets held in, or contributed to, their individual accounts." 29 C.F.R. § 2550.404a-5(h)(4). With respect to defined contribution plans where a plan's sponsors present investment options from which beneficiaries choose—like the Plan here—"fiduciaries must engage in a reasoned decision-making process for investigating the merits of each investment option and ensure that each one remains in the best interest of plan participants." *Schweitzer v. Inv. Comm. of Phillips 66 Sav. Plan*, 960 F.3d 190, 197 (5th Cir. 2020) (cleaned up).

---

[25] The parties do not dispute the first element—that the Plan here is governed by ERISA. And they only disagree on the second element as to one of the two Defendants. The bulk of this lawsuit instead focuses on the third element: whether a fiduciary breach occurred.

ERISA fiduciaries must go about their work under the guidance of the very strict fiduciary duties of loyalty and prudence. *Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc*., 472 U.S. 559, 570–71 (1985). These duties are similar to what is found under the common law of trusts. *Tibble v. Edison Int'l*, 575 U.S. 523, 528–29 (2015) ("We have often noted that an ERISA fiduciary's duty is derived from the common law of trusts. In determining the contours of an ERISA fiduciary's duty, courts often must look to the law of trusts." (cleaned up)); *LaScala v. Scrufari*, 479 F.3d 213, 219 (2d Cir. 2007) ("The fiduciary obligations of the [plan's fiduciaries] to the participants and beneficiaries of [an ERISA] plan are those of trustees of an express trust— the highest known to the law." (second alternation in original)).

In the Fifth Circuit, an ERISA plaintiff bears the burden of "prov[ing] a breach of a fiduciary duty and a prima facie case of loss to the plan." *McDonald v. Provident Indemn. Life Ins. Co.*, 60 F.3d 234, 237 (5th Cir. 1995). Once the plaintiff has met this burden, the defendant can defeat liability by establishing "that the loss was not caused by . . . the breach of duty." *Id.* 237 (citing *Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915, 917 (8th Cir. 1994)). Because ERISA actions are civil in nature, the default standard of proof is the preponderance of the evidence standard. *Grogan v. Garner*, 498 U.S. 279, 286 (1991). Proving a fact by a "preponderance of the evidence" means showing that the existence of a fact is more likely so than not. *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 (1983). Thus, to prove a fact or claim by a preponderance of the evidence, a party with the burden of proof must prove that it is more likely than not that its version of the facts is true. *Id.*

### C. Fiduciaries of the Plan

"In every case charging breach of ERISA fiduciary duty, . . . the threshold question is . . . whether [a defendant] was acting as a fiduciary (that is, was performing a fiduciary function)

when taking the action subject to complaint." *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000). There is no dispute that the EBC serves as a fiduciary based on evidence amply establishing its fiduciary status. The Plan's governing documents specifically empower the EBC with the authority to select and retain investment managers, along with overseeing administration of the Plan. However, the parties continue to disagree as to whether American can be also held liable as a fiduciary when the governing documents only explicitly name the EBC. At the summary judgment stage, the Court allowed Plaintiff to proceed to trial on claims against both the EBC and American.[26] But the Court noted it would continue to evaluate American's fiduciary status.[27] After reviewing the evidence and applicable law, the Court stands by its prior conclusion that both the EBC and American are proper defendants as fiduciaries of the Plan.

> Under ERISA, a person is a fiduciary "to the extent" that:
>
> (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A). In other words, an ERISA "fiduciary" is anyone or any entity who exercises discretionary control over plan administration, *id.* § 1002(21)(A)(iii), which captures those who appoint, retain, or remove a fiduciary, *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 284 F. Supp. 2d 511, 660–61 (S.D. Tex. 2003). The Fifth Circuit has identified three general ways to assume fiduciary status under ERISA: (1) serving "as a named fiduciary in the instrument establishing the employee benefit plan," (2) "becoming a named fiduciary pursuant to a procedure specified in the plan instrument," and (3) acting "as a 'functional fiduciary' under the broad

---

[26] June 20, 2024 Mem. Op. & Order 16, ECF No. 143.
[27] *Id.*

authority, control, or advice provisions of ERISA." *Perez v. Bruister*, 823 F.3d 250, 259 (5th Cir. 2016) (citations omitted).

As it relates to the third catchall way to qualify as an ERISA fiduciary, there is some limitation on who qualifies: "if an employer and its board of directors have no power with respect to a plan other than to appoint the plan administrator and the trustees, then their fiduciary duty extends only to those functions." *Sommers Drug Stores Co. Emp. Profit Sharing Tr. v. Corrigan Enters., Inc.,* 793 F.2d 1456, 1459–60 (5th Cir. 1986). That is why, "when courts evaluate whether a party is an ERISA fiduciary, they must focus on the specific role the purported fiduciary played as relevant to the claim at hand." *Humana Health Plan Inc. v. Nguyen*, 785 F.3d 1023, 1027 (5th Cir. 2015). To be sure, the Fifth Circuit has hesitated to recognize broader liability for those who "have no power with respect to a plan other than to appoint the plan administrator." *Sommers*, 793 F.2d at 1459–60; *see also Fentress v. Exxon Mobil Corp.*, 304 F. Supp. 3d 569, 586 (5th Cir. 2018) ("The Fifth Circuit has never recognized a theory of ERISA fiduciary liability that holds corporate directors personally liable for failing to monitor fiduciaries appointed by the directors." (cleaned up)). But this hesitation appears designed to protect *individuals* rather than the larger corporate entity that oversees lesser administrators of a plan. *See, e.g.*, *Perez*, 823 F. Supp. 3d at 260 n.10 (individual); *Fentress*, 304 F. Supp. 3d at 586 (corporate directors).

Fiduciaries include trustees who retain management control over plan assets and investment managers who are commonly delegated such authority by the trustees. 29 U.S.C. § 1105(c)(3); 29 U.S.C. § 1102(c)(3). Importantly, a fiduciary as to one function is not necessarily a fiduciary as to others. *Pegram*, 530 U.S. at 225–26 (citing 29 U.S.C. § 1002(21)(A)); *see also Bannister v. Ullman*, 287 F.3d 394, 401 (5th Cir. 2002) ("The phrase 'to the extent' indicates that a person is a fiduciary only with respect to those aspects of the plan over which he exercises

authority or control."); *Hozier v. Midwest Fasteners, Inc.*, 908 F.2d 1155, 1158 (3d Cir. 1990) ("Fiduciary duties under ERISA attach not just to particular persons, but to particular persons performing particular functions."). ERISA also imposes explicit co-fiduciary duties on plan fiduciaries who knowingly participate in a breach by another fiduciary, enable the breach by another fiduciary, or know of a breach and fail to make reasonable efforts to remedy the breach. 29 U.S.C. § 1105(a).

Focusing on American's specific role here, it is a co-fiduciary who undoubtedly has the power to appoint, retain, and remove plan fiduciaries—members of the EBC—since doing so is "in the purview of the HR department and . . . the executive team . . . is responsible for . . . the entire company." But that is not the extent of American's role. American functionally exercises additional responsibilities despite the Plan's governing documents naming just the EBC as the administrator. It also has the corresponding duty to ensure that the EBC members in turn comply with their fiduciary duties. *See In re Enron Corp.*, 284 F. Supp. 2d at 661 (citing *Leigh v. Engle*, 727 F.2d 113, 134–35 (7th Cir. 1984)); *Mehling v. New York Life Ins.,* 163 F.Supp.2d 502, 509–10 (E.D. Pa. 2001); *Liss v. Smith*, 991 F. Supp. 278, 310, 311 (S.D.N.Y. 1998)). Alongside the EBC, Aon, and the Asset Management Group, American is also responsible for overseeing the Plan's investment managers, in addition to communicating with the Plan's advisors, preparing materials for EBC meetings, and raising any concerns or issues concerning the Plan with EBC members. In fact, both the EBC and American signed the master consulting agreement with Aon. And American is listed as the named fiduciary in that agreement's investment policy statement. That is why, as one executive put it, it is really the American staff who runs the Plan.

Based on these appointment and removal powers, combined with its additional oversight and advisory responsibilities, the record establishes that American functionally serves as an ERISA

44

fiduciary. And as evidenced throughout this opinion, American knowingly participated in or enabled the breach by its co-fiduciary without making reasonable efforts to remedy that breach. 29 U.S.C. § 1105(a). This conclusion as to American's fiduciary status is premised on what matters for determining fiduciary status: the discretionary control actually exercised rather than what the governing documents say. *See In re Enron Corp.*, 284 F. Supp. 2d at 661 n.159. Therefore, based on the record before it, the Court finds that American is a fiduciary alongside the EBC.

### D.  Duty of Prudence

Based on the factual findings and for the reasons that follow, the Court concludes that Plaintiff has failed to prove a breach of the duty of prudence in connection with the design and implementation of its processes for monitoring the Plan—specifically, selecting and retaining investment managers, overseeing proxy voting, and not intervening in the Exxon proxy vote.

An ERISA fiduciary must discharge its responsibilities using "the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B); *see also Tibble*, 575 U.S. at 528. The "prudence standard normally focuses on the fiduciary's conduct in making [the] investment decisions [at issue], and not on the results." *Main v. Am. Airlines, Inc.*, 248 F. Supp. 3d 786, 793 (N.D. Tex. 2017). The "appropriate inquiry" is "whether the individual trustees, at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment." *Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 299 (5th Cir. 2000) (citation omitted); *see also Donovan v. Cunningham*, 716 F.2d 1455, 1467 (5th Cir. 1983) ("[ERISA's] test of prudence . . . is one of conduct, and not a test of the result."). In other words, "[p]rudence is

evaluated at the time of the investment without the benefit of hindsight." *Metzler v. Graham*, 112 F.3d 207, 209 (5th Cir. 1997).

The prudence standard is inherently comparative, requiring that it "is 'measured according to the objective prudent person standard developed in the common law of trusts.'" *Guenther v. BP Ret. Accumulation Plan*, No. 4:16-CV-996, 2024 WL 1342746, at *22 (S.D. Tex. 2024) (citation omitted). Courts evaluate this standard by examining "the conduct of similarly situated fiduciaries to provide an objective standard." *Dupree v. Prudential Ins. Co. of Am.*, No. 99-8337-Civ.-JORDAN, 2007 WL 2263892, at *46 (S.D. Fla. 2007); *see also, e.g.*, *Cunningham v. Cornell Univ.*, 86 F.4th 961, 984 (2d Cir. 2023) (affirming summary judgment where the fiduciary's processes were consistent with prevailing standards during relevant time period); *Sweda v. Univ. of Pa.*, 923 F.3d 320, 330 (3d Cir. 2019) (recognizing that ERISA fiduciaries' performance must be evaluated against "contemporary industry practices"); *Cal. Ironworkers Field Pension Tr. v. Sayles*, 259 F.3d 1036, 1044 (9th Cir. 2001) (finding no error in reliance on evidence that "the Bloomberg system was the tool prevalently used in the industry" to conclude that fiduciaries had acted prudently); *DiFelice v. Fiduciary Couns., Inc.*, 398 F. Supp. 2d 453, 467 (E.D. Va. 2005) ("[T]he appropriate benchmark with which to judge a fiduciary's behavior is an objective one 'measured against the standards of the investment industry.'" (citation omitted)).

Plaintiff failed to show by a preponderance of the evidence that Defendants breached the duty of prudence. Fatal to the prudence claim is that Defendants' practices did not fall short of the prevailing industry standards. Defense expert Meythaler, an experienced investment consultant who has worked with numerous retirement plans, offered credible and unrefuted testimony that American's process here comports with prevailing fiduciary practice and standards. According to Meythaler, Defendants' procedures at times even surpassed those typically employed by large-plan

fiduciaries across various benchmarks. Plaintiff identified not one fiduciary with a more rigorous monitoring process than Defendants. This alone is dispositive for the breach of prudence claim given that it is evaluated based on an inherently comparative standard. *Guenther*, 2024 WL 1342746, at *22.

Despite employing procedures that were at a minimum on par with other fiduciaries, Plaintiff nonetheless suggested that Defendants' monitoring process was inadequate because the EBC members did not personally review investment managers' proxy voting activities, relying instead on Aon to integrate this review as part of Aon's broader process for monitoring the performance of investment managers. But there is no evidence that this outsourcing approach was out of line with normal fiduciary practice. To the contrary, Meythaler credibly testified that plan committees typically rely on their investment advisors to conduct holistic evaluations of investment managers. In Meythaler's experience, proxy voting issues have rarely, if ever, been judged by advisors to be sufficiently material in the context of other investment factors to warrant raising to the EBC. Plaintiff's own (and sole) expert even conceded that he did not recall the only 401(k) fiduciary committee he served on ever discussing an investment manager's proxy-voting practices when selecting investment options, let alone overseeing an investment manger's proxy votes. As Plaintiff's counsel acknowledged during closing argument, the prudence claim in this lawsuit primarily aims to shift industry standards to emphasize proxy voting oversight more than fiduciaries and their advisors currently prioritize in order to protect participants' financial interests. Perhaps that shift should occur. And maybe at some point it will. But this future-looking goal reveals the fatal flaw underlying Plaintiff's prudence claim: Defendants' practices were not incongruent with the prevailing industry standards *at the time*.

Plaintiff's only specific past critique is that the Asset Management Group failed to notice BlackRock's lack of quarterly attestations confirming compliance with proxy-voting guidelines. Yet, these attestations were supplementary to the existing agreements in place that designated investment managers as co-fiduciaries. But regardless of BlackRock's failure to submit attestations and Defendants' failure to notice and address this deficiency, Plaintiff's core complaint is that BlackRock flouted—not followed—the ESG-themed portions of its proxy-voting guidelines. Because Defendants were aware of these guidelines and raised no objections to the ESG aspects, receiving these attestations would have only confirmed what Defendants already knew: BlackRock adhered to the ESG-themed portions of its proxy guidelines by voting in support of ESG ends. Even if this portion of Defendants' monitoring process was imprudent, all the quarterly attestations would have demonstrated is whether BlackRock failed to live up to its ESG commitments. And if BlackRock had failed in this way, the Plan would have benefitted according to Plaintiff's theory despite any imprudence on Defendants' part.

While Defendants' monitoring efforts undeniably failed as it relates to confirming receipt of and reviewing BlackRock's quarterly attestations, the record still reflects that Defendants otherwise maintained a robust process for monitoring, selecting, and retaining managers in the Plan's core investment lineup. This process included quarterly meetings by the EBC itself, as well as written and oral reporting from internal and external experts responsible for evaluating the Plan's investment managers. Specifically, the engagement of Aon—a leading industry consultant—as a co-fiduciary and an outside expert to continuously monitor all aspects of the Plan, including the managers' activities, mitigated this attestation shortcoming. In particular, Aon conducted comprehensive evaluations of the Plan's investment managers. The EBC relied on Aon's many investment professionals to assess any fact that they, in their professional judgment,

deemed necessary to a thorough evaluation of the Plan's investment managers and to elevate for EBC discussion any issues that Aon's team believed would be material to the Plan's financial interests. Under Fifth Circuit law, fiduciaries "are entitled to rely on the advice they obtain from independent experts." *Bussian*, 223 F.3d at 300–01; *see also Cunningham*, 716 F.2d at 1474 ("ERISA fiduciaries need not become experts in the valuation of closely-held stock—they are entitled to rely on the expertise of others."); *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 420, 421 (4th Cir. 2007) (recognizing fiduciary's use of retained expert as "evidence of a thorough investigation"). Indeed, as here, prudence may require that fiduciaries rely on experts where they personally lack the expertise necessary to engage in a thorough evaluation. *See, e.g.*, *Harley v. Minn. Mining & Mfg. Co.*, 42 F. Supp. 2d 898, 907 (D. Minn. 1999) ("[I]f a fiduciary lacks the education, experience, or skills to be able to conduct a reasonable, independent investigation and evaluation of the risks and other characteristics of the proposed investment, it must seek independent advice."), *aff'd*, 284 F.3d 901 (8th Cir. 2002); *Liss*, 991 F. Supp. at 297 ("[W]here the trustees lack the requisite knowledge, experience and expertise to make the necessary decisions with respect to investments, their fiduciary obligations require them to hire independent professional advisors.").

To be sure, a fiduciary may not rely on an expert "blindly." *Bussian*, 223 F.3d at 301. Instead, when relying on an expert's advice, a fiduciary must "(1) investigate the expert's qualifications, (2) provide the expert with complete and accurate information, and (3) make certain that reliance on the expert's advice is reasonably justified under the circumstances." *Id.* (citation omitted)). The record, however, does not establish by a preponderance of the evidence that Defendants' reliance on Aon was blind. Defendants hired a well-qualified advisor by engaging in a competitive process involving several leading investment firms, all of whom provided extensive

information regarding their experience, resources, and manager-research procedures. Once Aon was fully vetted and retained—first in 2015 and again in 2022—the EBC engaged Aon's services regularly. The EBC received written and oral reports discussing Aon's ongoing monitoring of managers (on at least a quarterly basis and sometimes more frequently). And the EBC utilized American's own internal investment professionals, the Asset Management Group, to supplement Aon's monitoring and to provide an additional check by, among other things, independently meeting with investment managers, meeting regularly with Aon itself, conducting independent due diligence, and reviewing and assessing Aon's quarterly reports before they were sent to the EBC. This is another layer of review that few large-plan fiduciaries replicate.

Plaintiff offered no expert opinion or evidence that Defendants' measures fell short of then-prevailing fiduciary practices. *See Cunningham*, 86 F.4th at 984; *Sweda*, 923 F.3d at 330. Nor did Plaintiff identify any flaw in Aon's work. Additionally, it was the industry standard for investment managers to self-report violations of their proxy-voting guidelines, which further mitigates against Defendants' failure to recognize that BlackRock did not submit the required quarterly attestations.[28] So the evidence does not show that Defendants' procedures deviated from the prevailing industry standards—in many cases, they exceeded the standards.

There was also insufficient evidence that Defendants failed to take an action that a prudent fiduciary would have taken to avoid the results of the Exxon proxy vote. Even if Plaintiff somehow mustered proof that Defendants' investigative and monitoring efforts fell short of the prevailing standard of care, the prudence claim would still not succeed because the trial record does not permit

---

[28] The failure to submit the quarterly attestations was a discovery deficiency identified late in trial. BlackRock's quarterly attestations that were uniquely within Defendants' control. Although such a deficiency assuredly impacted Plaintiff's ability to build a case around Defendants' alleged failure to monitor proxy voting and effectively cross-examine specific witnesses, these attestations ultimately do not change the outcome in this case. The discovery deficiency is therefore harmless in this regard. Nonetheless, the Court **ADMONISHES** Defendants and their counsel for this deficient production.

the conclusion that Defendants failed to take any meaningful intervention action that a prudent fiduciary would have taken following a thorough investigation. The prudence inquiry is focused on conduct, not results. As the Fifth Circuit has explained, even if a fiduciary fails to engage in a sufficient investigation, "ERISA's obligations are nonetheless satisfied" if the fiduciary's ultimate course of action is one that "would have been chosen had the fiduciary conducted a proper investigation." *Bussian*, 223 F.3d at 300; *see also In re Unisys Sav. Plan Litig.*, 173 F.3d 145, 153–54 (3d. Cir. 1999) (affirming conclusion that "a hypothetical prudent fiduciary would have made the same investments" as a defendant constituted "an alternate theory for holding that [defendant] was not imprudent").

The trial record does not permit the conclusion that a prudent fiduciary would have automatically removed BlackRock as a Plan investment manager following a sufficient investigation of the Exxon proxy vote. Neither Plaintiff nor his expert identified a single defined contribution official who decided to remove BlackRock—whether shortly before or immediately after the Exxon vote—based on a *fiduciary* judgment that doing so was necessary to protect Plan participants' financial interests. Plaintiff pointed only to actions by Texas public plans to terminate BlackRock engagements well after the Exxon vote. But those decisions were not undertaken to fulfill ERISA fiduciary duties, but rather to comply with Texas Senate Bill 13 and its policy countering BlackRock's energy boycott. While state legislators, based on their sound view of the public interest, have unbridled freedom to protest BlackRock's decision to divest from oil and gas companies in investment portfolios, ERISA fiduciaries are constrained by the law to look exclusively to participants' financial interests pursuant to the prevailing industry standards. Applicable here, those methods focused on whether BlackRock's index funds provided the promised performance at reasonable fees rather than intervention in proxy voting. Maybe these

industry methods will change given the potential problems with proxy voting highlighted by this case. But because this change has not yet occurred, the undisputed evidence is that BlackRock's management of the Plan resulted in lower fees and at least comparable returns to alternatives during the Class Period. Whether those returns would have been even higher if BlackRock rejected ESG investing does not impact the prudence analysis. At bottom, there was no evidence that another fiduciary removed BlackRock as an investment manager following the Exxon vote—the key consideration in the prudence analysis.

Nor was Plaintiff or his sole expert able to identify any other fiduciary who responded to BlackRock's proxy-voting record by withdrawing the delegation of proxy voting to BlackRock due to its ESG activism. To the contrary, the trial record makes clear that it is the long-established practice of defined contribution fiduciaries to delegate proxy voting to investment managers, whose portfolio construction responsibilities already require them to develop a deep understanding of the companies in which they invest. Demand for greater attention to managers' proxy voting activities in recent years has not yet changed that consistent fiduciary practice. The evidence also does not reveal that other fiduciaries in the industry managed on their own the thousands of votes that take place during each proxy season on their own. Under the requisite analysis, Defendants did not imprudently deviate from the industry standard.

Finally, the evidence did not show that a prudent fiduciary in the industry who ascertained BlackRock's intended vote in the Exxon election would have subsequently intervened beforehand to demand that BlackRock vote with management. Not only did the evidence show that even the major proxy advisory firms supported the dissident directors in the Exxon election, but Plaintiff's own expert conceded that he was unaware of any fiduciary who intervened in the unprecedented vote. The reasons why those fiduciaries decided not intervene—even if for disloyal reasons

focused on non-pecuniary aims—ultimately has no bearing on the prudence analysis. The same is true for the notion that a prudent fiduciary would have sued BlackRock for breach of fiduciary duties after the fact. Perhaps every fiduciary, including Defendants, should have done so. But, again, what is relevant to the prudence analysis is that Defendants did not act out of conformity with the prevailing industry standard.

*     *     *

In sum, there is no evidence that a prudent fiduciary adhering to its monitoring processes would have taken some action that Defendants did not with respect to BlackRock. Perhaps this degree of conformity is due to BlackRock exercising an alarming degree of control and influence over the industry and, as a result, can effectively rig the process in a cartel-like manner to insulate against its removal. Be that as it may, it still remains that Fifth Circuit law requires judgment for Defendants on Plaintiff's prudence claim. The basis for this conclusion is rooted in the inherently comparative nature of the required analysis for the duty of prudence. *Guenther*, 2024 WL 1342746, at *22. Even if fiduciaries should respond in a particular way based on the duty of loyalty, prudence claims are evaluated based on an objective standard, *Dupree*, 2007 WL 2263892, at *46, that looks to the prevailing industry standards at the time, *Cunningham*, 86 F.4th at 984; *Sweda*, 923 F.3d at 330; *Sayles*, 259 F.3d at 1044; *DiFelice*, 398 F. Supp. 2d at 467. Right or wrong, Defendants acted consistent with the prevailing industry standards. The evidence bore this out. Accordingly, the Court concludes that Plaintiff did not establish that the EBC failed to act with the "care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use." 29 U.S.C. § 1104(a)(1).

Notwithstanding this conclusion, the Court would be remiss if it did not remark on the problematic nature of this outcome. It is clear that the "incestuous" nature of the retirement plan

industry[29] makes a finding of imprudence essentially impossible in certain situations. By mirroring the prevailing practices of the fiduciaries who set the industry standard alongside BlackRock—even if those practices are not in the best financial interests of a retirement plan—Defendants escape liability under the prudence standard. To be sure, this is a shocking result given that the evidence revealed ESG investing is *not* in the best financial interests of a retirement plan. But no matter how problematic the outcome, the Court's conclusion on the prudence claim is the result a faithful application of what the law demands. At the end of the day, Defendants oversaw and monitored the Plan consistent with prevailing industry standards, even though the result is due to the incestuous industry comprised of powerful repeat players who rig the standard of care to escape fiduciary liability. It nevertheless remains within the province of the legislature to change ERISA's legal landscape to avoid future unconscionable results like those here. That being said, what conduct the duty of prudence does not reach the duty of loyalty may still cover.

## E.  Duty of Loyalty[30]

---

[29] Defendants' witness, Ivinjack, agreed that this industry is "so incestuous." He testified that three of the biggest investment managers—BlackRock, Vanguard, and State Street—have "practices that are in line with one another." Apparently setting the stage for the rest of the industry, BlackRock's proxy voting practices, specifically, are "in line with the practices of other index managers." Ivinjack also testified to his understanding that all investment managers receive delegated authority to vote proxies on behalf of clients. When asked about how Aon would hypothetically evaluate BlackRock, in an investment manager capacity, using that delegated authority, he provided surprising testimony: If BlackRock negatively treated 7-Eleven because of the potential health care concerns connected with Big Gulp consumption (increased potential for diabetes due to the large sugar content), Ivinjack not only repeatedly resisted answering if Aon would approve of such an action by an investment manager, but he also dismissively stated that Aon would "look at the entire universe of investment managers." Presumably, the reason for this is because, as Ivinjack conceded, the industry is "so incestuous." And whether Ivinjack intended to or not, his inability to discuss ESG factors in an unbiased, even-handed manner revealed Aon's own role in this remarkably incestuous industry. After all, BlackRock is one of Aon's largest owners, too.

[30] Although the Court denied Defendants' partial motion to exclude Heaton as an expert, it is worth noting that expert testimony is not necessary to support a breach of loyalty claim in the same way expert testimony is required to demonstrate the prevailing standard of care for a breach of prudence claim. For starters, ERISA's statutory text does not mandate specialized expert testimony to show a breach of loyalty. And the same is borne out in practice. There are multiple scenarios in which a plaintiff can succeed on a breach of loyalty claim without expert testimony, including clear evidence of self-dealing, a conflict of interest, or

Based on the factual findings and for the reasons that follow, the Court concludes that Defendants acted disloyally by failing to keep American's own corporate interests separate from their fiduciary responsibilities, resulting in impermissible cross-pollination of interests and influence on the management of the Plan. The most obvious manifestation of this is found in American's relationship with BlackRock. Because of American's corporate goals and as a complement to them, Defendants did not sufficiently monitor, evaluate, and address the potential impact of BlackRock's non-pecuniary ESG investing. Together, the influences of these non-Plan interests constituted a breach of loyalty, allowing BlackRock to engage in ESG-oriented proxy voting and investment strategies using Plan assets.

"ERISA's duty of loyalty is 'the highest known to the law.'" *Bussian*, 223 F.3d at 294 (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982)). This duty requires the fiduciary to act "*solely* in the interest of the participants and beneficiaries and . . . for the *exclusive* purpose of . . . providing benefits to participants and their beneficiaries." 29 U.S.C. § 1104(a) (emphases added). These benefits are "*financial* benefits" and the "[t]he term does not cover nonpecuniary benefits." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 421 (2014). This means that ERISA fiduciaries have a duty not to be influenced by the interest of any third person or by motives other than the accomplishment of the purposes of the ERISA plan—they must act with an "eye single" to the interests of the plan participants. *Pegram*, 530 U.S. at 235; *see also* RESTATEMENT (THIRD) OF TRUSTS § 78(1) cmt. F. (Am. Law Inst. 2007). "Perhaps the most fundamental duty . . . is that [a fiduciary] must display . . . complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Pegram*, 530 U.S. at 224 (internal quotation marks and citations omitted).

---

other straightforward fiduciary failures. *E.g.*, *Bierwirth*, 680 F.2d at 270–71 (self-dealing); *Pegram*, 530 U.S. at 233 (conflict of interest). Each of these scenarios is evident in this case.

To establish a breach of the duty of loyalty, a plaintiff must show that a fiduciary's decision was primarily motivated by interests beyond those of participants and beneficiaries. *Perez*, 823 F.3d at 261–62 ("Their breach of the duty of loyalty turns on their failure to place the interests of participants and beneficiaries first and foremost.").[31] In other words, "what matters is *why* the defendant acted as he did." *In re Wells Fargo ERISA 401(k) Litig.*, 331 F. Supp. 3d 868, 875 (D. Minn. 2018), *aff'd sub nom.*, *Allen v. Wells Fargo & Co.*, 967 F.3d 767 (8th Cir. 2020) (emphasis added); *see also Casey v. Reliance Tr. Co.*, No. 4:18CV424, 2019 WL 7403931, at *8 (E.D. Tex. Nov. 13, 2019) ("The duty of loyalty is grounded in the motivation driving a fiduciary's conduct."). This understanding of loyalty demands that a fiduciary "not subordinate the interests of the participants and beneficiaries . . . to other objectives" and "not sacrifice investment return or take on additional investment risk to promote benefits or goals unrelated to interests of the participants." 29 C.F.R. § 2550.404a-1(c)(1). Neither may a fiduciary "accept expected reduced returns or greater risks to secure [collateral] benefits" other than investment returns." *Id.* § 2550.404a-1(c)(2). That being said, ERISA allows a fiduciary to alternatively wear separate fiduciary and corporate "hats" provided that the sole focus is on plan interests while donning the fiduciary hat. *Pegram*, 530 U.S. at 225.

"Among the responsibilities and duties imposed on fiduciaries by ERISA is avoidance of conflicts of interest. *In re Enron Corp.*, 284 F. Supp. 2d at 547 (citing *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 251–52 (1993)). "The presence of conflicting interests imposes on fiduciaries the obligation to take precautions to ensure that their duty of loyalty is not compromised." *Bussian*,

---

[31] Other circuits are in accord. *See, e.g.*, *Reetz v. Aon Hewitt Inv. Consulting, Inc.*, 74 F.4th 171, 182 (4th Cir. 2023) (finding no loyalty violation where self-interest "did not motivate" fiduciary decision-making); *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1170 (6th Cir. 2022) (concluding disloyalty established only where "operative motive" behind fiduciary's action "was to further its own interests") (quoting *Brotherston v. Putman Invests., LLC*, 907 F.3d 17, 40 (1st Cir. 2018)).

223 F.3d at 299. "The level of precaution necessary to relieve a fiduciary of the taint of a potential conflict should depend on the circumstances of the case and the magnitude of the potential conflict." *Id.* (citation omitted). Therefore, "to prove a violation of the duty of loyalty, the plaintiff must go further and show actual disloyal conduct." *In re Northrop Grumman Corp. ERISA Litig.*, No. CV 06-06213 MMM (JCx), 2015 WL 10433713, at *28 (C.D. Cal. Nov. 24, 2015). In doing so, what other fiduciaries do (or fail to do) is irrelevant for the duty of loyalty, because the focus is instead on what the defendant fiduciary considered when acting (or not acting). *Perez*, 823 F.3d at 262.

Plaintiff demonstrated by a preponderance of the evidence that Defendants breached the duty of loyalty. Start with BlackRock's influence. Defendants acted disloyally by allowing their various ties to BlackRock to influence management of the Plan. To begin, Defendants knew that the Plan's largest investment manager, BlackRock, was also one of American's largest shareholders. BlackRock managed billions of dollars in Plan assets at the same time it owned 5% of American stock.[32] BlackRock also financed approximately $400 million of American's corporate debt at a time when American was experiencing financing difficulties. Defendants' own personnel put it best when describing this "significant relationship [with] BlackRock" and "this whole ESG thing" as "circular." It is no wonder Defendants repeatedly attempted to signal alignment with BlackRock.

While BlackRock's large ownership of American shares and debt financing are not enough on their own to constitute disloyalty, *Kopp v. Klein*, 894 F.3d 214, 222 (5th Cir. 2018) (noting

---

[32] BlackRock appears to have an ownership in all of the relevant players in this lawsuit, including Aon. It was shockingly revealed during trial that BlackRock is also one Aon's largest shareholders—possibly even the second largest. Given that Aon is responsible for monitoring and assessing BlackRock's performance as an investment manager, this relationship raises many additional questions, including how many layers of conflicts exist in the Plan and, in a more Orwellian sense, whether this is by design on BlackRock's part to maximize its control of the industry.

"potential for a conflict, without more, is not synonymous with a plausible claim of fiduciary disloyalty"), Plaintiff provided evidence demonstrating that Defendants acted disloyally because of BlackRock's outsized influence. For example, as a large company who consumes copious amount of fossil fuels, American was potentially susceptible to a proxy fight of its own by failing to comply with BlackRock's climate-related demands. Defendants were not only aware, but also discussed, Fink's letters outlining BlackRock's ESG expectations for companies of its size and describing the potential consequences that such companies would likely face should they fail to meet these demands. When Menezes pointed out one of Fink's letters in an email, he also noted that BlackRock manages "over $10 billion" of Plan assets. The only plausible explanation for supplying such context would be to underscore the importance of BlackRock and suggest there is value in meeting BlackRock's climate demands. This motivation to please BlackRock became even clearer during Montana's testimony. Montana noted that a failure to signal that American was actively complying with ESG disclosure requirements, for example, would potentially undermine the company's ability to obtain billions of dollars in essential loans from BlackRock. Such an incentive to signal a particular message to BlackRock, a potential lender, further unveils the problematic alignment of incentives in this dynamic because it falls short of "display[ing] . . . complete loyalty in the interest of the beneficiary" and does not "exclude all selfish [corporate] interest and all consideration of the interests of third persons." *Pegram*, 530 U.S. at 24 (internal quotation marks and citations omitted).

Defendants also acted disloyally by allowing American's corporate goals to influence the management and oversight of the Plan. American proudly expressed a corporate commitment to ESG goals—specifically, climate change initiatives. At the time American began incorporating ESG into its corporate strategy, particularly SAF initiatives and taking a leading role among

airlines on the issue of climate change, BlackRock pursued ESG objectives as the Plan's investment manager. While such an alignment on ESG is permissible under ERISA when there is clear separation between corporate goals and fiduciary obligations, *Pegram*, 530 U.S. at 225; *Bussian*, 223 F.3d at 299, Defendants failed to take necessary precautions to maintain this critical divide, resulting in Defendants' willingness to allow BlackRock to use Plan assets with little to no accountability in the pursuit of ESG investing. It quickly became clear during trial that the officials tasked with wearing both corporate and fiduciary hats failed to maintain the appropriate level of separation in their dual roles.

Starting with the most egregious conflict, Menezes' statements and actions demonstrate his inability to completely separate these competing interests when serving in his two roles. As the individual primarily responsible for the day-to-day fiduciary oversight of the Plan's investment managers *and* simultaneously managing American's extensive corporate financial relationship with BlackRock, Menezes regularly faced a misalignment of incentives. In an email chain with Montana, Menezes indicated the importance of the BlackRock relationship: "BlackRock holds ~$400M of our fixed income debt," "[t]hey are also our 4th largest equity holder," and "[w]e also invest a little over $10 billion with them between the 401(k) and pension plan."

Further evidence of Menezes's inability to keep his fiduciary and corporate duties separate stems from the fact that he turned a blind eye to BlackRock's obligation to submit quarterly attestations on proxy voting as required by the IMA. Alone among the Plan's investment managers, BlackRock did not comply with the IMA when it repeatedly failed to submit the required attestations. Menezes's failure to provide oversight and accountability of BlackRock at the same time he touted BlackRock's importance to American supplies evidence of "subordinat[ing] the interests of the participants . . . to other objectives" and "sacrific[ing] investment return . . . to

59

promote benefits or goals unrelated to interests of the participants." 29 C.F.R. § 2550.404a-1(c)(1). Even worse, Menezes provided false testimony—during his deposition and again at trial—that he *did* check for the receipt of BlackRock's required quarterly attestations and confirmed that he *did* receive them. This testimony was false and required correction at the end of trial. Despite this correction, the Court's impression of the entirety of Menezes's testimony is that he attempted to hide (and perhaps even cover up) his lack of oversight of a particular investment manager given the importance his placed on the corporate relationship with BlackRock.

This intermingling of corporate and fiduciary interests is not an isolated issue. In an email chain with American's corporate ESG executive, Eberwein expressed her support for BlackRock's ESG investing when she remarked that American and Blackrock share "one theme . . . climate change, sustainability" and favorably remarked that "[i]t's good." The email also attached the article titled "How to Make Your 401(k) a Little Less Evil." Nothing in this email exchange indicated a financial benefit. *Fifth Third Bancorp*, 573 U.S. at 421. To the contrary, it demonstrated that Eberwein was considering non-pecuniary interests, which is unsurprising given that Eberwein also feared Fink's letters would create a public relations "crisis" for American due to the airline's use of fossil fuels and viewed ESG funds as a "worthy consideration." Similarly, Montana testified that she became aware of BlackRock's ESG investing not just from the news but also because it "aligned to a time when American was trying to improve its [ESG] disclosures . . . [s]o it kind of reinforced the work that the company was undergoing." As these examples illustrate, the evidence made clear that officials regularly discussed ESG in favorable terms without identifying the economic basis for such a view. That is why measures to prevent such cross-pollination of corporate and fiduciary interests play an important role. Tellingly, none were implemented here

and shows Defendants' failure to "display . . . complete loyalty to the interest of the [Plan]." *Pegram*, 530 U.S. at 224.

The evidence also revealed instances when Defendants attempted to minimize "potential conflicts of interest" in order to avoid, as Montana put it, something hitting "too close to home." For example, Plan participants were unable to invest in American stock or KPMG stock. The former is intuitive, as American pays the paychecks of the Plan's participants, so investing significant portions of retirement savings in American stock understandably creates too much exposure. But investing in the latter is prohibited because KMPG, as auditor of the Plan, would hypothetically be motivated to "cook the books." But for some reason, BlackRock was remarkably not viewed as similarly conflicted—despite being one of the chief owners of American and a major industry player who used its influence to steer companies towards non-pecuniary ESG initiatives. According to Montana, the reason for Defendants' willingness to enact measures to mitigate the conflict of interest with KPMG but not with BlackRock was because BlackRock is "just reconstructing index funds." But by minimizing BlackRock's management role and failing to articulate a more principled basis for this distinction, Montana supplied a live demonstration of Defendants' systemic blindness due to these conflicts: they consistently downplayed, or failed to appreciate, the power and influence BlackRock wields over the Plan (and throughout the industry) through its proxy voting. The recurring explanation for this is that Montana and others believed there was value in appeasing BlackRock notwithstanding its ESG investing and large ownership interest in American.[33] This is the result of failing to keep corporate and fiduciary duties sufficiently separate, causing conflicts of interest to go unchecked.[34]

---

[33] Montana also downplayed the financial importance of BlackRock's ownership of American's $400 million debt.

[34] Some courts have found the failure to avoid or mitigate potential conflicts of interest to be evidence of a breach of the duty of prudence. *E.g.*, *Burch v. W.R. Grace & Co.*, 555 F.3d 1, 8 (1st Cir. 2009); *Leigh v.*

Given American's corporate interests bleeding over into the fiduciary realm and BlackRock's ownership stake in, and influence on, American, it is no surprise that Defendants utterly failed to loyally investigate BlackRock's ESG investment activities. The evidence made clear that multiple EBC members and American officials were aware of BlackRock's non-pecuniary ESG investing from the various informal email discussions, widespread news coverage, and Fink's outspoken and aggressive style of publishing open letters. Despite this awareness, no formal evaluation or assessment of BlackRock's ESG crusade commenced. For example, when the news broke about Fink's open letters, the EBC's reaction was not to investigate or further monitor BlackRock's activities to ensure that no harm would come to the Plan. Instead, the EBC's reaction was to consider *adding* ESG funds to the Plan. All the while, the EBC permitted BlackRock to continue managing Plan assets without a second thought and without expressing any hesitation that ESG investing might not be the most financially beneficial to the Plan.

As another example, after Texas's pushback against BlackRock's ESG activism, no member of the Asset Management Group raised this concern to the EBC. This is particularly striking given that renegotiations of the Plan's IMA with BlackRock were ongoing and voting was scheduled to take place the next month to decide whether to retain BlackRock as the Plan's largest investment manager. A few months later, BlackRock emailed Menezes about expanding proxy-voting choices for its clients and Ruehle followed up with BlackRock about these options. But once again, the EBC was not notified of this development and thus did not discuss BlackRock's proxy voting, including its new options. This was not unusual. The EBC never discussed BlackRock's proxy voting at any meetings during the Class Period. And the EBC did not

---

*Engle*, 727 F.2d 113, 134–35 (7th Cir. 1984); *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir. 1982); *Corley v. Hecht Co.*, 530 F. Supp. 1155, 1163 (D.D.C. 1982); *Sellers v. Trustees of Boston Coll.*, No. 22-10912-WGY, 2021 WL 1586755, at *16 (D. Mass. Apr. 11, 2024). But the Court finds the particular evidence about conflicts of interest in this case to be more determinative of the breach of loyalty claim.

meaningfully discuss proxy voting at all until prompted to do so following Plaintiff's lawsuit in 2023. This review requested, for the first time, "a summary of how each manager uses ESG in the management of their strategy." As Menezes put it, Defendants "had never done that before." Three months later, the EBC formally discussed proxy voting by the Plan's investment managers during the September 27, 2023 EBC meeting. While Defendants eventually took steps in the right direction, these actions do not retroactively erase previous disloyal behavior. Instead, the evidence shows that, despite having knowledge of BlackRock's ESG investing, Defendants did not explore—let alone raise—any concerns that BlackRock's ESG investing, including via proxy voting, could harm the Plan despite multiple indications that such harm was possible.

The absence of any internal analysis and monitoring of BlackRock's proxy voting to pursue ESG further suggests that Defendants took insufficient precautions keep the corporate and fiduciary duties separate. *Bussian*, 223 F.3d at 299. Or, if there were sufficient precautions in place, they did not successfully function with respect to BlackRock. *Cf. Jacobs v. Verizon Commc'ns Inc.*, No. 16 Civ. 1082 (PGG) (RWL), 2023 WL 3027311, at *22 (S.D.N.Y. Apr. 20, 2023) (finding the absence of analysis and consideration to show that the policies in place may not have functioned as intended). The effectiveness of a given process normally bears on the prudence analysis and, here, the evidence nevertheless revealed no prevailing industry practice to have a formal Chinese wall in place. So although the absence of formal separation is not imprudent, it does supply evidence of disloyalty given the particular circumstances at play here that warranted "tak[ing] [such] precautions to ensure that the[] duty of loyalty is not compromised." *Bussian*, 223 F.3d at 299. One need not look further than the severely misaligned incentives facing Menezes when managing the corporate relationship with BlackRock. Or the pressure on Eberwein to avoid a public relations "crisis" regarding American's use of fossil fuels in the aftermath of Fink's letters.

Or the incredible pressure on Montana, in her corporate role, to appease BlackRock as a potential lender of a critical funds during a precarious time. *Cf. id.* ("The level of precaution necessary to relieve a fiduciary of the taint of a potential conflict should depend on the circumstances of the case and the magnitude of the potential conflict."). In each of these situations, the official was incentivized to signal a commitment to ESG even though doing so was not in the Plan's best financial interest. And this falls short of keeping the corporate and fiduciary hats separate.

Making matters worse, Defendants never specifically asked Aon to analyze BlackRock's ESG activism, including through proxy voting, until after the filing of this lawsuit in 2023. Even if Defendants had done so, outsourcing all of these monitoring responsibilities to Aon would likely not have provided complete insulation from a breach of loyalty claim because Defendants, acting as loyal fiduciaries themselves, must at least take *some* step to address BlackRock's pursuit of non-pecuniary interests that could harm the Plan—be it their own analysis of ESG investing, BlackRock's proxy voting record when it diverged from the management's recommendations, meeting with BlackRock directly to reiterate the obligation to act in the Plan's best financial interests, or putting additional monitoring measures in place to determine whether additional action was warranted. Otherwise, taking *no* steps whatsoever amounts to blind reliance on an expert. *See Bussian*, 223 F.3d at 301.

There are various steps Defendants could have taken. Montana, for example, could have personally met with BlackRock like she did when concerns arose with TCW. Similarly, Menezes or another member of the Asset Management Team could have raised concerns about ESG investing with BlackRock directly during a quarterly meeting. Or any other official—be it Kerr, Eberwein, or someone else—could have said or done *something*. But not a single official did anything to at least question BlackRock or hold BlackRock accountable. As a result of the failure

64

to take any step despite awareness of BlackRock's ESG activism, Defendants acted disloyally by doing nothing to ensure BlackRock acted in the best financial interests of the Plan.

This conclusion is particularly alarming given that BlackRock's investment strategy during the Class Period was focused on ESG investing. Such a pursuit of non-pecuniary interests, in whole or in part, was *an end* itself rather than as a means to some financial end. This was a major red flag that Defendants wholly ignored. While it is permissible to consider ESG risks when done through a strictly financial lens, this does not describe BlackRock's activities. The evidence made clear that BlackRock wanted to play its part in combating perceived social ills by bolstering DEI and climate change initiatives, primarily by using proxy voting to pressure companies into compliance. The emblematic example of this is BlackRock pressuring energy companies into reducing greenhouse gas emissions and otherwise complying with a particular worldview of what it means to be a responsible company that "makes a positive contribution to society" and "benefit[s] . . . the communities in which they operate." But what is especially problematic about this stance is revealed by the inherent conflict between an energy company that derives its profits from fossil fuels and BlackRock's climate change expectations. Indeed, reducing greenhouse gas emissions is fatal to generating profits if fossil fuels will increase profits. This is precisely the case with Exxon: production of fossil fuels made it the leading oil company in the world. It is not possible to square this circle to conclude that BlackRock's investment strategy "maximiz[ed] the financial benefits" to the Plan. *Pegram*, 530 U.S at 235.

Despite the reality that ESG cannot stand on its own, Defendants still never meaningfully discussed the potential impact of BlackRock's known ESG-focused investing on the Plan. Even when BlackRock publicly supported shareholder proposals on climate change following Engine No. 1's letter to Exxon's Board of Directors asking them to explore clean and net-zero emission

energy options, Defendants remained silent. This is evidence of disloyalty because it does not make any rational economic sense for a shareholder (or an investment manager on behalf of shareholders) to encourage an energy company like Exxon to act in a manner that directly undermines the company's profits. Just as it would not make rational economic sense to act in a way that pressured Microsoft to sell less of what makes it so profitable: software and services. Or JP Morgan Chase reducing the quantity of profitable financial services. Or American providing fewer flights that it could profitably sell.

The most obvious explanation for Defendants' lack of accountability with respect to BlackRock is that Defendants approved of BlackRock's activities—be it because of the shared belief that ESG is a noble pursuit or because of the "circular" relationship with a large shareholder. Paying heed to either reason is disloyal to the Plan because such considerations are not "solely in the interest of the participants and beneficiaries" and for the "exclusive purpose" of providing benefits, 29 U.S.C. § 1104(a)(1), thereby violating the duty of loyalty, *Pegram*, 530 U.S. at 224, 235. An ERISA fiduciary who is influenced by his own or a third party's interests is disloyal because the fiduciary is no longer acting solely in the interests of the beneficiaries. *Id.* Defendants placed their own interests, as well as those of BlackRock, over the interests of Plan participants. *See Muri v. Nat'l Indemn. Co.*, No. 8:17-cv-178, 2019 WL 2513695, at *7–*8 (D. Neb. June 18, 2019). That is disloyal behavior.

It is possible to conclude that Defendants acted disloyally even though it is also true that utilizing BlackRock benefitted the Plan in some separate ways—such as comparatively lower fees. But this does not cancel out Defendants' disloyal behavior as it relates to BlackRock's ESG investing. That's simply not how the duty of loyalty works. Loyalty requires a fiduciary to *always* act solely for the Plan and in the Plan's best financial interests—not just some of the time. *Pegram*,

530 U.S. at 224 (requiring "complete loyalty" and "excluding all selfish interest and consideration of the interests of third persons" (cleaned up)). While at times Defendants acted in the Plan's interests—such as negotiating lower fees—at other times it did not act with an "eye single" toward maximizing the financial benefits. *Id.* at 235. One might wonder why Defendants disregarded these conflicts of interest and failed to appropriately monitor BlackRock. The answer was made clear during trial: American's own corporate interests and the influence of a major industry player.

*     *     *

At bottom, a breach of loyalty claim hinges on whether a fiduciary acted "solely in the interest" of plan participants. Even if Defendants acted in the same manner as other fiduciaries in the industry, such conformity is not enough to fend off a breach of loyalty challenge because the focus is on what the fiduciary *considered* when acting (or not acting)—not what others did. *Perez*, 823 F.3d at 262. Defendants knew BlackRock was pursuing ESG initiatives through delegated proxy voting authority and related activism. Plaintiff demonstrated the problems associated with ESG investing and that such a strategy was not in the best financial interests of the Plan. At a minimum, a loyal fiduciary would have monitored the situation more closely and even questioned BlackRock's non-pecuniary investment activities. *Cf. Cunningham v. Cornell Univ.*, No. 16-cv-6525 (PKC), 2019 WL 4735876, at *14 (S.D.N.Y. Sept. 27, 2019), *aff'd*, 86 F.4th 961 (2d Cir. 2023). Defendants took no affirmative steps on their own to review, monitor, and evaluate BlackRock. While outsourcing most of the Plan oversight to Aon helped avoid a breach of the duty of prudence, the same is not true for the duty of loyalty given that loyalty carries an even higher standard. *Pegram*, 530 U.S. at 224; *Bussian*, 223 F.3d at 294. Combined with Defendants' failure to take sufficient precautions to avoid conflicts of interest, BlackRock was handed significant

67

authority without adequate scrutiny. The only reasonable conclusion to draw from the totality of this evidence is that Defendants breached the duty of loyalty.

It is this evidentiary combination—Defendants' undeniable corporate commitment to ESG *plus* the endorsement of ESG goals by those responsible for overseeing the Plan *plus* the influence of and conflicts of interests with BlackRock *plus* the lack of separation between the corporate and fiduciary roles that reveals Defendants' disloyalty. Taken together, the evidence paints a convincing picture that Defendants breached the duty of loyalty—either in service of BlackRock's demands, in pursuit of American's own corporate goals, or both. At the end of the day, whether efforts to influence BlackRock could have been successful is not what determines whether the duty of loyalty is satisfied. Through that lens, the evidence made clear that Defendants' incestuous relationship with BlackRock and its own corporate goals disloyally influenced administration of the Plan.

## IV.    CONCLUSION

In many ways, the duties of prudence and loyalty comprise two sides of the same coin. Loyalty plays an important role in obviating some of the problematic outcomes—such as those occurring in this case—that result from reliance on a flawed, or rigged, industry practice. This is the only way to read ERISA's loyalty requirement so that it is not a superfluous duty or otherwise obscured entirely by prudence. Put simply, loyalty serves as a critical backstop. In industries featuring oligopolist or cartel-like behavior—such as the retirement savings industry in which the largest investment managers own significant stakes in all of the relevant actors—industry norms are not enough to safeguard against breaches of loyalty. Otherwise, such a low bar would encourage collusion, cause rampant evasion of ERISA's stringent requirements, and wreak havoc for retirement plan beneficiaries.

The facts here compellingly established fiduciary misconduct in the form of conflicts of interest and the failure to loyally act solely in the Plan's best financial interests. BlackRock's ESG influence is evident throughout administration of the Plan. The belief that ESG considerations confer a license to ignore pecuniary benefits is mistaken. ERISA does not permit a fiduciary to pursue a non-pecuniary interest no matter how noble it might view the aim. Plaintiff therefore proved by a preponderance of the evidence that American disloyally acted with an intent to benefit a party other than Plan participants and in a manner that was not wholly focused on the best financial benefit to the Plan. The facts do not compel the same result for prudence. Despite evidence of disloyal behavior, Defendants acted according to prevailing practices and in a manner similar to other fiduciaries in the industry. This is fatal to Plaintiff's breach claim prudence claim. Therefore, Plaintiff prevails on the breach of loyalty claim but not on the breach of prudence claim.

As to the deferred issues, the Court **OVERRULES** the remaining objections, **DENIES** Defendants' Motion to Exclude in Part Expert Testimony (ECF No. 120), and **DENIES** Defendants' oral motion for a directed verdict. Furthermore, as explained above, the Court **DEFERS** ruling on the question of losses pending further briefing from the parties. The Court also **DEFERS** ruling on the remedies, including the questions of whether injunctive relief is warranted and what damages, if any, are appropriate. The parties **SHALL** submit cross-supplemental briefing by no later than **January 31, 2025** addressing the following:

- What losses, if any, are supported by the evidence with and without relying on Heaton's testimony?

- Discuss the appropriate weight that should be given to Heaton's testimony.

- Identify what, if any, direct evidence links ESG investing to financial underperformance of the Plans in a way that harmed the Class.

- Given that Exxon's stock quickly rebounded after the 2021 proxy vote, discuss what losses, if any, occurred, and how this rebound in price impacts the loss analysis for the Class.

- Discuss whether *Dura Pharmaceuticals, Inc. v. Broudo*, 554 U.S. 336 (2005), should apply in the ERISA context even though it is a securities case and whether the relevant statutory schemes permit such a comparison.

- Discuss the loss-causation burden shifting framework in light of *McDonald v. Provident Indem. Life Ins. Co.*, 60 F.3d 234 (5th Cir. 1995).

- If the Court concludes that no actual losses occurred, discuss whether an injunction is still necessary and the appropriate scope for any such injunction.

Separate final judgment shall issue following the full resolution of this case.

**SO ORDERED** this **10th** day of **January, 2025**.

Reed O'Connor
**UNITED STATES DISTRICT JUDGE**