**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| BRYAN P. SPENCE, individually and as a representative of a class of similarly situated persons, and on behalf of the AMERICAN AIRLINES, INC. 401(K) PLAN and the AMERICAN AIRLINES, INC. 401(K) PLAN FOR PILOTS, | § § § § § § § § | |
| Plaintiffs, | § § | Case No. 4:23-cv-00552-O |
| v. | § § | |
| AMERICAN AIRLINES, INC., and the AMERICAN AIRLINES EMPLOYEE BENEFITS COMMITTEE, | § § § | |
| Defendants. | § § § | |

**PLAINTIFF'S SUPPLEMENTAL BRIEF**

# TABLE OF CONTENTS

ARGUMENT ................................................................................................... 1

I.      What losses, if any, are supported by the evidence with and without relying on Heaton's testimony? ............................................................................. 3

    A.    Losses Supported by Dr. Heaton's Testimony ............................................. 3

    B.    Quantification of losses (i.e., damages) based on Dr. Heaton's testimony .... 5

        1.    Voting Period Damages Model ................................................... 6

        2.    Lost Investment Gains Model ................................................... 7

    C.    Discuss the appropriate weight that should be given to Dr. Heaton's testimony. ............................................................................................. 8

    D.    Losses without relying on Dr. Heaton's testimony ...................................... 11

II.     Identify what, if any, direct evidence links ESG investing to financial underperformance of the Plans in a way that harmed the Class. ................. 13

III.    Given that Exxon's stock quickly rebounded after the 2021 proxy vote, discuss what losses, if any, occurred, and how this rebound in price impacts the loss analysis for the Class. ........................................................ 16

IV.     Discuss whether *Dura Pharmaceuticals, Inc. v. Broudo*, 554 U.S. 336 (2005) should apply in the ERISA context even though it is a securities case and whether the relevant statutory schemes permit such a comparison. ........................................................................................... 18

V.      Discuss the loss-causation burden-shifting framework in light of *McDonald v. Provident Indem. Life Ins. Co.*, 60 F.3d 234 (5th Cir. 1995)...... 20

VI.     If the Court concludes that no actual losses occurred, discuss whether an injunction is necessary and the appropriate scope for such an injunction.......................................................................................... 22

    A.    Injunctive relief ....................................................................................... 23

    B.    Other equitable or "remedial" relief ........................................................ 24

CONCLUSION............................................................................................. 26

CERTIFICATE OF SERVICE ....................................................................... 27

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Beck v. Levering,*
  947 F.2d 639 (2d Cir. 1991) .................................................................................. 23

*Brotherston v. Putnam Invs., LLC,*
  907 F.3d 17 (1st Cir. 2018) ................................................................................... 20

*Bussian v. RJR Nabisco, Inc.,*
  223 F.3d 286 (5th Cir. 2000) ................................................................................ 21

*Cal. Ironworkers Field Pension Trust v. Loomis Sayles & Co.,*
  259 F.3d 1036 (9th Cir. 2001) ............................................................................... 11

*Carpenters Dist. Council of New Orleans & Vicinity v. Dillard Dep't Stores, Inc.,*
  15 F.3d 1275 (5th Cir. 1994) ................................................................................ 12

*CIGNA Corp. v. Amara,*
  563 U.S. 421 (2011) .............................................................................................. 22

*Donovan v. Bierwirth,*
  754 F.2d 1049 (2d Cir. 1985) .......................................................................... 7, 11

*Dura Pharmaceuticals, Inc. v. Broudo,*
  554 U.S. 336 (2005) ........................................................................................ 18, 19

*Eaves v. Penn,*
  587 F.2d 453 (10th Cir. 1978) ....................................................................... 1, 2, 5

*Fifth Third Bancorp v. Dudenhoffer,*
  573 U.S. 409 (2014) .............................................................................................. 13

*Franklin v. Regions Bank,*
  125 F.4th 613 (5th Cir. 2025) .............................................................................. 12

*Free v. Briody,*
  732 F.2d 1331 (7th Cir. 1984) ............................................................................... 1

*In re Liljeberg Enters., Inc.,*
  304 F.3d 410 (5th Cir. 2002) .......................................................... 2, 8, 11, 15-16, 25

*Johnson v. Sw. Research Inst.,*
  384 F. Supp. 3d 722 (W.D. Tex. 2019) ................................................................ 12

*Martin v. Feilen,*
  965 F.2d 660 (8th Cir. 1992) ............................................................... 2, 20, 22, 23

*Martone v. Robb,*
  902 F.3d 519 (5th Cir. 2018) ........................................................................... 18, 20

*McDonald v. Provident Indem. Life Ins. Co.,*
  60 F.3d 234 (5th Cir. 1995) ............................................................................. 2, 20

*McMerty v. Herzog,*
  710 F.2d 429 (8th Cir. 1983) ................................................................................ 11

*N.Y. State Teamsters Council v. Estate of DePerno*,
   18 F.3d 179 (2d Cir.1994) ............................................................... 20
*Perez v. Bruister*,
   54 F. Supp. 3d 629 (S.D. Miss. 2014) ...................................... 1, 2, 12, 23
*Perez v. Bruister*,
   823 F.3d 250 (5th Cir. 2016)..................................................... 12, 22, 23
*Ramos v. Banner Health*,
   1 F.4th 769 (10th Cir. 2021) ............................................. 1, 5, 11, 19, 24
*Reich v. Lancaster*,
   55 F.3d 1034 (5th Cir. 1995) ................................................................ 23
*Rooney v. EZCORP*, Inc.,
   330 F.R.D. 439 (W.D. Tex. 2019)......................................................... 10
*Sec'y of U.S. Dep't of Labor v. Gilley*,
   290 F.3d 827 (6th Cir. 2002).............................................................. 20
*Story Parchment Co. v. Paterson Parchment Paper Co.*,
   282 U.S. 555 (1931).............................................................................. 2
*Tatum v. RJR Pension Inv. Comm.*,
   761 F.3d 346 (4th Cir. 2014)......................................................2, 19, 20, 21
*Tibble v. Edison Int'l*,
   575 U.S. 523 (2015)................................................................. 19, 21

## Statutes

15 U.S.C. § 78u-4(b)(4) ..................................................................... 20
29 U.S.C.
   § 1001(b) ........................................................................................ 21
   § 1104(a) ......................................................................................... 13
   § 1109(a) ......................................................... 1, 2, 19, 20, 22, 24, 25
Tex. Fin. Code Ann. § 304.003(c)(1) .................................................. 12

## Regulations

29 C.F.R. § 2550.404a-1(c)(1) .......................................................... 13

## Other Authorities

J.B. Gelbach, *Estimation Evidence*,
   168 Penn. L. Rev. 549 (2020)............................................................. 10

## ARGUMENT

"If a court finds a breach of fiduciary duties, it has wide leeway to fashion remedies to make plan participants whole." *Ramos v. Banner Health*, 1 F.4th 769, 778 (10th Cir. 2021). Fiduciaries (like Defendants) who breach ERISA's fiduciary duties must: (1) "make good to such plan any losses to the plan resulting from each such breach," (2) "restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary," and (3) "shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary." 29 U.S.C. § 1109(a). "[T]he reports of the various committees concerning this section of ERISA make it clear that Congress intended to provide the courts with broad remedies for redressing the interests of participants and beneficiaries when they have been adversely affected by breaches of a fiduciary duty." *Perez v. Bruister*, 54 F. Supp. 3d 629, 674–75 (S.D. Miss. 2014), *aff'd as modified*, 823 F.3d 250 (5th Cir. 2016) (quoting *Eaves v. Penn,* 587 F.2d 453, 462 (10th Cir. 1978) and citing *Free v. Briody,* 732 F.2d 1331, 1337 (7th Cir. 1984) ("ERISA grants the courts the power to shape an award . . . so as to make the injured plan whole.")). Further, "Congress intended the federal courts to draw on principles of traditional trust law." *Eaves*, 587 F.2d at 463. And trust law "provides for broad and flexible equitable remedies in cases involving breaches of fiduciary duty." *Id.* ERISA "directs courts to award damages to compensate for losses a plan sustains due to a breach." *Ramos v. Banner Health*, 1 F.4th 769, 778 (10th Cir. 2021) (citing 29 U.S.C. § 1109(a)). "The statute itself does not prescribe how courts are to measure loss, but [courts] have previously identified several appropriate measures: 'In addition to specific remedies for recovery of profits obtained by fiduciaries by use of plan assets,

trust law provides the alternative remedy of restoring plan participants to the position in which they would have occupied but for the breach of trust.'" *Id.* (quoting *Eaves*, 587 F.2d at 462). In choosing the remedy, "the court has a duty to enforce the remedy which is most advantageous to the participants and most conducive to effectuating the purposes of the trust." *Id.* (quoting *Eaves*, 587 F.2d at 462).

Not all forms of relief under ERISA require the Plaintiff to show a loss. *See* 29 U.S.C. § 1109(a) (stating that fiduciaries in breach of their duties are liable for "any loss" *and* subject to equitable relief); *Martin v. Feilen*, 965 F.2d 660, 672 (8th Cir. 1992) (upholding injunctive relief but remanding for determination of damages). But to seek *damages*, the plaintiff bears the burden of proving "a prima facie case of loss to the [P]lan." *McDonald v. Provident Indem. Life Ins. Co.*, 60 F.3d 234, 237 (5th Cir. 1995). "When a plaintiff has established a fiduciary breach and a loss, courts tend to conclude that the breaching fiduciary was liable." *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 366 (4th Cir. 2014) (citing cases from the 4th, 5th, 6th, 7th, and 10th Circuits). "[T]hat is precisely the result anticipated by ERISA's statutory scheme." *Id.* "[I]n determining the amount that a breaching fiduciary must restore to the [ERISA plan] as a result of a prohibited transaction, the court 'should resolve doubts in favor of plaintiffs.'" *Perez*, 54 F. Supp. 3d at 675 (citation omitted). The Fifth Circuit has "generally held that, '[w]hile the district court may not determine damages by speculation or guess, it will be enough if the evidence show[s] the extent of the damages as a matter of just and reasonable inference, although the result be only approximate.'" *In re Liljeberg Enters., Inc.,* 304 F.3d 410, 447 (5th Cir. 2002) (footnote and citations omitted); *accord Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931).

## I.    What losses, if any, are supported by the evidence with and without relying on Heaton's testimony?

### A.    Losses Supported by Dr. Heaton's Testimony

Determining losses to the Plan in most ERISA cases involving breach of fiduciary duty is, at best, an inexact science, and in some cases, quite difficult. *Ramos*, 1 F. 4th at 778. That is especially so given the facts of this case, which show a breach of the fiduciary duty of loyalty rooted in the Defendants' conflicted relationship with BlackRock—the world's largest asset manager—which engaged in conduct harmful to the Plan that extended well beyond one proxy vote against Exxon. Plaintiff's expert, J.B. Heaton, J.D., M.B.A., Ph.D., testified about one way to measure losses to the Plan caused by BlackRock, which had a "circular" or "incestuous" relationship with Defendants.[1] By using a single-firm event study, Dr. Heaton testified that BlackRock's 2021 Exxon proxy vote for climate activist firm Engine No. 1's dissident directors hurt the Plan by devaluing its energy stocks.[2]

Plaintiff has not only met his burden to show a prima facie case of loss to the Plan by demonstrating through Dr. Heaton's testimony that the cumulative abnormal returns (CARs) for the affected energy firms were negative, but has met the preponderance of the evidence standard on loss causation, even if there were no burden-shifting. CAR values assess the abnormal performance of a firm's stock while accounting for expected market and industry performance. The presence of negative CARs across multiple firms indicates a consistent trend of underperformance, which supports the conclusion that there was a negative market reaction to the event in question. Further, widespread negativity in CARs, even if they lack uniformly high

---

[1] Tr. Vol. I at 174:9-178:22.
[2] Tr. Vol. I at 174:9-174:8.

statistical significance, provides an inferential basis for causation, which suffices under the preponderance of evidence standard.

Here, as Dr. Heaton explained, the CARs for the energy industry after the Exxon proxy vote were uniformly negative.[3] By contrast, CARs for other industries in the same time period were *not* uniformly negative.[4] The lack of negative CARs in other industries supports the inference that something particularly affected the energy industry during that time period rather than just generally applicable market conditions. This inference is further supported by the fact that the negative CAR in the energy industry (-0.0632) is larger than any other negative CAR for other industries.[5] Importantly, the CARs themselves are undisputed[6]—Defendants simply dispute the inference that arises from them. Defendants contend that these measurements could result from random error, but that is implausible given the context above.[7]

The 1−p-value statistics Dr. Heaton provided give us a confidence interval—they tell us how likely it is, in terms of percentage, that the Exxon vote negatively impacted energy stock prices (which in turn caused losses to the Plan). A high 1−p (i.e., greater than 50%) is stronger evidence that the observed negative CAR is unlikely to have occurred randomly, which also supports the argument that the Exxon vote triggered the loss. A lower 1−p (i.e., lower than 50%) suggests weaker

---

[3] *See* Tr. Vol. I at 175:1-178:22, Ex. A (Plaintiff's Demonstrative 4, discussed by Dr. Heaton at trial); Ex. B (Dkt. 156-1, attached for the Court's convenience).

[4] Ex. B.

[5] *Id.*

[6] Tr. Vol. III at 144:8-145:17 (Dr. Boone agreeing that the numbers in the table (Ex. B) were calculated correctly).

[7] Dr. Heaton used a modified standard error rather than a traditional one to test the hypothesis of the event study while also addressing the recognized problem of low statistical power. Nonetheless, as explained, even calculations using Dr. Boone's conventionally calculated standard error result in the conclusion that it is more likely than not that the Exxon proxy vote had a negative price impact (which caused losses to the Plan), which satisfies Plaintiff's burden to show loss.

support but does not disprove causation; it only shows it is weaker. Here, for most of the firms (fourteen out of twenty-three), the percentage is well over 50% (more likely than not), and for a few (Exxon, Chevron, ConocoPhillips, Schlumberger, and Coterra), the certainty approaches 90%.[8] The combination of the negative CARs and high 1−p-values provides evidence to support the inference that the Exxon vote caused loss to the Plan and that it was not due to random chance, and enough evidence to show that it is more likely than not that the Exxon vote resulted in Plan losses. Thus, Plaintiffs have met their burden of showing loss causation, whether burden-shifting applies or not. And again, that conclusion is supported by CARs that are undisputed.

### B.   Quantification of losses (i.e., damages) based on Dr. Heaton's testimony

"[D]etermining the damages arising from a breach of fiduciary duty can often be difficult. For instance, there is no easy way to determine the extent of a loss from a breach that may have been diffuse and spread out across time or the extent of a loss resulting from lost investment opportunities." *Ramos*, 1 F.4th at 778. Thus, a plaintiff "need not provide a perfect estimate of how much loss the breach caused." *Id.* (citing *Eaves*, 587 F.2d at 463 ("The law clearly permits approximations as the extent of the damage, so long as the fact of damage or 'lost profit' is certain.")). As discussed above in Section I.A *supra*., Plaintiff showed loss causation by the preponderance of the evidence. Thus, even an approximation of damages is more than sufficient, especially given the difficulty in assessing the full extent of damage to the Plan presented by this case. But as the Court found at summary judgment, "Dr. Heaton's loss estimates are not mere speculation." Dkt. 143 at 35. Rather, Dr. Heaton used the "widely

---

[8] Ex. B.

accepted" and "conventional approach" to analyze the economic effect of BlackRock's proxy vote on energy stocks within the Plan.[9] Dr. Heaton proposed two damages models: the Voting Period Damages Model and the Loss Investment Gains Model.

### 1.    Voting Period Damages Model

The Voting Period Damages Model uses only the measured price reactions during the event window, or the voting period when the Exxon vote took place—May 18, 2021 (one day after proxy advisor Glass Lewis recommended the Engine No. 1 activist director slate) through May 27, 2021 (one day after BlackRock's vote).[10] It does not take into account any lost investment gains that the Plan would have made but for the loss due to BlackRock's vote. To calculate losses under this model, Dr. Heaton took the firms with 1−p−values of greater than 50% (showing that it was more likely than not that the Exxon vote had a negative impact on the prices) and calculated the loss per million in both the S&P 500 and Russell 1000 indexes by using the percentage each firm made up of each index and the firms' negative CAR values to determine losses per $1 million invested in the index. Dr. Heaton then multiplied the Plan balances in each of the S&P 500 and the Russell 1000 by the loss per million in each to determine total losses, which totaled $8,501,306 in the S&P 500 and $379,534 in the Russell 1000. As explained above, the CAR values Dr. Heaton used were calculated with Dr. Boone's traditional test statistic (rather than Dr. Heaton's modified test statistic). Using this method, Dr. Heaton estimates losses to the Plan of $8,880,840.00 following the Exxon vote.[11]

---

[9] *Id.*; Tr. Vol. I at 117:24-122:1.
[10] *See* Declaration of J.B. Heaton, J.D., M.B.A., Ph.D., Dkt. 59-2 at ¶ 24.
[11] Tr. Vol. I at 178:23-183:5.

### 2.    Lost Investment Gains Model

The problem with the Voting Period Damages Model is that it does not put the Plan back into the position it would have been but for the breach of fiduciary duty. The price drop caused by BlackRock's Exxon vote also prevented the Plan from building additional value on the amount the Plan should have had absent the losses.[12] Moreover, BlackRock's actions created uncertainty in the market, so the value impact of BlackRock's actions did not cease just because the Exxon vote had already occurred. Because the Voting Period Damages model only takes into account losses during the narrow window of time and does not account for the lost investment income on those losses, Dr. Heaton used the Lost Investment Gains model to calculate the total damages to the Plan. Considering lost investment gains is consistent with ERISA law, which provides that losses can refer to the difference between what was earned by the Plan because of a breach of fiduciary duty versus "what the Plan would have earned had the funds been available for other Plan purposes." *Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir. 1985). "The burden of proving that the funds would have earned less than that amount is on the fiduciaries found to be in breach of their duty. Any doubt or ambiguity should be resolved against them." *Id.* (collecting cases).

Dr. Heaton's Lost Investment Gains model assumes that the loss investment value is equal to the expected investment value of the amount lost during the Voting Period (calculated above) in Exxon and Chevron stock from the end of the Voting Period (May 28, 2021) to the present. From May 28, 2021 to October 27, 2023, Exxon's total stock market return—price appreciation plus the reinvestment of dividends— was 198%. During the same time period, Chevron's total stock market return was 152%. By reducing the value of Plan participants' investment in Exxon and Chevron

---

[12] Tr. Vol. I at 183:16-184:25.

common stock, the Plan was deprived of this price appreciation. Dr. Heaton calculated the loss of investment gains per $1 million invested in both the S&P 500 and the Russell 1000 and multiplied that number with the value of the Plan, Dr. Heaton calculates a total loss to the Plan, including lost investment gains, as $15,761,113.00.[13] And again, this number is calculated based only on firms with a greater than 50% 1–p-value as calculated using Dr. Boone's traditional test statistic.

These are reasonable and conservative estimates of loss given the power BlackRock exerted in forcing firms to become less profitable in the name of ESG, which undoubtedly caused even greater damage to the Plan, as explained below. *See* Section II *infra*. Plaintiff's calculation of total Plan losses—$15,761,113.00—is based on a single event measurable by traditional and acceptable methods. The damages estimated by Dr. Heaton show "the extent of the damages as a matter of just and reasonable inference," even if they were considered "approximate." *In re Liljeberg,* 304 F.3d at 447.

### C.    Discuss the appropriate weight that should be given to Dr. Heaton's testimony.

Dr. Heaton's testimony in the case is reliable and sufficient to support an award of damages to the Plan. Both Dr. Heaton and Dr. Boone agreed that a single-firm event study was the appropriate methodology to assess the impact, if any, the Exxon proxy vote had on the Plan.[14] Dr. Boone's two criticisms of Dr. Heaton's work on loss causation were: (1) the possibility of confounding events in the event window

---

[13] Tr. Vol. I at 185:1-186:5.
[14] Tr. Vol. I at 123:22-124:23, 126:10-127:2 (Heaton testimony); Tr. Vol. III at 142:12-15, 144:19-21 (Boone testimony).

and (2) the fact that Dr. Heaton's calculations did not reach 95% certainty. But she offered no critique of actual damages.

With burden-shifting, it is Defendants' burden to disprove loss causation. But even without burden shifting, Defendants still offered no evidence to counter Plaintiff's, so Plaintiff's evidence carries the day on the preponderance of the evidence.[15] Dr. Boone's testimony about confounding events amounts to pure speculation, as she did not perform an event study—the agreed-upon methodology—to test the effect of the supposedly confounding events.[16] She first suggested that a Dutch district court ruling might have had an impact on energy stock prices but offered nothing to prove it.[17] Nor is it plausible that the U.S. market would react to a lower court Dutch decision on climate change where there is almost no oil and gas production at all and then perhaps only by Royal Dutch Shell, and especially where the legal basis for the opinion was a Dutch law that "provides that acting in conflict with generally accepted social norms is unlawful," and has no American analog.[18] Ironically, if a single Dutch climate court ruling could impact American energy stocks, imagine what a direct climate change attack on an American energy company's board of directors could do. Dr. Boone also argued that a climate change recommendation from an international agency might have had an impact on energy stocks, but again,

---

[15] Tr. Vol. III at 143:5-15 (Boone admitting she did not run alternative event studies against Dr. Heaton's analysis); Tr. Vol. III at 148:6-12 (same).

[16] Tr. Vol. III at 140:8-18 (Boone admitting she did not run a single-firm event study to test the impact of her alleged confounding events of the Dutch Court ruling and the IEA recommendation).

[17] *Id.*

[18] https://www.loc.gov/item/global-legal-monitor/2024-12-09/netherlands-appeals-court-overturns-landmark-climate-change-decision-that-ordered-royal-dutch-shell-to-reduce-co2-emissions/. The district court opinion was already overruled on appeal, further supporting its weakness. *Id.*

no event study was even attempted to scientifically prove it.[19] Mere theories are insufficient to counter evidence supported by accepted methodology.

Finally, Defendants argued that because the probabilities (1−p-value) in Dr. Heaton's chart was less than 95%, his opinion should be discounted. While it is true that none of the 1−p-values were that high (though several were close), it is legally insignificant given that the burden of proof in a civil case is only the preponderance of the evidence, or more likely than not. Dkt. 157 at 41.[20] By arguing that Dr. Heaton's testimony should be discounted unless he can be statistically certain of the results, Defendants are suggesting that Plaintiff must exceed the burden of proof (and demand a standard of proof that is basically impossible to meet using a single-firm event study that is appropriately powered, according to Dr. Heaton's publications cited by courts).[21] In any event, Dr. Heaton expressed confidence in his results because there were no credible confounding events in the event window (and the possibilities Dr. Boone suggested were unsupported by evidence), and because the results were so consistent among energy firms specifically.[22] The Court can reasonably rely on Dr. Heaton's testimony, especially given that none of it was countered by evidence presented by Defendants supporting their speculative arguments, and because Dr. Heaton used the accepted methodology. Again, under ERISA, '[w]hile the district court may not determine damages by speculation or

---

[19] Tr. Vol. III at 140:8-18.
[20] *See also, e.g., Rooney v. EZCORP*, Inc., 330 F.R.D. 439, 450 (W.D. Tex. 2019); J.B. Gelbach, *Estimation Evidence*, 168 Penn. L. Rev. 549, 555-56 (2020).
[21] Tr. Vol. I at 134:5-136:1; *see also* Tr. Vol. III at 142:12-144:6.
[22] Tr. Vol. 1 at 173:16-178:22 (Heaton discussing Engine No. 1's Exxon proxy battle and confirming no confounding events were material); *see also* Tr. Vol. III at 138:19-140:18.

guess, it will be enough if the evidence show[s] the extent of the damages as a matter of just and reasonable inference, although the result be only approximate.'" *In re Liljeberg,* 304 F.3d at 447. Even if Dr. Heaton's conclusions were "uncertain," it is a longstanding principle of trust law that "uncertainties in fixing damages will be resolved against the wrongdoer." *Donovan*, 754 F.2d at 1056 (citing *Leigh v. Engle,* 727 F.2d 113, 138 (7th Cir. 1984); *McMerty v. Herzog,* 710 F.2d 429, 431 (8th Cir. 1983)).

### D.    Losses without relying on Dr. Heaton's testimony

If the Court chooses not to accept Plaintiff's proposals to measure damages, it has broad discretion to choose a different way to compensate the Plan. "If a district court finds a breach of fiduciary duties but rejects a plaintiff's proposed measure of damages, the court may fashion its own measure of loss resulting from the breach." *Ramos,* 1 F.4th at 778 (citing *Donovan*, 754 F.2d at 1055). When a district court "undertakes such a calculation of damages," appellate courts "give it considerable discretion." *Id.* (citing *Cal. Ironworkers Field Pension Trust v. Loomis Sayles & Co.*, 259 F.3d 1036, 1047 (9th Cir. 2001) ("When precise calculations are impractical, trial courts are permitted significant leeway in calculating a reasonable approximation of the damages suffered.")).

Finally, if the Court enters a monetary award, whether it is in the form of damages or equitable relief, the Court should also award the Plan prejudgment interest. *See* Am. Compl. at 53-54. If a court determines a fiduciary breached its duty to a plan under ERISA, it has discretion to award the plaintiffs prejudgment interest. *Ramos,* 1 F.4th at 784. "The determination of whether prejudgment interest should be awarded requires a two-step analysis: does the federal act creating the cause of

action preclude an award of prejudgment interest, and if not, does an award of prejudgment interest further the congressional policies of the federal act." *Carpenters Dist. Council of New Orleans & Vicinity v. Dillard Dep't Stores, Inc.,* 15 F.3d 1275, 1288 (5th Cir. 1994). "The Fifth Circuit has held that ERISA satisfies these inquiries." *Perez*, 54 F. Supp. 3d at 680. The Court "may take judicial notice of the calculations necessary for prejudgment interest." *Perez*, 54 F. Supp. 3d at 680.

As to the appropriate rate, the Fifth Circuit has held that it is appropriate for the district court to look to state law for guidance in determining the rate of interest. *Perez v. Bruister*, 823 F.3d 250, 274−75 (5th Cir. 2016). Because the Texas Supreme Court has held that prejudgment interest accrues at the rate for post-judgment interest, federal courts in Texas look to Texas state law on post-judgment interest rate for guidance in these circumstances, which dictates that appropriate interest rate is the prime rate on the date of the judgment. *Johnson v. Sw. Research Inst.*, 384 F. Supp. 3d 722, 727 (W.D. Tex. 2019). "Under the Texas Finance Code, the post-judgment interest rate is 'the prime rate as published by the Board of Governors of the Federal Reserve on the date of computation,' unless that rate is less than five percent or greater than fifteen percent." *Id.* at 726 (quoting Tex. Fin. Code Ann. § 304.003(c)(1)). "The interest rate is the prime rate as of the date of the award." *Id.* The current prime rate is 7.50%.[23]

The purpose of awarding prejudgment interest is to compensate the plaintiff "for the lost use of money due as damages from the time the claim accrues until judgment is entered, thereby achieving full compensation for the injury those damages are intended to redress." *Franklin v. Regions Bank*, 125 F.4th 613, 633 (5th

---

[23] *See* https://www.wsj.com/market-data/bonds/moneyrates.

Cir. 2025). Dr. Heaton's Lost Investment Gains model takes the loss use of money into account through November 2023 (the date of his expert report). Thus, if the Court awards the full $15.7 million in damages testified to by Dr. Heaton, it would be appropriate to also award prejudgment interest from November 2023 to the date of judgment.

## II.    Identify what, if any, direct evidence links ESG investing to financial underperformance of the Plans in a way that harmed the Class.

As fiduciaries, Defendants and BlackRock were required to "discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries." 29 U.S.C. § 1104(a). These benefits are "*financial* benefits . . . that trustees who manage investments typically seek to secure for the trust's beneficiaries." *Fifth Third Bancorp v. Dudenhoffer*, 573 U.S. 409, 421 (2014). This loyalty requires the fiduciary to "not subordinate the interests of the participants and beneficiaries in their retirement income or financial benefits under the plan to other objectives, and may not sacrifice investment return or take on additional investment risk to promote benefits or goals unrelated to interests of the participants." 29 C.F.R. § 2550.404a-1(c)(1). ESG investing, as defined and discussed by the Court (Dkt. 157 at 24-28), has goals other than making the most money possible for the Plan participants. By definition, it "considers or pursues a non-pecuniary interest as *an end* itself rather than as a means to some financial end." Dkt. 157 at 27. Indeed, it does not focus on just pecuniary interests or even on the best interests of the Plan participants, but on other "stakeholders" including non-Plan participants,

communities, and even "society" at large. Dkt. 157 at 37. This is what BlackRock admitted that it was doing with others' money, including the Plan's, and that is what the Court found that BlackRock did. Dkt. 157 at 28-37.

That, by itself, is evidence supporting an inference that the Plan was harmed by this loss of focus. But further direct evidence supports a loss to the Plan. First, the evidence showed that ESG investments underperformed. Even though the EBC was well aware that ESG investments are known to have "low performance," it was still open to considering it when BlackRock touted it. Dkt. 157 at 31. The then-chair of the EBC noted that "offering [ESG] is one thing, offering a known low performing fund is another so we need to treat lightly."[24] But Ken Menezes found study after study that ESG investing was so deficient that he could not even recommend it to the EBC, despite the well-known push for ESG at American Airlines at the time.[25] And as the Court found, ESG investments "often underperform traditional investments by approximately 10%." Dkt. 157 at 25. ESG investments also underperformed the S&P 500 and Russell 100 indices by 4% in 2023. *Id.*

Aside from the evidence that ESG investment strategy underperformed traditional investments, given BlackRock's status as the world's largest asset manager, it is reasonable to assume that when it began threatening to vote proxies against management when its ESG-related demands were not met, and then began *actually voting* that way, the entire index was depressed because companies in a fossil fuel related industry or that simply did not comply with all of BlackRock's ESG goals

---

[24] DX-148.
[25] Tr. Vol. II at 119:9-14; 233:6-25.

(which included DEI measures in addition to environmental/climate-related concerns) were likely worried they would be next and made efforts to comply. The best evidence to show that is true is the evidence that AA itself did just that. Dkt. 157 at 57-58.[26] And as the Court noted, BlackRock was demanding that companies "act in a manner that directly undermines the company's profits." Dkt. 157 at 66. Thus, there is a reasonable inference from this evidence that BlackRock's ESG activism likely harmed the performance of many firms in the S&P 500 and Russell 1000, as companies (like AA) were incentivized to take actions that undermined the companies' profits in order to stave off a multi-billion dollar loss like the one Exxon suffered resulting from a proxy attack by BlackRock and other activists.

Finally, the evidence of what happened to the Plan here supports the inference as well. BlackRock's ESG proxy voting was targeted to impact large energy stocks, and it is no surprise that it caused its intended harm to energy stocks as demonstrated by Dr. Heaton—stocks the Plan held. BlackRock started its ESG proxy voting campaign by supporting ESG shareholder proposals, then moved up to consequential proxy votes on board of directors at large (but lesser known) energy firms, then landing with a crescendo at the largest energy firm, Exxon. The impact on Exxon's stock was as expected, swift and large—and that impact directly caused harm to the Plan.

The evidence above supports a "just and reasonable inference" that the Plan actually suffered harm greater than the $15.7 million conservatively estimated by

---

[26] *See also* PX-38; PX-42.

Dr. Heaton, which makes those damages very reasonable by comparison. *In re Liljeberg,* 304 F.3d at 447. And even if the indices were doing well overall, that does not mean that BlackRock's activities did not cause a loss to the Plan. As the Court also noted, "underperformance can also occur as *relative* underperformance compared to how the index fund *should* have performed had the fiduciary focused exclusively on financial interests." Dkt. 157 at 25 n.17.

## III. Given that Exxon's stock quickly rebounded after the 2021 proxy vote, discuss what losses, if any, occurred, and how this rebound in price impacts the loss analysis for the Class.

Defendants did not offer any *evidence* on the amount of the Plan loss or to suggest that the damage to the Class was less than what Dr. Heaton estimated. Instead, Defendants offered only speculative arguments. These arguments did not raise any uncertainties, but to the extent they did, such uncertainties are resolved in Plaintiff's favor.

Because the energy stocks dropped in the midst of an overall up stock market, Defendants argue that the fossil fuel stocks price drop was only transitory[27] and eventually recovered what it lost.[28] Indeed, eventually most stocks in the Index, including most energy stocks, achieved even higher prices than when BlackRock perpetrated its proxy voting raid on Exxon's directors.[29] But this conflates the upward trend of the overall market with the proxy voting event. Defendants speculate that

---

[27] A transitory dip would be a quick day or two drop, followed by a complete recovery, from unexplained events. But the event window here was longer than that, and the event was well known, expected to have an adverse effect on the stock, and was quantified scientifically.
[28] Tr. Vol. III at 117:19-118:2.
[29] Tr. Vol. III at 117:19-118:2.

the energy stocks recovered because the negative sentiment of the ESG proxy voting wore off. But no evidence was submitted to prove that. Nor is that plausible in light of the fact that the directors elected by BlackRock and Engine No. 1's push stayed on Exxon's Board for years afterward, with two still serving on the board (Kaisa Hietala and Alexander Karsner) and the third, Greg Goff, only recently resigned in October 2024.[30] Likewise, there is no evidence of how much of the rise was due to the overall effects of the stock market, the price of oil and gas, or any other factors. All we know is that the energy stock prices nosedived and rebounded eventually. And critically, *there is no evidence to show that the growth that eventually allowed the stocks to regain the value they had before the Exxon vote would not have also happened if the energy stocks had not decreased.* That is why Dr. Heaton's loss estimate of $8.8 million holds. With no Exxon vote, and absent any evidence that the stock rebounding was due only to market correction after concern about the vote died down, the Plan's assets would been worth $8.8 million more. That is a loss to the Plan. Defendants cannot get a damage offset without showing that the offset was because of the market correcting because the impact of the Exxon proxy vote dissipated and then showing by how much. Without such evidence, this argument is speculative at best. As the Court noted, even if the energy stock prices eventually regained their value, there is still a loss due to the "relative underperformance compared to how the index fund should

---

[30] *See* https://corporate.exxonmobil.com/corporate-governance/board-of-directors; https://www.reuters.com/business/energy/exxon-director-quits-after-joining-elliott-backed-group-seeking-buy-citgo-2024-10-18/.

have performed had the fiduciary focused exclusively on financial interests." Dkt. 157 at 25 n. 25.

**IV.    Discuss whether *Dura Pharmaceuticals, Inc. v. Broudo*, 554 U.S. 336 (2005) should apply in the ERISA context even though it is a securities case and whether the relevant statutory schemes permit such a comparison.**

*Dura Pharmaceuticals, Inc. v. Broudo* held that an investor claiming securities fraud under the Securities Exchange Act cannot satisfy the requirement of proving that the fraud caused an economic loss simply by alleging in the complaint, and subsequently establishing, that the price of the security on the date of purchase was inflated because of the misrepresentation. 544 U.S. 336 (2005). Instead, the Court held that a securities fraud plaintiff must prove that a loss was actually caused by the defendant's misrepresentation—in other words, that the plaintiff suffered harm because they both bought the security at the inflated price and sold the security at a lower price. *Id.* at 342−45. Defendants here have attempted to analogize to *Dura* to argue that Plaintiff's demonstration that Exxon's stock (and therefore the Plan's value) nosedived after BlackRock's Engine No. 1 proxy vote in May 2021 is insufficient to prove loss. Factually speaking, that is different from the securities fraud scenario, where the loss would be limited to someone who both (1) bought the security at the *inflated* price and (2) sold it at a lower price. That is because "[i]f the purchaser were to sell immediately, while the stock is still inflated, there would be no loss. A loss only occurs when the market corrects and the stock's value declines." *Martone v. Robb*, 902 F.3d 519, 524 (5th Cir. 2018). Here, the Plan suffered loss because BlackRock's actions caused the Plan to *lose* the value it had before (through the demonstrated decrease in Exxon's stock price) and because the Plan was deprived of the reasonable investment gains of that value.

18

*Dura*'s far different legal context already renders its applicability here limited. For one thing, a claim of securities fraud is rooted in common law deceit and misrepresentation actions, and in those types of actions, "the common law has long insisted that a plaintiff in such a case show not only that had he known the truth he would not have acted but also that he suffered actual economic loss." *Id.* at 343–44. By contrast, as explained below (*see* Section V *infra*) and as confirmed by the Supreme Court, *see Tibble v. Edison Int'l*, 575 U.S. 523, 528 (2015), ERISA's fiduciary duties are rooted in trust law, where "'in matters of causation, when a beneficiary has succeeded in proving that the trustee has committed a breach of trust and that a related loss has occurred, the burden shifts to the trustee to prove that the loss would have occurred in the absence of the breach.'" *Tatum*., 761 F.3d at 361 (citations omitted). This distinction is significant because the common law recognizes that a misrepresentation without financial damage is not actionable. *Dura*, 544 U.S. at 344. That is not true with breach of fiduciary duty under ERISA, where the harm is caused by the breach itself, as it is grounds on its own to justify injunctive relief. 29 U.S.C. § 1109(a).

Additionally, the federal statute governing private securities litigation explicitly states that the plaintiff has the burden to prove loss causation. 15 U.S.C. § 78u-4(b)(4). "The statute thereby makes clear Congress' intent to permit private securities fraud actions for recovery where, but only where, plaintiffs adequately allege and prove the traditional elements of causation and loss." *Dura*, 544 U.S. at 346. By contrast, ERISA contains no provision regarding the burden of proof, nor does it even define "loss." *Ramos*, 1 F.4th at 778.

19

Regardless, even if the Court were inclined to look at the "logic" of *Dura* as applied here, *see Martone*, 902 F.3d at 524 n.11, Plaintiff has sufficiently demonstrated both loss and damages appropriate in the ERISA context. ERISA explicitly provides for relief to "the plan," and breaching fiduciaries shall "make good to such plan any losses to the plan resulting from each such breach." 29 U.S.C. § 1109(a). Here there is no question that the stock prices—and thereby the value of the Plan—decreased, as was required to be shown in *Dura*, *see Martone*, 902 F.3d at 524. *Dura*'s two-step requirement to show loss (inflation and price decrease) is irrelevant because there is already a price decrease here (and there is no allegation of inflation due to the actions of Defendants). This Plan lost value as a result of BlackRock's actions, and further lost value because the Plan lost the investment gains of that value (and will continue to do so). That is different from the plaintiff's loss from an inflated stock caused by misrepresentation as described in *Dura*. In short, *Dura*'s logic does not prevent a finding of loss or damages here.

## V. Discuss the loss-causation burden-shifting framework in light of *McDonald v. Provident Indem. Life Ins. Co.*, 60 F.3d 234 (5th Cir. 1995).

Governing law in the Fifth Circuit holds that once an ERISA plaintiff has met their burden to show breach and a prima facie case of loss, the burden shifts to the defendant—the fiduciary—to disprove causation, or to "prove that the loss was not caused by the breach of duty." *McDonald*, 60 F.3d at 237. A number of other circuits agree. *See Brotherston v. Putnam Invs., LLC*, 907 F.3d 17, 35–39 (1st Cir. 2018); *Tatum*, 761 F.3d at 362−63; *Sec'y of U.S. Dep't of Labor v. Gilley,* 290 F.3d 827, 830 (6th Cir. 2002); *N.Y. State Teamsters Council v. Estate of DePerno,* 18 F.3d 179, 182–83 (2d Cir.1994); *Martin*, 965 F.2d at 671.

This conclusion is rooted in the law of trusts, which underpins the concept of fiduciary duty in ERISA. The Supreme Court has "often noted that an ERISA fiduciary's duty is "derived from the common law of trusts." *Tibble*, 575 U.S. at 528; Dkt. 157 at 41. Trust law is an exception to the default rule that the plaintiff bears the burden of proof. In trust law, "'in matters of causation, when a beneficiary has succeeded in proving that the trustee has committed a breach of trust and that a related loss has occurred, the burden shifts to the trustee to prove that the loss would have occurred in the absence of the breach.'" *Tatum*., 761 F.3d at 361 (quoting *Restatement (Third) of Trusts* § 100, cmt. f (2012) (internal citation omitted); and citing Bogert & Bogert, *The Law of Trusts and Trustees* § 871 (2d rev. ed. 1995 & Supp. 2013) ("If the beneficiary makes a prima facie case, the burden of contradicting it . . . will shift to the trustee.")). This makes sense given that fiduciary duties, including the duty of loyalty, which Defendants breached here, are "the highest known to the law." *Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 294 (5th Cir. 2000).

Moreover, "this burden-shifting framework comports with the structure and purpose of ERISA." *Tatum*, 761 F.3d at 363. As stated in its preamble, the statute's primary objective is to protect "the interests of participants in employee benefit plans and their beneficiaries." 29 U.S.C. § 1001(b). To achieve this purpose, ERISA imposes not just statutory obligations, but *fiduciary* obligations on those responsible for administering employee benefit plans and plan assets, and provides for enforcement through "appropriate remedies, sanctions, and ready access to the Federal courts." *Tatum*, 761 F.3d at 363. "When a plaintiff has established a fiduciary breach and a loss, courts tend to conclude that the breaching fiduciary was liable." *Id.* at 366 (citing

cases from the 4th, 5th, 6th, 7th, and 10th Circuits). "[T]hat is precisely the result anticipated by ERISA's statutory scheme." *Id.*

While many Circuits agree with the Fifth Circuit, they are not unanimous, and there is currently a petition for writ of certiorari on the issue of loss causation burden-shifting pending at the Supreme Court.[31] But Plaintiff does not need burden-shifting to win, as he has proved loss causation by a preponderance of the evidence, as explained above in Sections I.A and C *supra*.

## VI.    If the Court concludes that no actual losses occurred, discuss whether an injunction is necessary and the appropriate scope for such an injunction.

Not all forms of relief under ERISA require the Plaintiff to show a financial loss. *See* 29 U.S.C. § 1109(a) (stating that fiduciaries in breach of their duties are liable for "any loss" *and* subject to equitable relief). Any "requirement of harm" under ERISA "must come from the law of equity," which includes harm simply "from the loss of a right protected by ERISA or its trust-law antecedents." *CIGNA Corp. v. Amara*, 563 U.S. 421, 443, 444 (2011). Thus, even if the Court determines that no actual losses occurred such that monetary damages for the class would be appropriate, the Court still has broad discretion to award "other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary," 29 U.S.C. § 1109(a), as it has already determined that the Class was harmed by virtue of Defendants' breach of fiduciary duties. *Perez*, 823 F.3d at 275 (holding district court did not abuse discretion in entering permanent injunctive relief "without focusing on the amount of loss" because "[i]t is not the magnitude of the losses . . . but the nature of the fiduciary (mis)conduct that should principally undergird an injunction."); *cf.*

---

[31] *See Pizarro v. The Home Depot, Inc.*, No. 24-620 (U.S. docketed Dec. 6, 2024).

*Martin*, 965 F.2d at 672 (upholding injunctive relief but remanding for determination of damages).

### A.    Injunctive relief

Given the language of the ERISA statute, injunctive relief to remove a fiduciary found to be in breach of their duties is commonplace and well-supported. "ERISA imposes a high standard on fiduciaries, and serious misconduct that violates statutory obligations is sufficient grounds for a permanent injunction." *Beck v. Levering,* 947 F.2d 639, 641 (2d Cir. 1991), *cert. denied,* 504 U.S. 909 (1992); *see also Martin*, 965 F.2d at 672 (collecting cases in which defendants who breached ERISA fiduciary duties were permanently enjoined from acting as service providers); *Perez*, 54 F. Supp. 3d at 681 (granting injunctive relief "prohibiting all Defendants from acting in the future as fiduciaries or service providers to ERISA-covered plans, as they have engaged in egregious misconduct."). And "[t]here is authority in this circuit for permanently barring fiduciaries who breached their duties from ever serving as an ERISA fiduciary again." *Perez*, 823 F.3d at 275 (citing *Reich v. Lancaster,* 55 F.3d 1034, 1054 (5th Cir. 1995)). Thus, because Plaintiff already proved that Defendants breached their fiduciary duty of loyalty to the Plan, at minimum, injunctive relief permanently removing the EBC members as Plan fiduciaries is appropriate.[32]

Because of the nature of Defendants' breach—their "circular" and "incestuous" relationship with BlackRock, it would further be appropriate for the Court to enjoin Defendants from using BlackRock (or any other asset manager that is a significant shareholder of American Airlines (i.e. who owns 3% or more of AA's shares) or who holds any of AA's fixed debt, to manage Plan assets without policies preventing those

---

[32] Because the Plan Sponsor is a fiduciary under ERISA, AA itself could not be enjoined from acting as a fiduciary altogether. But its management of the Plan can be more specifically addressed as discussed in this section and in Exhibit C.

who maintain the corporate relationship with the asset manager from also being Plan fiduciaries or playing a role in managing the Plan. And finally, to prevent the harm that occurred in this case due to the investment manager's harmful proxy votes, injunctive relief requiring Defendant AA to ensure that any proxy votes cast by asset managers using Plan assets are based solely on the demonstrated financial interest of the Plan participants would also be appropriate. To this end, Plaintiff includes proposed language for an injunction as Exhibit C.[33]

### B.    Other equitable or "remedial" relief

Given that ERISA remedies are based in the law of trusts, the equitable remedy of ordering the Defendant to pay the Plan the amount of money it gained from its breach of fiduciary duty is also available. *Ramos*, 1 F.4th at 778. Aside from damages and injunctive relief, ERISA also gives broad discretion to the Court to award other equitable relief, such as disgorgement, or "restor[ing] to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary." 29 U.S.C. § 1109(a). By giving BlackRock its $10+ billion Plan to manage, AA received the "circular" benefit of debt financing in a time of economic trouble and no proxy vote attack from BlackRock. As the Court heard at trial, BlackRock financed $400 million of AA's fixed debt. And the avoidance of a proxy attack on AA—a company that depends on fossil fuels as a core part of its business— was even more valuable. When BlackRock engaged in the ESG proxy vote at Exxon, it caused a 7.9% decline in Exxon's stock price.[34] While it is difficult to estimate the negative impact BlackRock's ESG activism and proxy voting would have had on

---

[33] Some of the proposed provisions are similar to what the State of Tennessee and BlackRock agreed to in settlement of *Tennessee ex rel. Skremetti v. BlackRock, Inc.. See* https://www.tn.gov /attorneygeneral/news/2025/1/17/pr25-3.html and https://www.tn.gov/content/dam/tn/attorneygeneral /documents/pr/2025/2025-1-blackrock.pdf.

[34] Tr. Vol. I at 179:9-20.

24

American's stock price, it is reasonable to infer that it would have had some negative financial impact, just as it did at Exxon and other energy companies. One day before the start of Dr. Heaton's event window (May 17, 2021), American Airlines' market cap was approximately $14.976 billion.[35] A 7.9% decline in AA stock price would have resulted in a loss of approximately $1.183 billion at AA—a loss that AA avoided by engaging in the "circular" relationship with BlackRock. Those were ill-gotten gains that AA received because of its breach of loyalty, and the Court could choose to award that or some lesser "approximat[ion]" to the Plan under § 1109(a). *In re Liljeberg*, 304 F.3d at 447.

ERISA also allows the Court to award "other . . . remedial relief as the court may deem appropriate." 29 U.S.C. § 1109(a). As the Court outlined in its Findings of Fact and Conclusions of Law, Defendants should not have placed a significant part of the Plan's assets in the hands of an asset manager that publicly stated that it would not act solely in the financial interest of the Plan participants, and which presented a conflict of interest for the Plan fiduciaries. The evidence here shows that Defendants paid BlackRock approximately $5.7 million in fees per year.[36] While it is true that the Plan would have had to pay some investment manager fees, it never should have been paying fees to BlackRock given those conflicts, so ordering Defendants to reimburse the Plan for the fees it paid BlackRock during the Class Period could also be "appropriate" to compensate the Plan for Defendants' breach of the duty of loyalty.

---

[35] *See* https://stockanalysis.com/stocks/aal/market-cap/ (market capitalization data for May 17, 2021).
[36] DX 678 shows that the Plan paid BlackRock $5,715,664 in fees in 2019. As the Court found, between 2017 and 2022, the Plan's total invested assets increased from $10.6 billion to $12.4 billion between 2017 and 2022 (Dkt. 157 at 13), and because BlackRock assesses fees as a percentage of assets under management (PX-30 at AA-SPENCE-00029108), the annual fees during the Class Period would likely be more than the amount paid in 2019. Defendants know the exact amount.

## CONCLUSION

Plaintiff respectfully requests that judgment be entered against Defendants, plus attorneys' fees and costs to be determined after motion and further briefing.

Dated: February 14, 2025.                     Respectfully submitted,

/s/ Heather Gebelin Hacker
ANDREW B. STEPHENS
Texas Bar No. 24079396
andrew@hackerstephens.com
HEATHER GEBELIN HACKER
Texas Bar No. 24103325
heather@hackerstephens.com
HACKER STEPHENS LLP
108 Wild Basin Rd. South, Suite 250
Austin, Texas 78746
(512) 399-3022 (phone)

REX A. SHARP
Texas Bar No. 18118800
rsharp@midwest-law.com
ISAAC L. DIEL*
idiel@midwest-law.com
HAMMONS P. HEPNER*
hhepner@midwest-law.com
SHARP LAW LLP
4280 West 75th St.
Prairie Village, Kansas 66208
(913) 901-0505

*Attorneys for Plaintiff and
the Certified Class*

*admitted *pro hac vice*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 14, 2025, this document was served through

the Court's CM/ECF Document Filing System upon all counsel of record.

<u>/s/ Heather Gebelin Hacker</u>
Heather Gebelin Hacker