# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| BRYAN P. SPENCE, individually and as a representative of a class of similarly situated, and on behalf of the AMERICAN AIRLINES, INC. 401(k) PLAN and the AMERICAN AIRLINES, INC. 401(k) PLAN FOR PILOTS, | § § § § § § § § § | Case No. 4:23-cv-00552-O |
| Plaintiff, | § § § | |
| v. | § § | |
| AMERICAN AIRLINES, INC., et al, | | |
| Defendants. | | |

## DEFENDANTS' SUPPLEMENTAL BRIEF

Dee J. Kelly, Jr. (S.B. # 11217250)
Russell D. Cawyer (S.B. # 00793482)
KELLY HART & HALLMAN LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Tel:  (817) 332–2500
Fax:  (817) 335–2820
dee.kelly@kellyhart.com
russell.cawyer@kellyhart.com

Mark W. Robertson (*pro hac vice*)
(N.Y. Bar # 4508248)
William D. Pollak (*pro hac vice*)
(N.Y. Bar # 4737037)
O'MELVENY & MYERS LLP
7 Times Square
New York, NY 10036
Tel.:  (212) 326–2000
Fax:  (212) 326–2061

Brian D. Boyle (*pro hac vice*)
(D.C. Bar # 419773)
Shannon M. Barrett (*pro hac vice*)
(D.C. Bar # 476866)
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
Tel.:  (202) 383–5300
Fax:  (202) 383–5414
bboyle@omm.com
sbarrett@omm.com

*Attorneys for Defendants American Airlines,
Inc. and the Employee Benefits Committee*

# TABLE OF CONTENTS

Page

I.   **"What losses, if any, are supported by the evidence with or without relying on Heaton's testimony?"** ................................................................................. 1

    A.   Heaton's Opinion Does Not Show a Loss ............................................................. 1

    B.   Plaintiff Has Not Identified an Alternative Course of Action a Loyal Fiduciary Would or Could Have Taken That Would Have Avoided the Purported Loss. ...................................................................................................... 5

II.  **"Discuss the appropriate weight that should be given to Heaton's testimony."** .......... 7

    A.   Heaton's Event Window Does Not Accurately and Reliably Capture the Impact of BlackRock's Proxy Vote on Energy Company Share Prices. ................. 7

    B.   The Short-Term Share Price Movements Heaton Purported to Observe Are Not Statistically Significant. ............................................................................... 10

III. **"Identify what, if any, direct evidence links ESG investing to financial underperformance of the Plans in a way that harmed the Class."** ........................... 14

IV.  **"Given that Exxon's stock quickly rebounded after the 2021 proxy vote, discuss what losses, if any, occurred, and how this rebound in price impacts the loss analysis for the Class."** ..................................................................................... 14

V.   **"Discuss whether *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), should apply in the ERISA context even though it is a securities case and whether the relevant statutory schemes permit such a comparison."** ...................... 15

VI.  **"Discuss the loss-causation burden shifting framework in light of *McDonald v. Provident Indem. Life Ins. Co.*, 60 F.3d 234 (5th Cir. 1995)."** .................................. 17

VII. **"If the Court concludes that no actual losses occurred, discuss whether an injunction is still necessary and the appropriate scope for any such injunction."** ............................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988)................................................................ 12

*Black v. Food Lion, Inc.*,
    171 F.3d 308 (5th Cir. 1999) .................................................11

*Brandner v. Abbott Lab'ys., Inc.*,
    2012 WL 27696 (E.D. La. Jan. 5, 2012)............................. 22, 24

*Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*,
    752 F.3d 82 (1st Cir. 2014) ...................................................... 9

*Brown v. Medtronic, Inc.*,
    628 F.3d 451 (8th Cir. 2010) .................................................. 15

*Castellow v. Chevron USA*,
    97 F. Supp. 2d 780 (S.D. Tex. 2000) .....................................11

*City of L.A. v. Lyons*,
    461 U.S. 95 (1983)................................................................. 21

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013)............................................................... 22

*Dardaganis v. Grace Cap. Inc.*,
    889 F.2d 1237 (2d Cir. 1989) ............................................. 2, 5

*DeFazio v. Hollister, Inc.*,
    854 F. Supp. 2d 770 (E.D. Cal. 2012), *aff'd sub nom. DeFazio v. Hollister Emp.*
    *Share Ownership Tr.*, 612 F. App'x 439 (9th Cir. 2015) ..................................... 5, 24

*Donovan v. Bierwirth*,
    754 F.2d 1049 (2d Cir. 1985) ................................................... 2

*Dura Pharmaceuticals, Inc. v. Broudo*,
    544 U.S. 336 (2005)........................................................... 15, 16

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    309 F.R.D. 251 (N.D. Tex. 2015)............................................. 8

*Hearring v. Sliwowski*,
    806 F.3d 864 (6th Cir. 2015) .................................................. 25

*In re Apache Corp. Sec. Litig.*,
    2024 WL 532315 (S.D. Tex. Feb. 9, 2024)............................. 10

*In re Bos. Sci. Corp. ERISA Litig.*,
    254 F.R.D. 24 (D. Mass. 2008) .............................................. 16

*In re High-Tech Emp. Antitrust Litig.*,
    2014 WL 1351040 (N.D. Cal. Apr. 4, 2014)........................... 13

*In re Photochromic Lens Antitrust Litig.*,
    2014 WL 1338605 (M.D. Fla. Apr. 3, 2014) .......................... 13

**TABLE OF AUTHORITIES**
**(Continued)**

Page(s)

*In re SunEdison, Inc. ERISA Litig.*,
   331 F. Supp. 3d 101 (S.D.N.Y. 2018), *aff'd sub nom. O'Day v. Chatila*, 774 F.
   App'x 708 (2d Cir. 2019) ........................................................................................ 6

*In re: Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig.*,
   2016 WL 827067 (D.S.C. Feb. 29, 2016) ............................................................ 13

*Int'l Longshoremen's Ass'n, Loc. 1291 v. Phila. Marine Trade Ass'n*,
   389 U.S. 64 (1967) .............................................................................................. 22

*Kiessling v. Kiawah Island Inn Co. LLC*,
   2019 WL 331176 (D.S.C. Jan. 25, 2019) ............................................................ 13

*Kirk v. Clark Equip. Co.*,
   2020 WL 5593750 (N.D. Ill. Sept. 18, 2020) ...................................................... 11

*Kopp v. Klein*,
   894 F.3d 214 (5th Cir. 2018) .......................................................................... 6, 17

*Louisiana v. Biden*,
   45 F. 4th 841 (5th Cir. 2022) .............................................................................. 22

*Martin v. Feilen*,
   965 F.2d 660 (8th Cir. 1992) ................................................................................ 2

*Martone v. Robb*,
   902 F.3d 519 (5th Cir. 2018) ........................................................................ 15, 16

*McClain v. Metabolife Int'l, Inc.*,
   401 F.3d 1233 (11th Cir. 2005) ........................................................................... 11

*McDonald v. Provident Indem. Life Ins. Co.*,
   60 F.3d 234 (5th Cir. 1995) ................................................................................ 17

*Meyer v. Brown & Root Constr. Co.*,
   661 F.2d 369 (5th Cir. 1981) .............................................................................. 21

*Monroe Cnty. Emps.' Ret. Sys. v. S. Co.*,
   332 F.R.D. 370 (N.D. Ga. 2019) ........................................................................ 13

*Payne v. Travenol Lab'ys, Inc.*,
   565 F.2d 895 (5th Cir. 1978) ........................................................................ 21, 22

*Peabody v. Davis*,
   636 F.3d 368 (7th Cir. 2011) ................................................................................ 2

*Perez v. Bruister*,
   54 F. Supp. 3d 629 (S.D. Miss. 2014), *aff'd as modified*, 823 F.3d 250 (5th Cir.
   2016) ..................................................................................................................... 5

*Pizarro v. Home Depot, Inc.*,
   111 F.4th 1165 (11th Cir. 2024) ........................................................................ 17

*Proujansky v. Blau*,
   2000 WL 98382 (S.D.N.Y. Jan. 28, 2000) .......................................................... 4

**TABLE OF AUTHORITIES**
**(Continued)**

Page(s)

*Ramirez v. Exxon Mobil Corp.*,
2023 WL 5415315 (N.D. Tex. Aug. 21, 2023) ........................................ 8

*Ramos v. Banner Health*,
461 F. Supp. 3d 1067 (D. Colo. 2020), *aff'd*, 1 F.4th 769 (10th Cir. 2021) .............................. 6

*SEC v. Life Partners Holdings, Inc.*,
854 F.3d 765 (5th Cir. 2017) ........................................................11

*Sims v. BB&T Corp.*,
2018 WL 3128996 (M.D.N.C. June 26, 2018) .................................... 2, 15

*Smith v. France*,
850 F. App'x 243 (5th Cir. 2021) .................................................... 23

*Spence v. Am. Airlines, Inc.*,
2024 WL 3092453 (N.D. Tex. June 20, 2024) .................................... 2

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) .................................................................... 21

*Thole v. U.S. Bank*,
590 U.S. 538 (2020) .................................................................... 21

*United States v. Ferguson*,
584 F. Supp. 2d 447 (D. Conn. 2008) ............................................ 9

*United States v. Hatfield*,
795 F. Supp. 2d 219 (E.D.N.Y. 2011) ............................................ 13

*United States v. Olis*,
2006 WL 2716048 (S.D. Tex. Sept. 22, 2006) .................................. 9

*Wells v. SmithKline Beecham Corp.*,
601 F.3d 375 (5th Cir. 2010) ........................................................11

**Statutes**

29 U.S.C. § 1109(a) ...................................................................... 2, 5

29 U.S.C. § 1132(a)(2) .................................................................. 25

**Other Authorities**

211 Fed. Jud. Ctr., *Reference Manual on Sci. Evid.* (3d ed.) ...................... 12

Jonah B. Gelbach, *Estimation Evidence* 168 U. Penn. L. Rev. 549 (2020) ................................11

Kingsley Browne, *Pernicious P Values: Statistical Proof of Not Very Much*, 42 U.
Dayton L. Rev. 113 (2017) ............................................................ 12

Restatement (Third) of Trusts § 100 (2012) ...................................... 2

**Rules**

Fed. R. Civ. P. 65(d) .................................................................... 22

iv

**TABLE OF AUTHORITIES**
**(Continued)**

Page(s)

**Regulations**

Financial Factors in Selecting Plan Investments, 85 Fed. Reg. 72846, 72848,
   72860 (Nov. 13, 2020) .......................................................................................... 22

Prudence and Loyalty in Selecting Plan Investments and Exercising Shareholder
   Rights, 87 Fed. Reg. 73822, 73831 (Dec. 1, 2022) .................................................. 22

In its January 10, 2025 Order, ECF 157, the Court held that Defendants American Airlines, Inc. ("American") and the Employee Benefits Committee ("EBC") breached their fiduciary duty of loyalty but did not act imprudently. The Court reserved ruling on the element of loss and what relief, if any, Plaintiff is entitled to and posed seven questions to the parties. *Id*. at 69–70. Defendants set out the Court's questions, in the order posed, and their responses below. As explained below, the record does not support a finding of loss and no relief is warranted.

## I.    "What losses, if any, are supported by the evidence with or without relying on Heaton's testimony?"

The evidence in this case does not support the existence of any loss—with or without the testimony of Plaintiff's sole expert, J.B. Heaton. The trial record establishes that no loss can be associated with the Plans' use of BlackRock over other managers: As the Court has already recognized, the BlackRock index funds at issue offered better performance at lower fees than the Plans could have achieved through other leading managers. ECF 157 at 52, 66; AA-APP232; AA-APP311–318; AA-APP001–005; AA-APP068, 73–74, 81. And, while Plaintiff contends that Defendants should have persuaded BlackRock to vote proxies differently, Heaton himself opined that, as a general matter, ESG-related proxy voting has had no effect on the value of shares held in the Plans' index portfolios. AA-APP163–165. Heaton identified just one exception—a May 2021 vote in the Exxon director election—and Heaton's analysis of the purported temporary effects of that vote on energy company share values was Plaintiff's sole submission with regard to a potential loss to the Plans. For two independent reasons, however, Heaton's testimony concerning the short-term effects of that board election does not establish a loss to the Plans from any breach.

### A.    Heaton's Opinion Does Not Show a Loss.

First, Heaton's testimony does not establish a loss because it does not show that the Plans or the Class are financially worse off at the time of trial than they would have been but for the

breach. ERISA holds fiduciaries liable for "any losses to the plan resulting from" a breach. 29 U.S.C. § 1109(a). Thus, the "appropriate remedy in cases of breach . . . is the restoration of the trust beneficiaries to the position they would have occupied but for the breach of trust." *Dardaganis v. Grace Cap. Inc.*, 889 F.2d 1237, 1243 (2d Cir. 1989) (quoting *Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir. 1985)).[1] Consistent with that principle, courts in ERISA cases "have generally applied the law of trusts to find that a loss occurs when there is a difference between the *current value* of the Plan as compared to what the Plan would have been worth had the breach not occurred." *Sims v. BB&T Corp.*, 2018 WL 3128996, at *5 (M.D.N.C. June 26, 2018) (emphasis added) (collecting cases); *see Donovan*, 754 F.2d at 1057 (rejecting loss methodology that would measure loss immediately after breach); *see also* Restatement (Third) of Trusts § 100 comment b(1) (noting that in cases involving sale of trust property at too low a price, "the trustee's liability would be the amount by which the sale price was inadequate, plus (or minus) a projected total return on that amount *to the time of surcharge*." (emphasis added)). Put simply, "loss" under ERISA is the difference between the value of the Plans' assets *at the time of trial* with and without the fiduciary breach.

Heaton's calculations do not address the existence of a loss under that standard. Heaton purported to observe an $8.8 million decline in the value of the Plans' energy company shares during an eight-day window surrounding the May 2021 Exxon board election that he attributed to

---

[1] *See also Peabody v. Davis*, 636 F.3d 368, 373 (7th Cir. 2011) ("[T]he measure of loss applicable under ERISA . . . requires a comparison of what the Plan actually earned . . . with what the Plan would have earned [but for the fiduciary breach]."); *Martin v. Feilen*, 965 F.2d 660, 671 (8th Cir. 1992) ("The basic remedy under trust law for such a breach of [fiduciary] duty is to restore plan participants to the position in which they would have occupied but for the breach of trust."); *Spence v. Am. Airlines, Inc.*, 2024 WL 3092453, at *17 (N.D. Tex. June 20, 2024) (quoting same); *see also* Restatement (Third) of Trusts § 100 (2012) (breaching trustee is chargeable with "the amount required to restore the values of the trust estate and trust distributions to what they would have been if the portion of the trust affected by the breach had been properly administered").

BlackRock's vote in that election. AA-APP156–158; AA-APP190.[2]  Ignoring for the moment the flaws in Heaton's methodology described below, *infra* at 7–13, this measure may have made sense had the Plans abruptly sold all their shares of energy stock at the end of Heaton's eight-day window. In that event, the Plans ostensibly would have received less for their shares by selling at a depressed price.  But the Plans have continued to hold their positions in the BlackRock index funds—and the energy company shares in those portfolios—since May 2021. AA-APP216–217; AA-APP290; AA-APP035–37. As a result, Heaton's purported loss measure only holds up if one assumes that the temporary dip in energy company share prices that Heaton purported to observe in May 2021 has persisted to the present, such that it continues to reduce the value of the Plans' holdings today.

The assumption, however, is flatly contradicted by the evidence.  This flows directly from what Heaton purported to measure.  Heaton did not purport to analyze the economic effects of the actual behavior of the dissident directors on Exxon's board, once elected.  Indeed, the period he analyzed (his "event window") ended before the election results were fully known.  *Infra* at 8. Rather, Heaton attempted to measure the effect of initial market *fears* about what ***might*** occur in the energy sector—that a newly constituted Exxon board would steer the company in an economically detrimental direction and that BlackRock would support dissident directors for other energy companies' boards.  AA-APP211.

But, as a matter of basic economics, stock prices that fall on initial fears rebound as those fears prove unfounded.  AA-APP215–218.  And the initial fears that Heaton assumed existed have

---

[2] Heaton then inflated his initial calculation to $15.76 million by assuming that the Plans realized an $8.8 million loss in May 2021, and that—but for the decline—the $8.8 million would have been invested in the BlackRock funds at issue and grown by the rate of return of those funds.  AA-APP158–160.  In other words, the only difference between Heaton's $8.8 million and $15.76 million figures is that he adds the equivalent of pre-judgment interest at a rate corresponding to the performance of the BlackRock funds at issue.  *Id.*

proven to have been misplaced.  AA-APP211–218; AA-APP291–293.  As Heaton explained, "[i]t turns out that people were wrong" about the election's effect on Exxon:  the stock has been "dynamite" ever since.  AA-APP217–218.  Uncontradicted evidence at trial confirmed that Exxon shares have outperformed both the broad S&P 500 index as well as the energy sector index during the period from immediately prior to the 2021 board election through the time of trial.  AA-APP215–218; AA-APP290–295.  And not only has BlackRock refrained from supporting dissident directors in any subsequent election, but, by Heaton's own admission, BlackRock has stepped so far back from its ESG proxy-voting agenda that its CEO is no longer willing even to say "ESG."  AA-APP183–184; AA-APP211–212; *see also* ECF 157 at 35–36 (finding that BlackRock sharply curtailed its ESG-themed proxy voting since 2021).  Heaton himself conceded that the negative price effect he calculated for energy stocks may have "drifted away" as the result of subsequent events.  AA-APP216; *see also* AA-APP215–218 ("[I]f the market concerns about value destruction from climate activism [were] reduced, then it would be possible that some of those effects [would go] away.").  Yet he did not try to measure the effects of those subsequent events.  AA-APP215–216.  The upshot is that Heaton's testimony amounted to an improper "snapshot" approach to loss valuation.  He purported to assess the immediate effect of initial market fears on the value of the Plans' energy shares at the end of his eight-day event period in May 2021 without considering the ultimate effect as those initial fears plainly dissipated and energy company share values (and the value of the Plans' assets) sharply rebounded.

Courts have rejected this type of "snapshot" method as an incompetent measure of economic loss under ERISA.[3]  A focus on mere short-term effects fails to measure whether plan

---

[3] *See, e.g.*, *Proujansky v. Blau*, 2000 WL 98382, at *10 (S.D.N.Y. Jan. 28, 2000) (rejecting argument that "loss vel non to an ERISA plan be decided in the snapshot moment immediately after the fiduciary breach complained of" and recognizing that "where subsequent events may

assets are less valuable today than they would have been but for the breach, *see Dardaganis*, 889 F.2d at 1243, and thus is inconsistent with the equitable principles animating ERISA, *Perez v. Bruister*, 54 F. Supp. 3d 629, 675 (S.D. Miss. 2014), *aff'd as modified*, 823 F.3d 250 (5th Cir. 2016) ("Windfalls are not equitable."). To be sure, where a loss is established under ERISA, measurements of damage may be "approximate." *Id.* at 676. But we are not here dealing with any sort of "approximation." Heaton's focus solely on transitory fluctuations during an eight-day period, and his neglect of later periods of recovery through which the Plans maintained steady ownership of their energy company shares, severed his analysis from the legally relevant question of Plan injury.

### B. Plaintiff Has Not Identified an Alternative Course of Action a Loyal Fiduciary Would or Could Have Taken That Would Have Avoided the Purported Loss.

Plaintiff also failed to connect the transitory loss Heaton purported to calculate to the specific breach of loyalty found by the Court. *See* 29 U.S.C. § 1109(a). Proving that **BlackRock's 2021 proxy vote** led to a decline in the prices of energy company shares is not sufficient to meet Plaintiff's burden, as Defendants did not cast that vote. The breach the Court has found is one order removed from BlackRock's action: In particular, the Court found that "a loyal fiduciary would have monitored the situation more closely and even questioned BlackRock's non-pecuniary investment activities." ECF 157 at 67. Under Fifth Circuit law, to establish a loss from this type of fiduciary breach (rooted in a failure to monitor another fiduciary), a plaintiff must make a showing "that the Defendants would have acted differently had they engaged in proper

---

determine the existence of a loss or quantify its amount, it is appropriate to consider post-breach occurrences"); *DeFazio v. Hollister, Inc.*, 854 F. Supp. 2d 770, 812 (E.D. Cal. 2012), *aff'd sub nom. DeFazio v. Hollister Emp. Share Ownership Tr.*, 612 F. App'x 439 (9th Cir. 2015) (holding that "any loss to the Plan must be assessed on a long-term basis, not isolated annual inquiries that ignore the dynamics of the Plan and various factors affecting its growth").

monitoring—and that an alternative course of action could have prevented the Plan's losses." *Kopp v. Klein*, 894 F.3d 214, 221 (5th Cir. 2018) (affirming dismissal where plaintiffs failed to allege "an alternative action that the Defendants would have taken").[4]

Plaintiff made no such showing at trial. Plaintiff's theory of loss hinges on Defendants' failure to intervene in BlackRock's decision to vote proxies in favor of the Exxon director candidates nominated by "Engine No. 1." ECF 156 at 11, 16. But the Court has not found that a loyal ERISA fiduciary would have intervened to prevent that vote, and in fact the trial record does not permit such a finding. Indeed, Heaton himself conceded that, despite having access to the same information regarding BlackRock as Defendants, no fiduciaries of which he was aware interceded with BlackRock before or during the Exxon proxy vote. ECF 157 at 51–53; AA-APP174; AA-APP180–181; *see also* AA-APP166–167; AA-APP170–172. This includes not only the fiduciaries of private ERISA plans but also those of state and local government retirement plans. AA-APP180–181. As the Court has noted, while certain public plan officials later began to threaten to withdraw assets from BlackRock, they commenced these efforts long after the Exxon vote—and did so in order to comply with newly legislated policy requirements rather than in compliance with fiduciary duties. ECF 157 at 51.

Nor is there any basis to conclude that a loyal ERISA fiduciary in Defendants' positions *could have* timely intervened in the Exxon vote in a way that would have changed the outcome of the election. Because the Plans' shares were insufficient to sway the election outcome, Defendants would have had to convince BlackRock to take the extraordinary step of switching its vote for all

---

[4] *See also*, *e.g.*, *In re SunEdison, Inc. ERISA Litig.*, 331 F. Supp. 3d 101, 113 (S.D.N.Y. 2018), *aff'd sub nom. O'Day v. Chatila*, 774 F. App'x 708 (2d Cir. 2019) ("[I]t remains plaintiffs' burden to allege facts suggesting that additional monitoring of the Plan's holdings 'would have averted the injury' and caused a 'change of course.'"); *Ramos v. Banner Health*, 461 F. Supp. 3d 1067, 1127 (D. Colo. 2020), *aff'd*, 1 F.4th 769 (10th Cir. 2021) (same).

shares it held on behalf of investors.  AA-APP304–305.  But BlackRock's vote was not disclosed until the afternoon of the day before it was cast, AA-APP165–166, and Heaton conceded that the EBC "could not have known from any public reporting how BlackRock intended to vote in [the Exxon] election" even a week before it happened.  AA-APP165.  Indeed, Heaton was not aware of any plan fiduciary anywhere who actually ascertained BlackRock's intended vote in time to intervene.  APP166–167; AA-APP170–172; AA-APP174; AA-APP180–181.  For this additional reason, Heaton's testimony does not connect even the temporary loss in energy share prices he purported to calculate to the breach of loyalty found by the Court.

Finally, for similar reasons, Defendants have met their burden of persuasion to prove that any purported loss was not caused by a breach of the duty of loyalty, as explained in more detail below (*infra* at 17–20).

## II.    "Discuss the appropriate weight that should be given to Heaton's testimony."

Heaton's testimony is not entitled to any weight because his cherry-picked "event window" failed to account for key information and his statistical methodology was fundamentally flawed.

### A.    Heaton's Event Window Does Not Accurately and Reliably Capture the Impact of BlackRock's Proxy Vote on Energy Company Share Prices.

First, the Court should not credit Heaton's testimony because he gerrymandered the "event period" over which he tracked energy company stock prices, creating flaws that made it impossible for him to draw reliable conclusions about even the transitory effect of the BlackRock vote in 2021.  Specifically, Heaton failed to define an event period that was designed to capture the impact of BlackRock's proxy vote on energy share prices, and only that impact.  Heaton's event window in 2021 began on May 18, well before BlackRock's intended vote was publicly disclosed on May 25.  AA-APP190.  Heaton failed to credibly explain why changes in Exxon's stock price between May 18 and May 25 should be attributed exclusively to the influence of BlackRock's vote—or

even to the director election generally. Indeed, he admitted that he chose that event window so that he could capture the effect of the announcement by proxy advisors Glass Lewis and ISS that they recommended voting for Engine No. 1's candidates—an obvious confounding event that was not caused by BlackRock's statement, a week later, that it would follow their lead. AA-APP192–193.[5] And he arbitrarily truncated his event window so that it ended a full six days before the final results of the Exxon board election were announced and, thus, before anyone knew whether all of the Engine No. 1-nominated directors had secured seats on the board. AA-APP190; AA-APP210; AA-APP258–260. Courts have routinely assigned little weight to event studies whose periods of study are so poorly matched to the event of interest.[6]

Worse, the event period that Heaton arbitrarily constructed failed to isolate BlackRock's vote from events having nothing to do with the election that also could have caused energy shares to decline. *See* AA-APP258; AA-APP260–261. For example, Heaton confirmed that "the vast majority" of the decline in Exxon's stock price occurred in the first two days of the event window—i.e., on May 18 and May 19. This swing in energy share prices coincided with the U.N. International Energy Agency's issuance of a jarring recommendation that countries stop issuing new fossil fuel drilling permits. AA-APP261–265; *see* AA-APP110. And on May 26, the penultimate day of Heaton's event window (the very same day as the Exxon vote), a Dutch court

---

[5] To be sure, Heaton speculated that Glass Lewis and ISS's public announcement "was a significant signal to the market that with that kind of cover, BlackRock would be much more likely to vote in favor of the Engine No. 1 dissident directors." AA-APP193. But there is a much simpler explanation: the market reacted to Glass Lewis' and ISS's support for Engine No. 1, whether or not BlackRock followed their lead. Heaton did not even consider, much less correct for, that obvious confounding effect.

[6] *See, e.g.*, *Ramirez v. Exxon Mobil Corp.*, 2023 WL 5415315, at *14 (N.D. Tex. Aug. 21, 2023) (discrediting event study because the chosen event-window "could include extraneous market noise," making it "unsuitable for measuring price impact"); *Erica P. John Fund, Inc. v. Halliburton Co.*, 309 F.R.D. 251, 269 (N.D. Tex. 2015) (concluding that event study was flawed where "the use of a two-day [event] window [was] inappropriate to measure price impact").

ordered Shell to cut its carbon emissions by 45%.  AA-APP261–262; *see* AA-APP112 (explaining that "[t]he case could set a precedent for similar lawsuits against huge oil companies that operate across the globe."), AA-APP114.  Plaintiff's own evidence establishes that this was a significant confounding event:  The news articles he introduced to establish the importance of the Exxon vote themselves discuss the significant impact of an adverse court decision in Shell's home country on energy sector prospects.  *See e.g.*, AA-APP113–146 (PX75, PX77, PX79–80, PX83–84). Heaton did not even consider the evidence on this point; at trial, he claimed a complete lack of awareness of these obvious confounding events and thus had no explanation for why he constructed an event period that included them.  AA-APP195–196.

These flaws are fatal to Heaton's opinion.  As Heaton agreed, when "confounding news" is released during an event period, there is no reliable way to disaggregate stock price movements into components and attribute those components to specific pieces of news.  AA-APP195. Professor Boone elaborated on this point, explaining that where an overbroad event window captures such "confounding" events—events that could explain all or part of any abnormal change in share value—the event study cannot provide reliable inferences.  AA-APP265–269; AA-APP289–290.  No mathematical adjustments can cure a flawed event period.  AA-APP266–268. For these reasons, Heaton's conclusions should not be given any weight.[7]

---

[7] *See Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*, 752 F.3d 82, 89, 95 (1st Cir. 2014) (explaining that an expert performing an event study "must address confounding information that entered the market on the event date" and affirming exclusion of event-study testimony because the expert "seemingly made a judgment call as to confounding information without any methodological underpinning"); *United States v. Ferguson*, 584 F. Supp. 2d 447, 453 & n.7 (D. Conn. 2008) (concluding that event study was not a "reasonable estimate of the loss" in the case because it failed to account for "confounding factors that may have affected [the] stock price during [the event window]," including news articles); *United States v. Olis*, 2006 WL 2716048, at *8–10 (S.D. Tex. Sept. 22, 2006) (concluding that "confounding announcements" made it impossible "to estimate with any degree of reasonable certainty the actual loss to shareholders caused by" the defendant's conduct).

**B.    The Short-Term Share Price Movements Heaton Purported to Observe Are Not Statistically Significant.**

Heaton's testimony should not be given any weight by the Court for the additional reason that the short-term share-price changes he observed after correcting errors in his timely-disclosed work are not statistically significant "abnormal returns" under the generally accepted standards applied by social scientists. *See In re Apache Corp. Sec. Litig.*, 2024 WL 532315, at *11 (S.D. Tex. Feb. 9, 2024) ("Plaintiffs do not seriously contest that ***a 95% confidence level is the scientific and legal standard***") (emphasis added).

In his original and rebuttal reports (and declaration in support of class certification), Heaton agreed that a 95% confidence interval—the standard generally applied by social scientists outside of court—should be applied in testing his hypothesis that the Plans experienced a temporary loss, and he reported what he claimed were statistically significant results at that confidence level. AA-APP196–198. But Heaton made an elementary error in calculating those results—he divided the daily standard deviation by the square root of the number of days in his event period, when the appropriate procedure is to multiply. AA-APP198–199; AA-APP274–275; *see also* ECF 155 at 14; ECF 120 at 22–24.[8]  Correcting that error meant that his results were no longer statistically significant at what he called the "conventional" 95% level—in other words, his statistics left him with no scientific basis to conclude that energy company share prices were affected by the Exxon board vote. So, Heaton just moved the goalposts, claiming in his late eve-of-trial report that all he

---

[8] Heaton never admitted that he made this fundamental error. But his initial methodology of dividing the standard deviation by the number of days in the event window makes no logical sense—the standard practice is to multiply the standard deviation by the square root of the number of days in the event window because the longer the period examined, the larger the expected cumulative price movement. AA-APP271–273; AA-APP278–280. And his methodology led to absurd results. AA-APP283. Heaton's failure to admit his mistake and his attempts to defend a calculation that was facially erroneous provide another reason why his revised calculations should be given no weight.

needed to do was show results that were significant at the **50%** confidence level.  ECF 74-1 ¶¶ 8–10; AA-APP150; AA-APP204–205; AA-APP286–88.

As his trial testimony showed, Heaton is wrong.  No court decisions or statistical treatises support using such a low significance threshold for statistical proof.  Heaton himself has never previously offered testimony applying that threshold.  AA-APP201; AA-APP204–05; AA-APP287–288.  Nor would it make sense to use a 50% threshold because it would detect "statistically significant" abnormal stock movements 50% of the time just by chance, "so it becomes a coin flip." AA-APP286.  Even Heaton's own publications do not suggest such a coin-flip test for statistical significance (in or outside of litigation), AA-APP205–206, and the one law review article he cited on cross-examination characterizes the idea as "radically rethink[ing] the treatment of statistical estimation evidence in federal civil litigation."  *See* AA-APP209; Jonah B. Gelbach, *Estimation Evidence*, 168 U. PENN. L. REV. 549, 560 (2020).[9]

Heaton attempted to defend his unprecedented approach by claiming that it matched the standard of proof in civil cases.  That is misguided—whether Plaintiff has met his burden of proof on liability is separate from the threshold question of whether Heaton applied a reliable social science methodology to reach inferences ***from statistics alone***.  As the Federal Judicial Center's

---

[9] *Wells v. SmithKline Beecham Corp.*, 601 F.3d 375, 380–81 (5th Cir. 2010) (finding unreliable expert testimony whose "bases [were] not generally accepted, ha[d] not been subjected to peer review and publication, and [were] not backed by studies meeting requisite scientific standards"); *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1251 (11th Cir. 2005) (excluding as unreliable expert testimony where expert "offered no evidence of any testing of his theory" and showed "no proof for support of his opinions by the scientific community"); *Black v. Food Lion, Inc.*, 171 F.3d 308, 313 (5th Cir. 1999) (same); *Castellow v. Chevron USA*, 97 F. Supp. 2d 780, 798 (S.D. Tex. 2000) (same); *Kirk v. Clark Equip. Co.*, 2020 WL 5593750, at *3 (N.D. Ill. Sept. 18, 2020) (excluding expert opinion that "cite[d] no scientific studies, treatises, or other generally accepted industry standards" in support of its conclusion); *cf. SEC v. Life Partners Holdings, Inc.*, 854 F.3d 765, 776 (5th Cir. 2017) (requiring experts to "point to some objective source—a learned treatise, the policy statement of a professional association, a published article in a reputable scientific journal or the like—to show that they have followed the scientific method.").

Reference Manual on Scientific Evidence specifically cautions, "the temptation should be resisted" to compare a statistical confidence interval to the probability of liability.  *See* 211 Fed. Jud. Ctr., *Reference Manual on Sci. Evid.* at 23 (3d ed.).  Otherwise, significant liabilities could be imposed based on fleeting associations—associations that are very likely to be observed merely by chance. *See* Kingsley Browne, *Pernicious P Values: Statistical Proof of Not Very Much*, 42 U. DAYTON L. REV. 113, 146–47 (2017) ("No one who knows the slightest amount of statistics would actually believe that one should label as 'statistically significant' a disparity that would be expected by chance about half the time, although perhaps such a person would be willing to so testify if the price is right.").

In his post-trial brief, Plaintiff tried to defend Heaton's twelfth-hour[10] shift in methodology by pointing to class certification decisions in a small number of securities fraud cases in which defense evidence showing that share price movements following corrective disclosures were not statistically significant at the conventional 95% confidence level was held insufficient to rebut the presumption of an "efficient market"—thus allowing the cases to proceed on a class basis.  *See* ECF 156 at 18 n.95, 19 n.98. [11]  But the courts in these cases found that the securities plaintiffs had offered ample other evidence that the market was trading efficiently—thus allowing the plaintiffs to invoke a presumption of reliance on the alleged fraud notwithstanding the absence of

---

[10] Heaton scrambled to disclose his new "coin-flip" approach only after the close of expert discovery.  *Compare* ECF 74-1 (disclosing Heaton's updated methodology on December 20, 2023) *with* ECF 40 (noting closure of expert discovery on November 27, 2023).

[11] These cases involve the presumption of an efficient market enunciated by the Supreme Court in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988).  In securities cases where that presumption is applicable, a plaintiff alleging that it relied on a defendant's material misrepresentation need not prove that it was actually **exposed** to that misrepresentation; the "efficient market" is deemed to have incorporated that misrepresentation, so a plaintiff need only show that it purchased the security in question at the market price.

statistically significant price movements when corrective disclosures hit the market.[12]  And ***none*** of these cases permitted a plaintiff to proceed with "coin-flip" statistical proof as a basis for imposing liability or fixing damages.

In the end, Heaton did not even try to pretend that his 50% confidence threshold aligns with standard practice in the scientific community, and Professor Boone testified flatly that it does not.  AA-APP287–288.  And the circumstances that led Heaton to pursue his "coin-flip" standard for statistical proof in this case—first, offering opinions that energy company share movements around the time of the Exxon director vote were statistically significant under accepted scientific standards of 95%, and then abruptly shifting to an unprecedented test for significance when he realized his initial calculations were erroneous—are alone sufficient to justify disregarding Heaton's loss opinions.[13]  Defendants thus submit that Heaton's conclusions would not be entitled to any evidentiary weight even if Heaton had purported to address questions relevant to the Plans' economic losses under ERISA.

---

[12] *See, e.g.*, *Monroe Cnty. Emps.' Ret. Sys. v. S. Co.*, 332 F.R.D. 370, 386 (N.D. Ga. 2019) (a mix of statistically significant and non-statistically significant results "in combination with the other [relevant] factors, provid[ed] further evidence of market efficiency").  The other cases Plaintiff cited similarly address class certification, or other pre-trial skirmishes, where the courts judged the concerns over proffered statistical proof to go merely to its "weight."  *In re High-Tech Emp. Antitrust Litig.*, 2014 WL 1351040, at *12 n.25 (N.D. Cal. Apr. 4, 2014) (addressing summary judgment and *Daubert* motions); *In re Photochromic Lens Antitrust Litig.*, 2014 WL 1338605, at *26 (M.D. Fla. Apr. 3, 2014) (addressing class certification); *United States v. Hatfield*, 795 F. Supp. 3d 219, 234 (E.D.N.Y. 2011) (addressing request for preliminary order of forfeiture).

[13] *See, e.g.*, *Kiessling v. Kiawah Island Inn Co. LLC*, 2019 WL 331176, at *8 (D.S.C. Jan. 25, 2019) (expert testimony is unreliable "when the expert changed his normal methodologies in order to obtain a particular result"); *In re: Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig.*, 2016 WL 827067, at *4 (D.S.C. Feb. 29, 2016) (expert's testimony unreliable where he "changed the methodology he employed to obtain a [statistically significant] result").

III.    **"Identify what, if any, direct evidence links ESG investing to financial underperformance of the Plans in a way that harmed the Class."**

No direct evidence links ESG investing or ESG-focused proxy voting to financial underperformance of the Plans' investments that harmed the Class.  Plaintiff initially accused Defendants of violating ERISA for making "ESG funds" available through the Plans' brokerage window but abandoned the theory before trial, ECF 157 at 2 n.2, and accordingly offered no evidence of loss on this theory.  Rather, as noted, Plaintiff's only evidence of purported financial harm to the Plans consists of Heaton's event study of energy company share price movements around the time of the 2021 Exxon director vote, and that is insufficient to establish a loss to the Plans for the reasons set forth above. *See supra* at 1–13.

IV.    **"Given that Exxon's stock quickly rebounded after the 2021 proxy vote, discuss what losses, if any, occurred, and how this rebound in price impacts the loss analysis for the Class."**

For the reasons discussed in response to the Court's first question, Heaton's calculations of short-term, transitory movements in energy company shares in 2021 do not speak to the question of whether the Plans experienced losses from the identified breach of loyalty, as they do not establish that the current value of the Plans' energy company shares (or of the Plans' BlackRock fund investments) is lower than it would have been but for the adjudicated breach.  *See supra* at 1–7.  Only by analyzing the value of the Plans' assets, at the time of trial, with and without the breach, can the question of whether the Plans experienced economic losses properly be probed.  While Heaton neglected to analyze this question altogether, the record is uncontradicted that energy company shares have performed exceedingly well over the period inclusive of the 2021 Exxon director vote to the time of trial.  Exxon shares have outperformed not only the broad stock market (as measured by the S&P 500) but also the energy sector index.  AA-APP290–295.  These facts, and the corresponding evidence that the market fears that Heaton contends initially depressed

energy sector share prices have dissipated, *supra* at 3–5, negate a conclusion of loss on Plaintiff's theory.

**V.    "Discuss whether *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), should apply in the ERISA context even though it is a securities case and whether the relevant statutory schemes permit such a comparison."**

As a threshold matter, this Court need not address *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), to find that Plaintiff failed to establish a loss to the Plans.  That conclusion inextricably follows from the principle under ERISA and trust law that a loss exists only if there is a difference between the ***current value*** of the Plans' assets and the value the Plans would have had but for a breach.  *Sims*, 2018 WL 3128996, at *5; *supra* at 2–3.  Nevertheless, as the Fifth Circuit has expressly recognized, the logic of *Dura* applies in the context of ERISA fiduciary breach claims.  *Martone v. Robb*, 902 F.3d 519, 524 n.11 (5th Cir. 2018) ("While *Dura* involved securities fraud rather than ERISA fiduciary duties, its logic still applies[.]"); *see also, e.g., Brown v. Medtronic, Inc.*, 628 F.3d 451, 456 (8th Cir. 2010) (applying *Dura* in ERISA context because a "rule founded on basic concepts of loss and injury and characterized as 'pure logic' should find broad application in ERISA").  And it helps here to illustrate why Heaton's approach was both legally and logically infirm.

In *Dura*, the Supreme Court reversed a Ninth Circuit decision holding that the plaintiffs in a securities action had adequately alleged a loss by pleading that they had purchased a pharmaceutical company's stock at a time when the stock's price was artificially inflated.  544 U.S. at 340.  The Supreme Court explained that, even if an investor purchases stock at an inflated price, whether the investor suffered a loss would depend on the circumstances under which the investor later sold the shares and what happened between the purchase and the sale: "[I]f, say, the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss."  *Id.* at 342.  *Dura* thus teaches that a fluctuation in a stock's price

15

does not itself prove a loss to the investor. Rather, the existence of a loss depends on the conditions on which the investors traded in the stock, and those conditions are controlled by a "tangle of factors affecting" the price of an asset that vary over time. *Id.* at 343.

That logic readily applies here. Heaton claimed that BlackRock's support for the dissident directors depressed the price of energy stocks during an eight-day period in 2021. For reasons previously explained, Heaton's analysis was deeply flawed. Nevertheless, accepting his flawed analysis as competent, persuasive proof that energy company share prices were temporarily impaired by the Exxon board vote in May 2021, the Plans could conceivably have realized an economic injury only by being net sellers of energy company stocks during that window—only then could the Plans be said to have sold shares at depressed prices. On the other hand, if the Plans were net acquirers of shares during those eight days, they would have actually gained from the temporary decline in stock values in that they would have obtained the shares at a discount and experienced only the benefits of the subsequent rebound. *Cf. In re Bos. Sci. Corp. ERISA Litig.*, 254 F.R.D. 24, 31 (D. Mass. 2008) (holding that ERISA plaintiffs who were net sellers during period when stock was artificially inflated suffered no loss or injury because any losses they incurred as a result of acquiring shares at inflated price was more than offset by the high return they enjoyed by selling shares at inflated price). Similarly, investors who held onto their shares through the asserted eight-day decline and subsequent rebound could not be said to have been harmed nor helped by price movements during the eight-day window that Heaton measured, as those prices would not have determined the price at which they acquired or sold their shares.

This does not mean that a plan or other investor must sell its shares to establish a loss. *Martone*, 902 F.3d at 524. But under trust law principles incorporated into ERISA, Plaintiff must prove that the temporary eight-day stock price decline that Heaton purports to have calculated

diminished the Plans' current value.  Plaintiff could do so by showing that the Plans sold more shares than they acquired at allegedly depressed prices during that short period or by demonstrating that, despite the rebound, the price decline Heaton purported to observe in 2021 continued to affect the value of the shares to which the Plans have held onto—i.e., the price at which the Plans could sell the shares—through the time of trial.  But Plaintiff has offered no evidence of the former,[14] and Heaton admitted he did not determine the latter.  AA-APP215–16.

## VI.     "Discuss the loss-causation burden shifting framework in light of *McDonald v. Provident Indem. Life Ins. Co.*, 60 F.3d 234 (5th Cir. 1995)."

The Fifth Circuit's adoption of a burden-shifting framework in *McDonald v. Provident Indemnity Life Insurance Co.*, 60 F.3d 234 (5th Cir. 1995), does not alter the analysis of the loss issues above.[15]   The Fifth Circuit held in *McDonald* that "[t]o establish a claimed breach of fiduciary duty, an ERISA plaintiff must prove a breach of a fiduciary duty and a *prima facie* case of loss to the plan." *Id.* at 237.  It is only upon such a showing that "the burden of persuasion shifts to the fiduciary to prove that the loss was not caused by . . . the breach of duty." *Id.*  (quotations omitted).  In a more recent case, the Fifth Circuit explained that to carry this burden, a plaintiff must show a loss and that "that an alternative course of action could have prevented the Plan's losses." *Kopp,* 894 F.3d at 221.  If a decrease in asset value was unavoidable, there is no loss.

---

[14] In fact, uncontradicted evidence establishes that the Plans increased their holdings of the BlackRock index funds at issue (and thus increased their holdings in the energy stocks represented in those indices) between March 31, 2021 and June 30, 2021, the quarter that included the Exxon board vote and Heaton's event window. *Compare, e.g.*, AA-APP102, *with* AA-APP106; *id.* AA-APP107.  If anything, this indicates that the Plans' economically benefited from the transitory decline in energy share prices that Heaton purported to observe.

[15] Courts of appeals are divided on the propriety of this burden-shifting framework. *See Pizarro v. Home Depot, Inc.*, 111 F.4th 1165, 1174 n.2 (11th Cir. 2024) (summarizing circuit split). Defendants submit that there is no basis for burden-shifting in ERISA's text or structure and preserve the issue for appeal.

As discussed above, Plaintiff has not met his burden to show a prima facie case of loss to the Plans. Heaton's testimony—Plaintiff's only basis for claiming loss—should be afforded no weight, *see supra* at 7–13; and his calculations do not demonstrate that the Plans or Class suffered any loss, *see supra* at 2–5. In addition, Plaintiff has not met his prima facie burden of showing that a loyal fiduciary could have taken any alternative course of action that would have ultimately proved effective in avoiding the short-term share price movements that Heaton purported to observe. *Supra* at 5–7.

Even were the Court to conclude that Plaintiff established a prima facie case of loss, Defendants have demonstrated that this loss was not caused by the breach. This is because Plan fiduciaries focused exclusively on participants' financial interests would have followed the exact same course. First, the Plans' fiduciaries would not have terminated the BlackRock index funds. Terminating the funds under these circumstances would not have been in participants' best interests. As the Court has already recognized, *see* ECF 157 at 52, the BlackRock index funds offered better performance at lower fees than the Plans could have achieved through any other leading managers. *See* ECF 157 at 52, 66; AA-APP232; AA-APP311–318; AA-APP001–005; AA-APP068, 73–74, 81; Vol. 3 Trial Tr. 221:5–222:5 (those funds had "the lowest expense ratio … our plan participants could receive").

Second, the Plans' fiduciaries would not have attempted to intercede with BlackRock to change its overall vote in the Exxon election. Even if the fiduciaries had managed to learn of BlackRock's intended vote at the same time it was reported, they would have had but a single day to analyze it independently and consult other sources. Based on such an independent analysis, they almost certainly would have agreed with market experts specializing in proxy

voting analysis, such as the major proxy voting advisers Glass-Lewis and ISS, who supported Engine No. 1's directors and offered economic reasons for doing so.[16]

Likewise, the Plan fiduciaries would not have interceded with BlackRock because they could not have known the immediate effect BlackRock's vote would have on energy company share prices. Under Plaintiff's defective short-term loss theory, before interceding with BlackRock, the fiduciaries would have had to predict the short-term price impact of the proxy election on Exxon and other energy stocks. It would not have been enough for the fiduciaries to analyze the longer term economic implications of the proxy vote; they also would have to predict short term price impacts to be sure that even if the vote promised long-term economic success, it would not cause a temporary reduction in share price. Indeed, had they interceded in BlackRock's fiduciary decision without any such analysis, they could be sued for failing to act based on all the relevant financial factors—or for prioritizing long-term growth over short-term price impacts. It goes without saying that short-term stock price fluctuations are notoriously hard to predict. Accurate prediction of short-term movements in stock price depends on an understanding of market expectations. In other words, if the vote is as the market was already expecting, the stock price may not move at all. The evidence shows that no fiduciary—the Plans' fiduciaries included—could have predicted the short-term effect of BlackRock's vote on share prices. Even Heaton, with all the benefit of hindsight, could not show a statistically significant correlation between energy stock prices and the Exxon director vote. AA-APP203–04; AA-

---

[16] Indeed, the Plans' investment advisor, Aon, did not raise a concern with Defendants regarding the Exxon board election. As the Court has recognized, plan committees typically look to such advisors to conduct holistic evaluations of investment managers, including, as the advisor deems necessary, a review of managers' proxy voting practices. ECF 157 at 47.

APP275. Defendants would not have attempted to make such a prediction in a single day—or acted rashly in the absence of such an informed prediction.

Finally, the record does not permit the conclusion that BlackRock would have acceded to any intercession by Defendants.  Plaintiff speculates that BlackRock's later retreat from its support of ESG shareholder resolutions under pressure from state regulators indicates that it would have made an about-face earlier.  But in that later time frame, there was declining support for ESG resolutions across the entire universe of investment managers—whether because of political considerations, or because the managers had concluded that shareholder resolutions were more prescriptive after the SEC's relaxation of shareholder proposal rules in late 2021.  *See* AA-APP054; AA-APP244; AA-APP246–247; AA-APP251–055.  In the spring of 2021, by contrast, manager support for ESG resolutions was at its apex, AA-APP153, AA-APP172–173, and a BlackRock vote against the dissident directors would have placed the firm at odds not only with other large investment managers like Vanguard and State Street, but also—as noted—the major proxy voting advisers Glass-Lewis and ISS.  AA-APP177.  Plaintiff's supposition that BlackRock would have bucked this trend at the behest of a single plan client, when it had larger plan clients that were vocally supportive of the dissident directors, AA-APP254, is highly implausible.

VII.    **"If the Court concludes that no actual losses occurred, discuss whether an injunction is still necessary and the appropriate scope for any such injunction."**

The trial record confirms that an injunction is neither necessary nor appropriate in this case. Here, although the Court found that the Defendants breached their duty of loyalty, the Plans' participants suffered no losses.  As explained below, the breach found by the Court—that "Defendants did not sufficiently monitor, evaluate, and address the potential impact of

BlackRock's non-pecuniary ESG investing," ECF 157 at 55—has already been remedied. Thus, Plaintiff cannot show any further threat of injury and injunctive relief is not warranted.

In his Amended Complaint, Plaintiff framed his requested injunctive relief as an order that Defendants refrain "from any further violations of their ERISA fiduciary responsibilities," ECF 41 at 53. By the time Plaintiff filed his post-trial brief, that request had changed to a request for an injunction preventing Defendants "from permitting proxy voting unless it is solely in the demonstrated financial interest of the Plan participants." ECF 156 at 20. Neither request seeks a valid remedy.

The former, if granted, would do no more than vaguely require Defendants to comply with ERISA and is thus the type of "obey the law" injunction that the Fifth Circuit and Supreme Court have held to be impermissibly non-specific.[17]

The second proposed injunction is likewise unwarranted for several reasons. First, Plaintiff has not established standing to seek injunctive remedy. To seek injunctive relief, Plaintiff must show "that he is under threat of suffering 'injury in fact' that is concrete and particularized;" that the threat is "actual and imminent, not conjectural or hypothetical;" that the threat is "fairly traceable to the challenged action;" and that the remedy sought will "redress the injury." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009); *see also Thole v. U.S. Bank*, 590 U.S. 538, 547 (2020) (affirming dismissal of injunctive relief claims under Article III). Merely showing "past exposure to illegal conduct" is not enough; rather, he must prove a "real or immediate threat that [he] will be wronged again." *City of L.A. v. Lyons*, 461 U.S. 95, 103, 111 (1983) (alterations

---

[17] *Meyer v. Brown & Root Constr. Co.*, 661 F.2d 369, 373 (5th Cir. 1981) (an injunction that merely "orders a defendant to obey the law is not permitted."); *Payne v. Travenol Lab'ys, Inc.*, 565 F.2d 895, 897–98 (5th Cir. 1978) (injunction barring defendants from "discriminating on the basis of color, race, or sex in employment practices" is impermissible.).

omitted); *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (imminent injury is one that is "*certainly impending*"). Plaintiff has shown no such immediate threat. The Court found that, under political pressure from state officials, BlackRock has retreated from casting proxy votes in support of ESG-themed shareholder resolutions, ECF 157 at 35–36, and the record contains no indication that any other Plan manager is threatening to cast proxy votes for purposes other than furthering investors' financial interests in any Plan portfolios. In addition, the record confirms that Defendants have augmented the Plans' manager-review practices to elicit annual reports from the Plans' outside investment consultant discretely on managers' proxy-voting activities, including on votes cast against management. *See* AA-APP221–222; AA-APP224–225; AA-APP227–229.

The injunction sought in Plaintiff's post-trial brief is also impermissibly vague. An injunction must "'be specific in terms' and 'describe in reasonable detail . . . the act or acts sought to be restrained.'" *Payne v. Travenol Labs., Inc.*, 565 F.2d 895, 897 (5th Cir. 1978) (quoting Fed. R. Civ. P. 65(d)).[18] Plaintiff's proposed injunction is neither specific nor detailed. Determining whether a given proxy vote is "solely in the demonstrated financial interest of the Plan participants" requires the exercise of judgment. ECF 156 at 20. As the Court found (and as DOL officials in two successive administrations recognized in separate rulemakings[19]), an environmental or social factor may bear on prospects for gains or losses in a particular security,

---

[18] *Int'l Longshoremen's Ass'n, Loc. 1291 v. Phila. Marine Trade Ass'n*, 389 U.S. 64, 76 (1967) (entering an injunction that is insufficiently specific is "both [a] serious and [a] decisive" error); *see also, e.g.*, *Louisiana v. Biden*, 45 F. 4th 841, 846 (5th Cir. 2022) ("To comply with Rule 65(d) a district court's order should state its terms specifically and describe in reasonable detail the conduct restrained or required."); *Brandner v. Abbott Lab'ys, Inc.*, 2012 WL 27696, at *4 (E.D. La. Jan. 5, 2012) (refusing to grant injunction that "fail[ed] to inform Abbott what actions are required and what specific actions are prohibited" (quotations omitted)).

[19] Prudence and Loyalty in Selecting Plan Investments and Exercising Shareholder Rights, 87 Fed. Reg. 73822, 73831 (Dec. 1, 2022); Financial Factors in Selecting Plan Investments, 85 Fed. Reg. 72846, 72848, 72860 (Nov. 13, 2020).

and an investment manager may properly consider that factor in pursuit of financial performance. *See* ECF 157 at 25–27.  At the same time, the Court also found that, where an investment manager articulates a financial motivation when casting a proxy vote on an ESG issue, it may be difficult for observers to determine whether the financial motivation was genuinely held and truly operative.  *See id.* at 37.  Plaintiff's proposed command that Defendants permit proxies to be cast only when "solely in the demonstrated financial interest of Plan participants" thus leaves unclear what Defendants must do in order to comply and avoid contempt.  *See, e.g.*, *Smith v. France*, 850 F. App'x 243, 248 (5th Cir. 2021) (partially vacating injunction because it "does not make clear . . . how [one party] can comply with" it).  This is especially problematic given that the Court has observed even where the details of an investment manager's intended proxy vote and rationale are available to shareholders ahead of the vote, the manager may not be fully forthright or clear about how the vote furthers investors' financial interests—including how ESG considerations impact that financial analysis.  *See* ECF 157 at 36 ("Often times, BlackRock couched its ESG investing in language that superficially pledged allegiance to an economic interest.").

The proposed injunction also raises questions as to how Defendants would need to act if, regardless of a manager's apparent motives, there appears to be a sound non-ESG related rationale for a particular vote.  The 2021 Exxon board vote itself exemplifies this concern.  In supporting some of the same directors as BlackRock, Vanguard—whom Plaintiff at one point lauded as properly placing investors' financial interests ahead of ESG goals, ECF 41 ¶ 48—expressed concerns about the financial effects of Exxon's perceived failure to prepare adequately for a potential "energy transition."  AA-APP057.  And Vanguard articulated significant conventional concerns about Exxon's financial performance wholly unrelated to ESG, including that Exxon had been "significantly underperforming peers and the market over all relevant short- and longer-term

periods." *Id.* The 2021 Exxon vote thus exemplifies a proxy contest in which there are persuasive reasons why an affirmative vote would be in investors' financial interests, and yet a manager's motives for voting affirmatively may be mixed. After all, the Plans' co-fiduciary investment consultant, Aon, evaluated the BlackRock vote in the context of its overall proxy-voting record and found no basis to raise concerns with any of its ERISA plan clients. AA-APP235–238. Plaintiff's generic proposed injunction does not clarify "what actions are required and 'what specific actions are prohibited'" in such an instance. *Brandner*, 2012 WL 27696, at *4.

Plaintiff's requested injunction is likewise unlawfully murky as to what measures Defendants would need to take to withhold permission for proxy voting if a manager is unwilling to accept Defendants' direction as to how to vote. While the record reflects that BlackRock has introduced protocols allowing institutional investors to assume control over the voting of their own beneficially-owned shares, ECF 157 at 36, there is no evidence in the trial record that such protocols exist across all managers. Defendants could always, with sufficient notice, withdraw the Plans from funds managed by a given institution. But the record demonstrates that such a move could as easily hurt the Plans' participants as help them. For instance, Heaton conceded that withdrawing the Plans' assets from the BlackRock index funds prior to the 2021 Exxon board election would not have spared the Plans from the alleged effects of BlackRock's vote, and the evidence is undisputed that moving to a different manager would have subjected the Plans to poorer performance at higher fees. *See, e.g.*, AA-APP232; AA-APP311–318; AA-APP001–005; AA-APP068, 73–74, 81. All of this is to say that should the Court enter Plaintiff's requested injunction, both parties will likely have to return to the Court to seek further guidance—repeatedly. Courts have rejected similarly nebulous requests for injunctive relief in the ERISA context. *See, e.g., DeFazio*, 854 F. Supp. 2d at 808 (rejecting request for injunctive relief where it would likely

"requir[e] the parties to return to court in the same position they are in today, only several years later" and observing that "it is neither [the court's] role nor its desire to 'step in, roll up [its] sleeves and decide how to run this company or this ERISA plan'").

Finally, far from redressing any alleged economic injuries, the injunction Plaintiff proposed in his post-trial brief could exacerbate them by imposing long-term Plan administration costs that outstrip any forward-looking benefits. The vote-by-vote monitoring potentially necessary to determine whether proxy votes are "solely in the demonstrated financial interest of the Plan participants," ECF 156 at 20, would require additional dedicated personnel chargeable to the Plan or the use of a professional proxy advisor with expected fees in the range of $1 million a year. *See* AA-APP301. Such an expense year after year would likely outweigh any speculative advantage obtained by micromanaging proxy voting given Heaton's concession that it rarely affects stock values, AA-APP163–164, and given his failure to demonstrate a Plan loss resulting from the one proxy vote he deemed financially consequential, *supra* at 1–13.

At the same time, any ESG-themed proxy votes that caused concrete injuries to investors would subject the manager to a breach of fiduciary duty action itself under ERISA—at the behest of ***any*** participant in ***any*** investing plan. *See* 29 U.S.C. § 1132(a)(2); *see also* AA-APP008; AA-APP012; AA-APP016 (contracts subjecting Plans' managers to fiduciary status and requiring proxy votes in conformity with ERISA fiduciary duties).[20] There is no need for Plaintiff's requested injunction given the managers' own fiduciary obligations and potential legal exposures.

---

[20] Given the obvious flaws in the forms of injunction that Plaintiff has articulated thus far, Plaintiff may use his supplemental brief to identify some new proposed equitable measures for the Court's consideration. Defendants ask, in fairness, that they be afforded the opportunity to address any such suggestions. *See, e.g.*, *Hearring v. Sliwowski*, 806 F.3d 864, 867 (6th Cir. 2015) (declining to impose relief that was not specifically requested because "[c]ourts must give both sides . . . an opportunity to join a debate about any appropriate relief").

Respectfully submitted,

Dated:  February 14, 2025

Mark W. Robertson (*pro hac vice*)
(N.Y. Bar # 4508248)
William D. Pollak (*pro hac vice*)
(N.Y. Bar # 4737037)
O'MELVENY & MYERS LLP
7 Times Square
New York, NY 10036
Tel.:  (212) 326–2000
Fax:  (212) 326–2061
mrobertson@omm.com
wpollak@omm.com

Brian D. Boyle (*pro hac vice*)
(D.C. Bar # 419773)
Shannon M. Barrett (*pro hac vice*)
(D.C. Bar # 476866)
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
Tel.:  (202) 383–5300
Fax:  (202) 383–5414
bboyle@omm.com
sbarrett@omm.com

*/s/ Russell Cawyer*

Dee J. Kelly, Jr. (S.B. # 11217250)
Russell D. Cawyer (S.B. # 00793482)
KELLY HART & HALLMAN LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Tel.:  (817) 332–2500
Fax:  (817) 335–2820
dee.kelly@kellyhart.com
russell.cawyer@kellyhart.com

*Attorneys for Defendants American Airlines, Inc. and the Employee Benefits Committee*

## CERTIFICATE OF SERVICE

On February 14, 2025, a true and correct copy of the foregoing document was served upon all persons who have requested notice and service of pleadings in this case via the Court's CM/ECF system.

*/s/ Russell Cawyer*
Russell Cawyer
